# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 335-7 LLC, FGP 309 LLC, 226 LLC, 431 HOLDING LLC, and 699 VENTURE CORP., <br><br>                   Plaintiffs, <br>     v. <br><br> CITY OF NEW YORK, NEW YORK CITY RENT GUIDELINES BOARD, and RUTHANNE VISNAUSKAS (in her official capacity as commissioner of the New York State Division of Homes and Community Renewal), <br><br>                   Defendants. | No. 1:20-cv-01053 <br><br> **COMPLAINT** |

Plaintiffs 335-7 LLC, FGP 309 LLC, 431 Holding LLC, 226 LLC, and 699 Venture Corp., by their undersigned attorneys, for their Complaint allege as follows:

## NATURE OF THE ACTION

1.     This action challenges the constitutionality of New York State and New York City's Rent Stabilization Laws, which apply to nearly one million apartment units in New York City. These laws, in themselves and as implemented by the New York City Rent Guidelines Board, violate the prohibition on uncompensated takings in the United States Constitution. Further, the Rent Stabilization Laws as amended by the 2019 Housing Security and Tenant Protection Act, Senate Bill 6458 ("Tenant Protection Act" or "2019 amendments"), deprive Plaintiffs of their right to procedural due process of law in the processing of rent overcharge complaints. The Rent Stabilization Laws effect both physical takings and regulatory takings of property, and neither New York State nor New York City have compensated the owners of the property that has been taken—which violates the Takings Clause of the Constitution. They also engage in confiscatory takings because they do not allow owners to receive a reasonable rate of return. What is more,

these takings are takings that are not for public use. Plaintiffs, landlords whose properties are subject to New York's rent stabilization regime, are entitled to damages and declaratory and injunctive relief to compensate them for these unconstitutional takings and bar such takings going forward, and to recover their attorney's fees incurred herein.

2.     There are various laws that govern rent stabilization in New York City; these laws are codified in several places, including N.Y. UNCONSOL. LAW TIT. 23 § 8621 (McKinney) and NEW YORK CITY ADMIN. CODE § 26-501 *et seq*. And the State of New York has promulgated regulations that further govern rent stabilization; those regulations are located at N.Y. COMP. CODES R. & REGS. TIT. 9 § 2520 *et seq.* These laws and regulations, together with all related laws, codes, and regulations, and the established and published implementing policies of the Rent Guidelines Board and the New York State Division of Housing and Community Renewal (the "Division") will be referred to as the "Rent Stabilization Laws."

3.     New York City initially adopted rent stabilization in 1969 as a supposed temporary emergency measure to combat a post-World War II housing crisis, and thereafter periodically extended the law over the ensuing fifty years by further declarations of temporary emergencies. In 2019 the State materially amended the Rent Stabilization Laws to create the most onerous rent regulatory regime the State has ever seen, while at the same time abandoning the justification of a supposed "temporary" emergency to enshrine rent stabilization as a permanent fixture of New York law. Moreover, the Tenant Protection Act, by design, effectively closed off every viable opportunity for owners of rent-stabilized property to exit the residential rental market; ensured that rent-stabilized units will not be profitable in the long-run; and instantly reduced the value of rent-stabilized properties by epic proportions of at least between twenty and forty percent and likely more. One (though hardly the only) of the causes of the diminution in value of rent-stabilized

buildings—and one of the reasons the diminution is so difficult to quantify—is the manner in which the 2019 amendments changed the rules governing the litigation of rent overcharge complaints, which now require owners to justify decades old rent increases with records that both the New York State Legislature and New York courts assured owners they could safely discard. Under these new rules, tenants are assured of prevailing even on overcharge complaints that are factually meritless merely because owners lack ancient documentation, visiting not only potentially massive monetary liability, but also major permanent rent reductions on innocent owners.

4.      This action challenges the Rent Stabilization Laws as a whole, with a particular focus on the egregious, draconian 2019 amendments that are now included in those Laws. Even if the rent stabilization regime that predated those amendments were consistent with the requirements of the Fifth Amendment (a point Plaintiffs do not concede), the 2019 amendments are unconstitutional, and render the entire regulatory scheme in its current form unconstitutional as well.

5.      Defendants, by adopting and implementing the Rent Stabilization Laws, have engaged in a physical taking in violation of the Fifth and Fourteenth Amendments. Through the Rent Stabilization Laws—particularly the 2019 amendments—Defendants have effectively compelled owners of rent-stabilized units to continue to rent out their property at a below-market rate in perpetuity, and effectively required owners to continue to renew tenancies regardless of whether they wish to do so. The laws have similarly destroyed Plaintiffs' rights to possess (and exclude), use, and dispose of their property. And the Laws have deprived owners of their reversionary right to possess and use their property after the terms of rental leases expire—which also is a physical taking.

6.	Defendants, by adopting and implementing the Rent Stabilization Laws, have also engaged in a regulatory taking in violation of the Fifth and Fourteenth Amendments. The 2019 amendments had an enormous negative economic impact on Plaintiffs, whose buildings containing rent-stabilized units have instantly suffered a permanent evaporation of their current asset value and an elimination of their capacity for asset value appreciation. The evaporation of current value and elimination of potential for appreciation arise directly from the fact that the Rent Stabilization Laws as currently existing and implemented guarantee, in the wake of the Tenant Protection Act, that at least some owners' net operating income will be eliminated over time, and that the net operating income of all rent-stabilized apartments will decrease over time. This is wholly inconsistent with Plaintiffs' reasonable investment-backed expectations, and the entire rent stabilization regime—which is tailored to benefit a subset of tenants while injuring a subset of landlords—is confiscatory in nature. Moreover, the dire exactions that the Tenant Protection Act imposes on owners have no nexus with the stated goals of the Rent Stabilization Laws. All this amounts to a regulatory taking.

7.	The Fifth Amendment only permits the government to take property "for public use." Defendants, by adopting and implementing the Rent Stabilization Laws, have taken Plaintiffs' property for impermissible non-public uses. This is so for three independent reasons: (1) because the amended Rent Stabilization Laws benefit a particular arbitrary class of individuals without regard to need—tenants of rent-stabilized apartments—which means that they do not engage in a taking for a public use; (2) because the amended Rent Stabilization Laws are not rationally related to a public purpose, and thus commit takings for a non-public use; and (3) because *Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005), and its predecessor cases that have broadly expanded the definition of "public use" were incorrectly decided and should be

overruled by the Supreme Court. Because the Rent Stabilization Laws effect takings that are not for public use, they are inherently invalid and must be enjoined.

8. Finally, the rent overcharge provisions of the Rent Stabilization Laws also violate Plaintiffs' procedural due process rights. By requiring owners to produce records to validate ancient rent increases taken decades ago, which prior statutory, regulatory, and case law specifically authorized owners to discard, Defendants have deprived owners of substantial property interests through procedures that do not merely risk erroneous outcomes, but guarantee them. Nor do Defendants have any genuine interest in utilizing these procedures, which in addition to their other infirmities generate substantial costly and burdensome litigation and could readily be replaced without any burden on the State.

**PARTIES**

9. Plaintiff 335-7 LLC ("335-7") is a New York corporation. 335-7 is the owner and landlord of the buildings known as and located at 335 and 337 West 14th Street, New York, New York. 335 and 337 West 14th Street collectively contain fifty-six rental apartments, twenty-two of which are rent-stabilized and two of which are rent-controlled.

10. Plaintiff FGP 309 LLC ("FGP") is a New York limited liability company. Until on or about October 23, 2019, FGP was owner and landlord of the building known as and located at 309 East 110th Street, New York, New York. 309 East 110th Street contains fifteen apartments, all of which are rent-stabilized.

11. Plaintiff 431 Holding LLC ("431") is a New York corporation. 431 is the owner and landlord of the building known as and located at 172 Prince Street, New York, New York. 172 Prince Street contains twenty-five rental apartments, seven of which are rent-stabilized.

12.     Plaintiff 226 LLC ("226") is a New York corporation. 226 is the owner and landlord of the building known as and located at 226 West 16th Street, New York, New York. 226 West 16th Street contains sixteen rental apartments, six of which are rent-stabilized.

13.     Plaintiff 699 Venture Corp. ("699 Venture") is a New York corporation. 699 Venture is the owner and landlord of the building known as and located at 699 East 137th Street, Bronx, New York. 699 East 137th Street contains twenty-three rental apartments, all of which are rent-stabilized.

14.     Defendant City of New York is a municipal government composed of five counties or boroughs. The State of New York has given the City of New York the ability to determine whether a housing emergency exists and to both adopt and implement rent stabilization.

15.     Defendant New York City Rent Guidelines Board (the "Rent Guidelines Board") is a government agency established by the City of New York. The Rent Guidelines Board consists of nine members, all appointed by the Mayor of New York City. The Rent Guidelines Board has the authority to hold hearings and consider testimony pertinent to rent stabilization, and to establish annual rent adjustments for rent-stabilized units.

16.     Defendant Ruthanne Visnauskas is the Commissioner of the New York State Division of Housing and Community Renewal (the "Division"). The Division is responsible for administering the Rent Stabilization Laws throughout the State, including in New York City; for promulgating rules, regulations, policies and procedures pursuant to the Rent Stabilization Laws; and for processing, investigating, and rendering decisions on rent overcharge complaints filed with it by tenants.

## JURISDICTION

17.    This Court has personal jurisdiction over each Defendant in New York and in this judicial district because each Defendant regularly transacts business in this judicial district.

18.    This Complaint alleges that Defendants have violated Plaintiffs' rights as protected by the United States Constitution under the Fifth and Fourteenth Amendments. This Court thus has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiffs seek damages under 42 U.S.C. § 1983; declaratory and injunctive relief under 28 U.S.C. § 2201(a) and 42 U.S.C. § 1983; and attorneys' fees under 42 U.S.C. § 1988(b).

## VENUE

19.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims alleged in this Complaint have occurred, and will continue to occur, in this district; because the property that is the subject of this action is situated in this district; and because Defendants reside in this district.

## STANDING

20.    Plaintiffs own or owned buildings subject to the Rent Stabilization Laws. 335-7's buildings contain twenty-two rent-stabilized apartments; 431's building contains seven rent-stabilized apartments; 226's building contains six rent-stabilized apartments; and 699 Venture's building contains twenty-three rental apartments, all of which are rent-stabilized. And the building previously owned by FGP contains fifteen apartments, all of which are rent-stabilized.

21.    Plaintiffs have been injured by the Rent Stabilization Laws in numerous ways.

22.    At the time of the enactment of the 2019 amendments, FGP had an accepted offer to purchase 309 East 110th Street for a price of $2,725,000. The parties were in the process of negotiating the terms of a formal written purchase and sale agreement. Following the immediate

evaporation of value caused by the 2019 amendments, FGP's buyer withdrew its offer and the parties renegotiated the purchase price down to $1,800,000. Thus, due to the Tenant Protection Act, FGP has suffered actual damages of $925,000. Other than simply holding the building, which FGP did not desire to do, FGP had no choice but to accept the reduced offer: No other buyers were forthcoming, and the buyer made clear that, in the wake of the 2019 amendments, it had no interest in the building except at a drastically reduced price.

23.     335-7, again relying on the law as it predated the 2019 amendments, invested $800,000 on a major capital improvement at its 14th Street properties. The Tenant Protection Act has eliminated 335-7's opportunity to make a positive return on this investment, injuring 335-7.

24.     699 Venture is currently defending ten rent overcharge claims (that is, claims in judicial or administrative proceedings alleging that owners charged rent greater than the maximum permitted under the Rent Stabilization Laws), every one of which challenges ancient rent increases. These claims were raised as counterclaims in summary nonpayment proceedings that 699 Venture commenced prior to the passage of the 2019 amendments. The earliest challenged rent increases in the various apartments range in date from 1997 to 2009; all but two of the cases challenge increases taken between 1997 and 2001. 699 Venture is deprived of the ability to meaningfully defend the claims because (1) 699 Venture disposed of various ancient records related to lawful rent-stabilized rent increases, as permitted and even encouraged by the law that predated the 2019 amendments, and (2) 699 Venture is no longer able to present testimony that could establish the work it performed and the costs it incurred and paid as they relate to each specific apartment in which it faces a rent overcharge claim. The Tenant Protection Act thus makes 699 Venture potentially liable for rent overcharges in apartments in which, in fact, all rent increases taken were justified and lawful at the time they were taken. Because 699 Venture will be forced to litigate

claims that should have been long dead and faces new and massive liability, the Tenant Protection Act has injured 699 Venture.

25.     699 Venture, 431, 226, and 335-7 have also been injured by the Tenant Protection Act in multiple additional ways. The evaporation of value in their holdings has been caused by, inter alia, their inability to increase rents on rent-stabilized apartments by an amount sufficient to cover increases in operating costs; by the permanent open-ended exposure to rent overcharge complaints, with no statute of limitations and no limitation on the scope of examination of a unit's rental history; by the transformation of rent stabilization from a temporary emergency measure into a permanent regulatory scheme; and by the removal of all practical avenues to exit from the residential rental business and the necessarily accompanying regulatory scheme.

## BACKGROUND ON RENT STABILIZATION

I.     <u>HISTORY OF RENT REGULATION IN NEW YORK.</u>

26.     The long history of rent regulation in New York demonstrates that the underlying nature of the rent regulatory laws, in all their various manifestations, is confiscatory. For over seven decades now, the private New York real estate industry has been shouldering a large share of the basic public burden of providing low cost housing to those in need. Further, the heavy exactions taken by rent regulation have never been in proportion to the governmental aims allegedly served: regulation has never been targeted to the needy, and in fact, perversely, has generally directed the bulk of its benefits to affluent tenants; this is truer today than ever. And now, New York has ushered in a new era of takings with its 2019 Tenant Protection Act. As will be set forth herein in detail, the Tenant Protection Act is punitive and amounts to an unvarnished taking. And, unlike in the prior era, the new regulatory scheme does not even seek to justify itself by the invocation of the State's emergency police power. Finally, the Tenant Protection Act also seeks,

again unconstitutionally, to virtually foreclose regulated landlords from exiting the business of providing subsidized housing, to the needy and the affluent alike.

27.     New York has long had two systems that regulate rent: rent control and rent stabilization. New York's rent control initially went into effect in 1951. As it exists today, it places limits on rents charged to tenants (or their successors) who (1) have lived in their apartments since 1971, and (2) who live in buildings that were constructed prior to February 1, 1947. NY RENT & EVICT. LAW § 2100.9 (McKinney). Fewer than 22,000 units are currently covered by rent control. Plaintiffs do not challenge New York's rent control system in this Complaint.

28.     New York first adopted rent stabilization in 1969. Rent stabilization limits the rent that owners can charge to residential tenants living in apartments that were constructed before January 1, 1974, and that contain six or more units. The Rent Stabilization Laws also created the Rent Guidelines Board and empowered it to determine whether and how much rents for rent-stabilized units may be raised on an annual basis. *See* N.Y. UNCONSOL. LAW TIT. 23 § 8624 (McKinney).

29.     New York's long and often difficult history of rent control began as a response to a wartime emergency: on November 1, 1943, the federal government simply froze all New York City rents at their March 1, 1943 levels. Following the end of World War II, however, while the federal government abandoned rent regulation, New York retained rent regulation in essentially its early draconian form, albeit applied only to buildings in existence as of 1947. Deprived of the opportunity to obtain a reasonable return—or, in many cases, any return at all—on their investments, landlords by the thousands became insolvent and lost their holdings. The deterioration and abandonment of literally entire neighborhoods became the stuff of legend.

30.     Finally, in 1970, following "several studies indicating massive housing disinvestment or abandonment attributable in large part to uneconomic rents," *241 E. 22nd St. Corp. v. City Rent Agency*, 305 N.E.2d 760, 762 (N.Y. 1973), the New York City Council instituted reforms designed to allow landlords of rent-controlled apartments (over one million units at the time) to gradually increase rents enough to make their properties economically viable. Local Law 30 of 1970, allowing collectible rents to increase by 7.5% per year until they reached a level commensurate with a complicated "base rent" formula, had as its purpose "to cope with the widespread problem of housing disinvestment and abandonment and to preserve the existing stock of rent controlled apartments in New York City; and to balance the interests of both landlords and tenants." *89 Christopher Inc. v. Joy*, 355 N.Y.S.2d 584, 586 (N.Y. App. Div.), *modified*, 318 N.E.2d 776 (N.Y. 1974).

31.     Meanwhile, in 1969, New York State enacted the Rent Stabilization Law, which established a second, parallel system of regulation. Under rent stabilization as initially enacted, buildings with six or more units constructed after February 1, 1947, and previously decontrolled apartments (that is, apartments that had been rent-regulated but no longer were) in buildings with six or more units were covered. The Law established the Rent Guidelines Board, vested with the power to set rent increases for renewal leases and new tenancies in covered buildings. The 1969 Rent Stabilization Law also established an industry association, the Rent Stabilization Association, which was authorized to promulgate a code, subject to City approval. The 1969 Rent Stabilization Law was seen as a milder form of rent regulation than rent control, with an objective of facilitating an ultimate transition to a free market. Significantly, the code adopted by the Rent Stabilization Association and approved by New York City allowed owners in good standing with the Rent

Stabilization Association[1] to obtain rent increases in addition to Rent Guidelines Board increases, based on improvements made either to an entire building or to an individual apartment. The purposes of these code provisions, like the purposes of the 1970 rent control amendments, were to begin to combat abandonment and disinvestment, and, significantly, to attempt to create an environment in which owners of regulated housing could obtain a return on their investment. The monthly rent increase obtainable for individual apartment improvements was set at one-fortieth of the cost of the improvements, although tenant consent was required for occupied units, rendering individual apartment improvements an effective tool only once an apartment became vacant.

32.     In a further attempt to combat abandonment and disinvestment, in 1971 New York State enacted vacancy decontrol for both rent-controlled and rent-stabilized units. However, decontrol was ended in 1974 with the passage of the Emergency Tenant Protection Act, which subjected all previously deregulated apartments to rent stabilization, and further provided that prospectively vacated rent-controlled units would become rent-stabilized—including those in buildings constructed prior to 1947. The Emergency Tenant Protection Act did however exempt from coverage apartments in buildings completed or substantially rehabilitated after January 1, 1974. Further, the Emergency Tenant Protection Act, like the 1969 Rent Stabilization Law, was specifically enacted to deal with the supposed ongoing thirty-year-old post-World War II housing emergency, and as such required periodic renewal based upon findings of continued emergency by local legislatures. The 1969 Rent Stabilization Law and the Emergency Tenant Protection Act both claimed as their objectives the elimination of profiteering, the prevention of unjust exactions

---

[1] Membership in the Rent Stabilization Association was hardly automatic. Among other things, landlords could be (and often were) expelled for a host of infractions.

of rent, and, at the same time, incentivizing owners to maintain and improve the regulated housing stock.

33.     Despite the intentions of its creators, the new, even more complex dual system of rent regulation, enacted piecemeal between 1969 and 1974, did not solve the problems of disinvestment and abandonment, which by this time seemed almost permanent features of what had been described as a *temporary* post-war housing crisis for some three decades. By 1976, New York City already owned 4,611 multifamily buildings acquired through in rem tax foreclosures; by 1979 the number had risen to approximately 11,700. *See* David Reiss, *Housing Abandonment and New York City's Response*, 22 N.Y.U. Rev. L. & Soc. Change 783, 787–88, 788 n.24 (1996). Abandonment in fact remained a serious problem in New York City into the early 1990s, *id*. at 788, until the twin Rent Regulatory Reform Acts of 1993 and 1997.

34.     As noted, the 1969 Rent Stabilization Law tasked the Rent Guidelines Board with responsibility for setting the levels of lawful rent increases for all rent-stabilized renewal leases, a responsibility the Rent Guidelines Board has now discharged every year for fifty years.

35.     The 1969 law also tasked the Rent Guidelines Board with setting the levels of lawful increases for vacancy leases, which the Rent Guidelines Board did from 1969 through 1997. Rent Guidelines Board vacancy increases ranged from zero to 15% and averaged roughly 5.5%, or slightly more than the increase for a two-year renewal lease, which averaged slightly over 5% for the same period. During the years after 1997, vacancy increases were fixed by statute at twenty percent for a two-year vacancy lease and slightly less (varying from year to year) for a one-year lease. Following the Tenant Protection Act, however, landlords are not entitled to *any* vacancy increases.

36.     In setting increases for renewal leases, the Rent Guidelines Board's task is governed by N.Y. UNCONSOL. LAW TIT. 23 § 26-510(b), which has remained largely unchanged since initial passage of the law. This provision does not dictate any specific formula that the Rent Guidelines Board must follow, but instead merely mandates that the Rent Guidelines Board consider

> (1) the economic condition of the residential real estate industry in the affected area including such factors as the prevailing and projected (i) real estate taxes and sewer and water rates, (ii) gross operating maintenance costs (including insurance rates, governmental fees, cost of fuel and labor costs), (iii) costs and availability of financing (including effective rates of interest), (iv) over-all supply of housing accommodations and over-all vacancy rates, (2) relevant data from the current and projected cost of living indices for the affected area, (3) such other data as may be made available to it.

*Id.* These materials are assembled annually by Rent Guidelines Board staff and summarized in various reports and studies, including but not limited to an annual "Income and Affordability Study," in which the Rent Guidelines Board staff presents for consideration data on, inter alia, the affordability of rental housing to New Yorkers from all income strata, including families on public assistance and others living at or near the poverty level, and an annual "Price Index of Operating Costs," which reflects annual changes in the basic costs of operating rental property.

37.     Each year, together with its order establishing permissible rent increases, the Rent Guidelines Board issues an Explanatory Statement summarizing various statistical data and input it has received from both the real estate industry and tenant advocates. Each Explanatory Statement includes an analysis, based on the Price Index of Operating Costs, of the level of increases that would be necessary for owners' inflation adjusted net operating income to remain constant. Largely because the Rent Guidelines Board considers affordability of rent-stabilized housing for low-income tenants (not to mention comments from numerous tenants and tenant advocacy groups that invariably demand that rent increases be frozen or even rolled back in order to subsidize low-income renters), the Rent Guidelines Board's annual orders generally approve rent increases that

14

lag far behind its own analysis of what would be necessary merely for owners to keep up with their costs. By way of example, in 2006 the Rent Guidelines Board concluded increases of 8% for a one-year lease and 13.5% for a two-year lease would maintain levels of real (inflation adjusted) net operating income, yet it approved increases of only 4.25% for one-year leases and 7.25% for two-year leases. In 2017 the Rent Guidelines Board calculated required increases of 6% and 8.5% but approved only 1.25% and 2%. While there have been a few years in which Rent Guidelines Board increases minimally exceeded cost requirements, such years were few, and wholly inadequate to compensate for the multiple years in which increases fell far short. Thus, it is clear that, like the old rent control system before it, the Rent Stabilization Laws' approach to the setting of base rents is structurally designed to artificially depress rents and, over time, make it impossible for at least some owners to realize *any* return on their investments—and ensure that owners in general cannot obtain a reasonable return on their investments. As will be discussed below, the Tenant Protection Act has now removed all mechanisms that previously provided a measure of compensation for this structural defect in the Rent Stabilization Laws.

38. Following the flurry of legislative activity between 1969 and 1974, almost two decades passed with only minimal legislation. From 1975 through 1992, New York passed only a single significant law involving rent stabilization, the Omnibus Housing Act of 1983, 1983 N.Y. Laws, Ch. 403. However, the Omnibus Housing Act effected primarily administrative reforms. As relevant to this action, its major change was to institute a system of annual Division registrations for all rent-stabilized apartments. This registration system, which was implemented as of April 1, 1984, remains in effect today, and as will be seen below it plays a significant role in the new unconstitutional rent overcharge procedures enacted by the Tenant Protection Act (which operate

independently from the unconstitutional base rent structure, although they considerably exacerbate its constitutional infirmities).

39.    In 1993 New York enacted the first of two Rent Regulation Reform Acts. The 1993 act introduced two forms of decontrol for rent-stabilized apartments, based respectively on vacancies in high-rent units, and on high income of tenants in occupied high-rent units. *See* NEW YORK CITY ADMIN. CODE §§ 26-504.1–26.504.3 (1993). The 1993 law also mandated that individual apartment improvements be incorporated into the Rent Stabilization Law and enacted a few technical modifications. The second Rent Regulation Reform Act, passed in 1997, established the above referenced twenty percent vacancy allowance plus a related "longevity" allowance. *See* NEW YORK CITY ADMIN. CODE § 26-511(c)(5-a) (1997). The procedures for high-income and high-rent decontrol were relaxed somewhat. In Housing Court eviction cases,[2] rules were enacted to combat various abusive delay tactics employed by tenants, including notably a rule requiring tenants, on an owner's application, to pay ongoing rent while litigating a dispute.

40.    Procedures were also implemented to reform the processing of rent overcharge complaints. In addition to the four-year limitation on collection of overcharges, the 1997 Rent Regulation Reform Act enacted a strict four-year limitation on examination of the rent history of any apartment subject to an overcharge complaint. *See* N.Y. UNCONSOL. LAW TIT. 23 § 26-516(a), (a)(2) (McKinney) (2015). The purpose of this provision was to alleviate the increasingly heavy burden on landlords to justify rent increases taken decades previously, especially the individual apartment improvement increases that had been available since the inception of rent stabilization almost thirty years before. Thus, owners who had actually performed individual apartment

---

[2] New York City has a dedicated court, with fifty sitting judges, whose sole purpose is adjudication of so-called summary proceedings (which often drag on for years) seeking possession of real property, together with some, though hardly all, other landlord/tenant disputes.

improvements in the distant past were free to dispose of ancient documents. Plaintiff 699 Venture in fact did just this, on the perfectly reasonable assumption that any future tenant seeking to challenge the legality of increases taken fifteen or twenty or twenty-five years earlier would be barred from prevailing unless she could demonstrate a fraud that, in reality, never occurred. Sadly, by the enactment of the Tenant Protection Act, Defendants have handed 699 Venture's tenants the opportunity to reap an undeserved windfall by now pressing overcharge claims against which 699 Venture is unable to properly defend, due to its reliance on previous acts of the very same state government.

41.    The twin Rent Regulation Reform Acts ushered in an era of prosperity for the New York City real estate industry. Disinvestment and abandonment decreased substantially. The physical condition of the housing stock, and in particular of rent-stabilized buildings that are often well over one hundred years old and sometimes considerably older than that, improved virtually every year; by the time the Census Bureau issued its 2017 Housing and Vacancy Survey, only 0.2% of rental apartments were in buildings classified as dilapidated. NEW YORK CITY, *Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey* at 27, Feb. 9 2018, https://on.nyc.gov/39fAAGM. Only 3.6% of rental units were deemed to have significant maintenance deficiencies; many units had no deficiencies at all. *Id.* at 7, 27. And 76.1% of tenants believed they lived in good or excellent neighborhoods, while only 4.4% felt their neighborhoods were poor. *Id.* at 27. All these findings were at or close to the most favorable levels ever recorded.

42.    In sum, the net cumulative effect of the two Rent Regulation Reform Acts was strongly positive. While the underlying confiscatory structure of regulated base rents for existing tenants remained in place—especially benefitting the affluent long term tenants in Manhattan whose rents were too low to allow owners to seek high-income deregulation—the availability of

increases and deregulation at vacancy, high-income deregulation, and longevity bonuses, combined with available increases for individual apartment improvements and major capital improvements, (1) substantially reduced abandonment and disinvestment and (2) began the process of returning the housing market to the free market condition that the Rent Stabilization Laws had always sought.

43.     All that has now been completely upended by the enactment of the Tenant Protection Act.

## II.     THE 2019 AMENDMENTS TO RENT STABILIZATION.

44.     On June 14, 2019, the New York State Legislature passed Senate Bill 6458, the Tenant Protection Act, which Governor Andrew Cuomo then signed into law the same day. The Tenant Protection Act, breathtakingly audacious in its scope, repeals and/or cripples virtually all the reforms that improved the financial health of the real estate industry, including not only the longevity and vacancy allowances enacted in 1997 and the 1993 decontrol provisions, but even the ability to recoup the costs of individual apartment improvements, which had been a feature of rent stabilization from its inception in 1969. Rent increases for major capital improvements, while were merely pared back rather than being effectively eliminated, now barely allow an owner to recoup the cost of such necessary items as replacing a roof or boiler, and certainly do not compensate for the inadequate increases handed out by the Rent Guidelines Board.[3]

---

[3] The Rent Guidelines Board issued its 2019 order several weeks *after* enactment of the Tenant Protection Act. Lest there be any doubt that the structural confiscatory nature of Rent Guidelines Board rent setting remained in place after the Tenant Protection Act, the Rent Guidelines Board authorized increases of 1.5% for a one-year lease and 2.5% for a two-year lease, despite the fact that its own research indicated increases of 4.75% and 9.25% would have been necessary for owners to keep pace with real costs. NEW YORK RENT GUIDELINES BOARD, *2019 Apartment & Loft Order #51* at 1, 14, June 25, 2019, https://bit.ly/36BjLFh.

45.     Moreover, having boxed owners of rent-stabilized apartments into a regulatory scheme in which their income growth is guaranteed over time to lag behind their expense increases, the Tenant Protection Act goes on to foreclose any realistic possibility that such owners will ever be able to exit the business of renting residential rent-stabilized apartments. As an initial matter, the Tenant Protection Act's first method of accomplishing this was by the expedient of dispensing with the pretense that the Rent Stabilization Laws address any supposed "temporary" emergency. Under the Tenant Protection Act, rent stabilization is permanent. The previous goal of transitioning out of a regulatory system that (fifty years ago) was universally understood to be disastrous has now been abandoned; there is no hope that any end to the "emergency" will provide an escape. The Rent Stabilization Laws in the Tenant Protection Act era are a permanent regulatory scheme.

46.     In this regard, it is certainly relevant that the post Tenant Protection Act Rent Stabilization Laws prevent owners from exiting the regulated rental market in multiple additional ways:

a.  The Tenant Protection Act virtually eliminated owners' ability to convert their rent-stabilized property into condominiums or cooperatives in New York City. Before 2019, an owner could withdraw rent-stabilized property from the rental market by obtaining approval from the Division to convert the property into cooperatives or condominiums; such conversions were governed by strict requirements that the owner had to meet before proceeding with a conversion. *See* N.Y. GEN. BUS. LAW § 352-eeee (McKinney 1988). Prior to the 2019 amendments, if the owner could persuade fifty-one percent of occupants to agree to buy their units, the owner could convert a complex and (after waiting several years) evict the remaining non-purchasing tenants. Although theoretically possible, such so-called "eviction conversions" were extraordinarily rare due to the high percentage of

tenants who had to participate. An alternative and, prior to 2019, much more common mechanism for converting rent-stabilized apartments was through so-called "non-eviction conversions." Under the prior law, such conversions could occur if the owner found buyers for fifteen percent of the units in the building, and there was no requirement that these buyers already be tenants in the building. *Id.* This type of conversion could not be used to evict rent-regulated tenants who wished to remain in the building, but as tenants gradually vacated their units over time the units could be sold or rented out to new tenants at a free market rate.

b. The Tenant Protection Act has eliminated condominium and cooperative conversions as a practical matter. *See* Tenant Protection Act, Part N. As an initial matter, the new law completely eliminated eviction conversions. What is more, under the new law fifty-one percent of bona fide tenants in occupancy must execute written purchase agreements in order for there to be a non-eviction conversion, while formerly only fifteen percent of the units had to be covered by purchase agreements, and they could be executed by either bona fide tenants in occupancy *or* bona fide purchasers. The effect of these new provisions was felt immediately: a few owners rushed conversion plans into motion under the deadline of the new law, and then conversions virtually ceased. *See* Josh Barbanel & Will Parker, *New York Condo Conversions Near the End, a Casualty of Rent Reform*, Wall Street Journal, July 9, 2019, https://tinyurl.com/y6n255vd. The Tenant Protection Act amendments block owners' last resort for leaving the rental marketplace by ensuring that tenants can always block the owner's ability to convert their property into condominiums.

c. The Tenant Protection Act repealed both luxury decontrol and high-income decontrol. Now—even if a tenant is high-income and the rent has reached a luxury level—the unit

must remain rent-stabilized. The Tenant Protection Act thus fully divorced rent stabilization from the need of the tenant and the luxury level of the unit.

d.  The Tenant Protection Act also made it impossible for the vast majority of owners—certainly including the Plaintiff owners herein—to recover their rental property, or even any part of it, for personal occupancy. Under the post-Tenant Protection Act Rent Stabilization Laws, an owner may only recover a single apartment for the personal use of his family and himself (which includes spouses, children, and parents). Only a natural person may recover an apartment, thus disqualifying the overwhelming majority of owners. And even a natural person seeking only a single apartment can recover only upon a showing of "immediate and compelling necessity." NY RENT & EVICT. LAW § 2104.5 (McKinney). Thus, an owner with any other viable residential option—again, obviously the overwhelming majority of the small minority of natural person owners—cannot avail himself of this option. The fact that there may be a few owners with, say, aging parents living with them on the upper floors of a walk up building who have an immediate and compelling necessity for a ground floor apartment does not provide a meaningful opportunity for the vast majority of owners to exit the regulated residential rental market.

e.  Other hypothetical bases for an owner to exit the regulated residential market are similarly too narrow to afford relief to more than a tiny percentage of owners, and similarly afford no relief to any of the Plaintiffs herein. Although the Rent Stabilization Code allows recovery of residential apartments for use by the owner in the owner's business, N.Y. COMP. CODES R. & REGS TIT. 9 § 2520.11(a)(1)(i), applicable zoning laws eliminate this as an option for most owners, including Plaintiffs herein, and in any event most owners will not find it suitable or even appropriate to relocate their business operation to, say, a

modest residential apartment in the South Bronx. And while an owner may also remove a building from regulation by performing a substantial rehabilitation, *id.* § 2520.11(e), only buildings in seriously deteriorated condition qualify, and only apartments that are already vacant can be deregulated. For the Plaintiffs herein, as for most owners, who operate fully tenanted and properly maintained buildings, substantial rehabilitation is not a viable option. Similarly, although the Rent Stabilization Code allows a landlord to empty a building for the purpose of demolishing it, *id.* § 2524.5(a)(2), the demolition process, not unlike substantial rehabilitation, is designed for either a building already mostly empty and deteriorated, or for cases in which a small older building may be part of an assemblage on which a large new building can be constructed. Displaced tenants must be given substantial stipends, typically in the six figures; exacting notice requirements must be met; and an owner must be prepared to navigate through a Division application process which, including multiple appeals, can easily take five years. And in the case of a building such as 699 East 137th Street, where the building is fully tenanted, demolition under the Rent Stabilization Laws is not economically feasible. In the case of the owner of a building which has been designated a landmark, demolition is often unavailable even in theory. Finally, upon information and belief, it is the Division's policy to deny demolition applications in fully tenanted buildings that are not part of a potential redevelopment assemblage, and in fact the Division has never approved such an application.

47.     The foregoing constitutes the exhaustive list of possibilities for an owner to exit the regulated residential rental market—both the few viable options that existed before the Tenant Protection Act, and the unviable ones that remain. For the Plaintiffs herein and for thousands of

others like them, the Defendants have foreclosed any viable opportunity to exit the regulated residential rental market, whether or not they wish to do so.

48.     Moreover, if an owner cannot meet one of the narrow requirements for removing their property from the rent-stabilized rental market, the Rent Stabilization Laws as a practical matter force the owner to continue offering their rent-stabilized apartment for rent at the rate set under those laws, as adjusted only by the minimal inadequate amounts authorized by the Rent Guidelines Board. While an owner may theoretically enjoy the right to allow units to sit vacant, such vacancies are not an economically viable use of the property, not only for the self-evident reason that such non-use generates no income, but also because the fixed costs of New York City landlords have grown to enormous proportions over the last few decades. The Rent Guidelines Board's own 2019 Income and Expense Study found that as of 2017 the cost of owning a single rent-stabilized apartment was almost $1,000 per month exclusive of any finance charges; by far the largest component of this amount was real estate taxes, which have exploded under the successive mayoral administrations of Michael Bloomberg and Bill de Blasio. NEW YORK CITY RENT GUIDELINES BOARD, *2019 Income and Expense Study* at 7, Apr. 4, 2019, https://bit.ly/31ywUgD. The simple fact is that, in the post Tenant Protection Act world, the owner of a rent-stabilized apartment building finds himself in the permanent business of providing rent-stabilized rental housing, with net operating income projected to decline—and eventually be eliminated altogether.

49.     This is clear from an examination of the effect of the Tenant Protection Act. Again, a number of the Tenant Protection Act's provisions create this situation:

a.     The Tenant Protection Act repealed the vacancy increase provisions that permitted a twenty percent increase in rent when an apartment became vacant (or passed a second time from

all tenants named on a lease to a family member). It likewise repealed the longevity increases that could be tacked onto a vacancy increase. And it banned the Rent Guidelines Board from adopting adjustments targeted to when an apartment becomes vacant. *See* Tenant Protection Act, Part B §§ 1, 3; Part C.

b.  The Tenant Protection Act drastically decreased the ability of landlords to pass along the costs incurred from making major capital improvements. As an initial matter, under the Tenant Protection Act, any annual rent increase under this provision is capped at two percent (previously, that amount was six percent). What is more, the period over which this increase may be taken is significantly longer under the Tenant Protection Act: twelve years (as opposed to eight) for buildings with thirty-five or fewer units and twelve-and-a-half-years (as opposed to nine) for buildings with thirty-five or more units. And the Tenant Protection Act specifies that these rent increases are temporary and must be permanently disentangled from the rent rate after thirty years. *See* Tenant Protection Act, Part K.

c.  The Tenant Protection Act has mostly eliminated the ability of landlords to pass along costs from individual apartment improvements. Owners may recover a maximum of $15,000 for improvements over any given fifteen-year period. And monthly rent may only be increased by one one-hundred-sixty-eighth of the cost of the improvement (for buildings with thirty-five or fewer units) and by one one-hundred-eightieth of the cost of the improvement (for buildings with more than thirty-five units); previously, these amounts were one-fortieth and one-sixtieth, respectively. The Tenant Protection Act also made the rent increases temporary, again requiring disentanglement after thirty years. *See* Tenant Protection Act, Part K. Especially for low rent apartments vacated after long term tenancies, typically with legal rents at a minor fraction of the apartment's value, the 2019 amendments ensure that

a landlord, already suffering a loss on the apartment based on a comparison between the cost of operation (including mortgage costs) and the rent collected, will suffer an *even greater loss* if it attempts to make any significant improvements. Thus, should the owner decide to rent its unrenovated "affordable" apartment to a new low-income renter, it will do so—i.e. essentially provide a welfare benefit—at a loss imposed by the State. And, to add insult to injury, it will have no choice but to incur the same loss even if, as will often be the case, the new tenant is affluent and has no need for affordable housing.

d.  The Tenant Protection Act also repealed provisions that permitted a landlord who had offered a "preferential rent" (that is, a lease at a rate below that permitted under the Rent Stabilization Laws) to raise that rent to the highest rent permitted under the Rent Stabilization Laws upon renewal of the lease. Now, the landlord can only raise the rent by the percentage that the Rent Guidelines Board allows stabilized rent rates to be raised each year. *See* Tenant Protection Act, Part E.

e.  The Tenant Protection Act extended the statute of limitations for a rent overcharge challenge and made it more difficult for an owner to rebut the presumption of willfulness in an overcharge challenge. Tenant Protection Act, Part F. This will increase owners' overall operating costs, as they will be required to defend more suits and expend more funds due to overcharges that may have been unintentional. Worse, the Tenant Protection Act eliminated the previous limitation on examination of the rent history of an apartment, guaranteeing that owners will face substantial rent rollbacks and financial liability for overcharge complaints that the Tenant Protection Act has taken away their ability—and their right—to defend. Rent rollbacks in particular will have a permanent negative effect on net operating income, further reinforcing that the Rent Stabilization Laws now box

owners into a business with perpetually diminishing returns, from which they cannot exit. *See also infra* Section V.

f.  The Tenant Protection Act lengthened the time periods governing eviction proceedings and the execution of eviction orders, *see* Tenant Protection Act, Part M, which will also increase owners' operating costs by permitting tenants who are failing to pay rent and should be evicted to remain in units longer than they otherwise would be permitted. In particular, the Tenant Protection Act has removed the requirement that courts order *pendent lite* payments by tenants who are delaying the prosecution of an eviction proceeding, even as the Tenant Protection Act has simultaneously mandated substantially longer adjournments, available to tenants merely for the asking; imposed additional procedural hurdles on the prosecution of cases; and even granted courts unlimited discretion to stay evictions in cases in which owners have already obtained final judgments after trial for nonpayment of rent. Importantly, these reforms were instituted not to address any crisis— 2018 Housing Court filings and actual evictions were both at thirty-five-year lows—but instead, like the rest of the Tenant Protection Act, simply to force landlords to provide housing to indigent and low-income tenants at their own unreimbursed expense. Indeed, evictions in New York City fell by eighteen percent in the six months following the enactment of the Tenant Protection Act. Elizabeth Kim, *Evictions in NYC Continue to Fall in Wake of Rent Reforms*, GOTHAMIST, Jan. 6, 2020, https://bit.ly/2SsvWOZ.

50.     In sum, with the enactment of the Tenant Protection Act, the typical rent-stabilized landlord—including every landlord Plaintiff in this action—now finds itself permanently forced to remain in a business from which it cannot exit, compelled to perform the essentially public welfare function of providing "affordable" housing to the indigent while prevented even from

obtaining the compensation of a fair return from affluent tenants; structurally locked in to a price control system that guarantees diminishing returns over time; and facing potential (and in the case of Plaintiff 699 Venture, actual) massive liability created by statute to redress supposed transgressions against which—guilty or innocent—it cannot meaningfully defend itself. And, as will be discussed below, these gross exactions have only a tenuous nexus to the governmental objectives they supposedly serve, and the exactions certainly are vastly out of proportion to their efficacy in achieving their stated ends. For multiple reasons, and based on at least four different lines of Supreme Court authority, the post Tenant Protection Act Rent Stabilization Laws facially and as applied to every Plaintiff herein effect takings in violation of the Fifth and Fourteenth Amendments, and the new overcharge rules deprive Plaintiff 699 Venture of procedural due process of law.

III.     RENT STABILIZATION SUBSIDIZES TENANTS AT THE EXPENSE OF PROPERTY OWNERS.

51.     A clear purpose of New York's rent stabilization system is to subsidize tenants—by ensuring that those who live in rent-stabilized units will be able to remain in those units with minimal rent increases each year—at the expense of owners of rent-stabilized units.

52.     The New York Legislature explicitly intended that the Tenant Protection Act help a certain population: tenants renting stabilized units. The Tenant Protection Act banned luxury and high-income decontrol and prevented landlords from recouping the cost of improvements "in order to prevent uncertainty, potential hardship and *dislocation of tenants*." Tenant Protection Act, Part D (emphasis added). And statements from various members of the Legislature confirm this reality: as Senator May put it, the new law "shift[s] the balance toward helping *renters* throughout New York State to stay in their homes," and as Senator Salazar stated it "empower[s]" renters to "stay in their homes." THE NEW YORK STATE SENATE, *Senate Passed Strongest Tenant Protections in*

27

*State History*, June 14, 2019, https://bit.ly/308zzNh (emphasis added). And in a joint statement,

Senate Majority Leader Stewart-Cousins and Assembly Speaker Heastie lauded the bill as

"giv[ing] New Yorkers the strongest *tenant* protections in history." Andrea Stewart-Cousins, *Joint*

*Statement From Senate Majority Leader Andrea Stewart-Cousins & Assembly Speaker Carl*

*Heastie On Historic Affordable Housing Legislation*, June 11, 2019, https://bit.ly/37MeMlb

(emphasis added).

53.     New York courts have likewise long recognized the nature of rent stabilization: it

subsidizes tenants at the expense of their landlords.

54.     As an initial matter, rent stabilization provides a public assistance benefit *to tenants*.

As New York's highest court recently explained,

> [t]he rent-stabilization program has all of the characteristics of a local public
> assistance benefit. . . . Rent stabilization provides assistance *to a specific segment*
> *of the population* that could not afford to live in New York City without a rent
> regulatory scheme. And the regulatory framework provides benefits *to a targeted*
> *group of tenants*—it protects them from rent increases, requires owners to offer
> lease renewals and the right to continued occupancy, imposes strict eviction
> procedures, and grants succession rights for qualified family members.

*In re Santiago-Monteverde,* 22 N.E.3d 1012, 1015–16 (N.Y. 2014) (emphases added). "Like other

public assistance benefits," the New York Court of Appeals continued, "the Rent Stabilization

Law *serves a select, defined group of New Yorkers* who struggle, in this case, to afford suitable

housing"; it "is an exceptional regulatory scheme that enables *a specifically targeted group of*

*tenants* to maintain housing in New York City." *Id.* at 1016 (emphases added).

55.     And the public assistance benefit of rent stabilization is paid for by the owners of

rent-stabilized property—not the government. Again, the New York Court of Appeals has

recognized this reality:

> While the rent-stabilization laws do not provide a benefit *paid for* by the
> government, they do provide a benefit *conferred by* the government through

regulation aimed at a population that the government deems in need of protection. Among other things, the Rent Stabilization Law caps legal rents. . . . [T]he government, recognizing that housing protection is necessary to benefit a specific group of tenants, has created a public assistance benefit through a unique regulatory scheme *applied to private owners of real property*.

*Id.* at 1016–17 (last emphasis added).

## BACKGROUND ON LEGAL CLAIMS

I.  THE RENT STABILIZATION LAWS PHYSICALLY TAKE PRIVATE PROPERTY WITHOUT JUST COMPENSATION.

56.    The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. The Rent Stabilization Laws run afoul of this provision by engaging in both physical and regulatory takings of owners' property, and by taking property for a non-public use.

57.    A "physical" taking "is a per se taking that requires just compensation." *Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2426 (2015). If the government physically dispossesses an owner of some or all of its property—either by occupying that property itself or forcing the owner to allow someone else to occupy it—a physical taking has occurred. And when a physical taking for public use occurs, the government must either be ordered to pay just compensation or enjoined from committing the taking.

*A.    The Rent Stabilization Laws Engage in a Physical Taking Because They Compel Owners to Rent Their Property Indefinitely and Refrain From Terminating Tenancies in Perpetuity.*

58.    As the Supreme Court has recognized, there may be a physical taking when a "statute . . . compel[s] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee v. City of Escondido, Cal.*, 503 U. S. 519, 528 (1992).

59.    The Rent Stabilization Laws do just this: they compel owners of rent-stabilized units to continue to rent out their property at a below-market rate and require owners to continue

to renew and/or maintain such regulated below-market tenancies regardless of whether they wish to do so. When New York enacted the Tenant Protection Act against the backdrop of the preexisting laws, it created a system that has the purpose and effect of preventing most owners—including Plaintiffs—from ever exiting the residential rental market if they own rent-stabilized apartments.

a. Owners are effectively prevented from converting their property into condominiums or cooperatives; they can no longer utilize the eviction mechanism, and the new non-eviction mechanism ensures that existing tenants can unilaterally block an owner's non-eviction conversion plan. Conversions have virtually ceased since enactment of the Tenant Protection Act.

b. Owners are typically barred from putting their property to almost all forms of non-residential use; they cannot rent the property out for retail use, office rentals, or storage. The only non-residential use that they can put the property to is in connection with a business which the owner owns and operates—an option unavailable to almost all owners, and unavailable to all of the Plaintiffs herein.

c. Owners cannot tear down their buildings unless they receive approval from both the Division and the New York City Department of Buildings, and cover the costs of *every single tenant*'s relocation—plus additional fees, stipends, and partial rent payments for six years—all at the end of an application process that can take up to five years to complete. While demolition is a viable option for a small number of landlords, the demolition application process was never designed for owners of fully tenanted buildings in any but the wealthiest neighborhoods; it is of no use to any of the Plaintiffs herein, and indeed throughout New York City is rarely used at all.

d. Owners who wish to remain in the residential rental marketplace but planned to leave the rent-stabilized rental marketplace no longer have hope of deregulation from a combination of vacancy and longevity increases and luxury or high-income decontrol—thus forcing them to remain in the rent-stabilized rental marketplace.

e. As a practical matter, owners cannot even allow their rent-stabilized units to remain vacant, since the prohibitively high fixed cost—an average of $12,000 per apartment per year— renders that option economically unviable; the laws thus force them to continue renting out their rent-stabilized units.[4]

f. Once the time comes to rent to a new tenant, the Tenant Protection Act further, and unreasonably, restricts an owner's right even to exclude manifestly undesirable tenants. The Tenant Protection Act established a new section of the Real Property Law, N.Y. REAL PROP. LAW § 227-f (McKinney), which, incredibly, bars an owner from refusing to rent to a prospective tenant on the basis of the prospective tenant's involvement in any prior landlord-tenant litigation—even litigation that might have resulted in the tenant's eviction for an offense such as drug selling or violence against other residents. Nor may a New York City landlord refuse to rent based on a tenant's lawful source of income. *See* NEW YORK CITY ADMIN. CODE § 8-107(5)(a)(1).

---

[4] The New York Court of Appeals has already recognized that a law expressly requiring an owner to rent its vacant units amounts to a physical invasion and a per se taking. *See Seawall Assocs. v. City of New York*, 542 N.E.2d 1059, 1061 (N.Y. 1989). In *Seawall*, New York City imposed a $500 fine for failure to rent a unit, in an era when real estate taxes were at a fraction of their current levels. The current cost of leaving a unit vacant in fact far exceeds the cost under the regulation held unconstitutional in *Seawall*. In fact, measured by its practical application to vacant units the Tenant Protection Act is not meaningfully distinguishable from the *Seawall* regulation, and as such is a physical invasion under New York's own precedent.

g. Owners are severely limited in their ability to recover their rented property for personal use: they may recover only one unit, must use the unit as their primary residence, must show immediate and compelling necessity for the unit's use, and cannot recover a unit if the tenant has been living in the building for fifteen years or is sixty-two or older or has a disability unless the owner offers to provide "an equivalent or superior housing accommodation at the same or lower stabilized rent in a closely proximate area." N.Y. UNCONSOL. LAW TIT. 23 § 26-511(9)(b) (McKinney). And an owner—such as every Plaintiff herein—is not permitted to a recover a unit that he or she holds through a corporate form.

60. The Rent Stabilization Laws thus have closed off every viable exit option for an owner of rent-stabilized property in New York City, compelling owners to rent their property for residential purposes at regulated rates when they would prefer to change its usage (perhaps changing to a retail rental or ceasing to rent the apartment for the purpose of personal occupancy).

61. The Rent Stabilization Laws likewise force owners to renew rent-stabilized tenancies in perpetuity—with very few exceptions and at rates that have been approved by the Rent Guidelines Board. This mandatory renewal, which can stretch across multiple generations literally forever, is akin in and of itself to a forced permanent tenancy—because only the tenant can choose to end the tenancy, despite the fact that the landlord and tenant may have initially signed only a one- or two-year lease. Combined with the fact that even after vacancy the owner's only option is a new stabilized tenant at the same artificially low rent, with the same inadequate Rent Guidelines Board increases continuing indefinitely, the Rent Stabilization Laws compel an involuntary permanent occupation of land by subsidized tenants. Indeed, the succession provisions of the Rent Stabilization Laws survived a previous takings challenge only because, at the time, an

owner still had viable options for exiting the regulated residential market. *See Rent Stabilization Ass'n v. Higgins*, 630 N.E.2d 626, 632 (N.Y. 1993) ("[W]e are unpersuaded by the argument that [rent stabilization succession rules] have created perpetual tenancies. An owner's right to evict an unsatisfactory tenant or convert rent-regulated property to other uses remains unaffected."). In the post Tenant Protection Act regulatory scheme, however, in which (1) landlords can no longer exit the market and (2) regulation is permanent, there can be no serious doubt that perpetual tenancies are not merely possible, but, at least in some instances, guaranteed. And New York law has also long recognized that the mere possibility of a perpetual tenancy constitutes a physical and a regulatory taking, obviously notwithstanding the fact that an owner may retain the right to evict an "unsatisfactory" tenant under limited circumstances.[5] *See Manocherian v. Lenox Hill Hospital*, 229 A.D.2d 197, 204 (N.Y. App. Div. 1997) ("It is virtually certain that long, successive successorships to rent-stabilized leaseholds will not be just theoretical possibilities because, markets being markets, they are likely to bloom as perennials, becoming functionally transformed into perpetual stakeholds. The Legislature should satisfy itself, as the courts will have to, that unwarranted de facto results from administrative quasi-judicial determinations do not constitute the functional equivalent of divestitures from landowners of reversionary rights to their properties without just compensation and due process." (quotation marks omitted)).

---

[5] The phrase "unsatisfactory tenant" is a misleading description of the class of tenants that a landlord has the *right* to evict under the Rent Stabilization Laws. The Rent Stabilization Code allows tenants to commit with impunity egregious violations that any rational person would conclude render the tenant "unsatisfactory." For example, the case of *West 115 11-13 Assocs. LLC v. Pierre*, 63 Misc. 3d 158(A) (N.Y. App. Term. 2019), upheld the trial court's refusal to evict a tenant who, without the owner's consent and without permits, had relocated live gas and plumbing lines in her kitchen.

62.     Under the Tenant Protection Act, by cutting off all possible exits from the regulated market, the New York Legislature has ensured that such functional divestures of reversionary rights will occur.[6] And, as discussed above, even apart from the taking effected by the succession rules, the combination of (1) the elimination of vacancy decontrol; (2) the elimination of any rent increase when an apartment becomes vacant; (3) the economic infeasibility of undertaking all but the most minimal individual apartment improvements; (4) the assurance that future Rent Guidelines Board rent increases will not keep pace with operating costs; and (5) owners' inability to exit the market mean that the Rent Stabilization Laws commit a per se physical taking under the Takings Clause, and Plaintiffs are entitled to compensation for it. *See Yee*, 503 U.S. at 528; *Horne*, 135 S. Ct. at 2426; *Resolution Tr. Corp. v. Diamond*, 18 F.3d 111, 123–24 (2d Cir.), *cert. granted, judgment vacated*, 513 U.S. 801 (1994) (finding that "the temporary nature of the rent control laws is needed to insulate them from constitutional challenge," and reading the length of time of a rent-controlled tenancy as a maximum of two years); *Resolution Tr. Corp. v. Diamond*, 45 F.3d 665, 676 (2d Cir. 1995) (adopting the same reasoning on remand "because a perpetual term might run afoul of takings jurisprudence").

63.     The Tenant Protection Act is the opposite of the laws at issue in *Yee v. City of Escondido*. In *Yee*, the Supreme Court rejected a facial physical takings challenge to a pair of ordinances that applied to landlords who rented lots for use by owners of mobile homes: one was a rent control ordinance that disallowed any increase in rent without city council approval, and the

---

[6] Beyond even the succession issues, the Tenant Protection Act, in brazen disregard of the takings holding in *Manocherian*, decrees that a not-for-profit corporate tenant providing housing to certain subtenants deemed "at risk" is entitled to renewal leases notwithstanding the fact that the corporate tenant rents the apartment to a succession of such subtenants—creating exactly the perpetual regulated tenancy held unconstitutional in *Manocherian*. *See* Tenant Protection Act, Part J § 1.

second was an ordinance that prevented landlords from evicting a mobile home owner except for cause. The Court premised this holding on the fact that

> on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so. To the contrary, the [rent control law] provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with 6 or 12 months notice.

503 U. S. at 527–28.

64.     The *Yee* Court explicitly reserved judgment on other situations, noting that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* at 528.

65.     The Tenant Protection Act is just such a statute: both on its face and as applied, it compels owners of rent-stabilized property to continue to rent their properties *and* refrain in perpetuity from terminating tenancies. It thus engages in blatant physical takings, which must be compensated.

66.     699 East 137th Street, owned by Plaintiff 699 Venture, illustrates the point. The building contains all rent-stabilized apartments. Under the post tenant Protection Act rent-stabilization laws, all those apartments will remain perpetually rent-stabilized. As the building is fully tenanted, neither demolition nor substantial rehabilitation are available. Cooperative or condominium conversion is not available. As the building is under corporate ownership, personal use is not an avenue to recover possession of any apartments, and in any event the corporate principals could not demonstrate any immediate and compelling necessity to relocate their families to the South Bronx. And while it could be feasible to leave a small number of units vacant at such time as current tenants leave, New York City currently collects property taxes of $38,000 per year,

to say nothing of the cost of water, fuel, insurance, maintenance, and debt service. In short, 699 Venture is now in the business of renting regulated apartments in perpetuity, with no possible exit.

67.     Worse, the Tenant Protection Act has also fundamentally, and permanently, altered the nature of the business which 699 Venture finds itself locked into. For all the reasons noted above, the building's revenue growth will now lag behind growth in operating costs. Because almost half the building has pending overcharge claims challenging rent increases taken between 1997 and 2009, 699 Venture, unless the Tenant Protection Act is enjoined, faces an immediate cut in revenue and an immediate permanent reduction in monthly rents for multiple units. Even in apartments in which the legal rent is higher than the rent actually charged, 699 Venture will be unable to increase rents sufficiently to keep pace with operating costs, and rent overcharge complaints—both those already filed and others that will surely follow in the wake of successful challenges—will reduce legal rents to the point where they no longer exceed market rates. In sum, it is no exaggeration to say that, in the wake of the Tenant Protection Act, 699 Venture has been forced to remain permanently in a business that is no longer attractive.

>    B.     *The Rent Stabilization Laws Engage in a Physical Taking Because They Strip Owners of their Rights to Possess, Use, and Dispose of Their Property.*

68.      An owner of property retains "the rights to possess, use and dispose of it" and "[t]o the extent that the government permanently occupies physical property, it effectively destroys each of these rights." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (quotation marks omitted).

69.     Here, it is clear that because Defendants have destroyed these rights via the Rent Stabilization Laws, a physical taking has occurred.

70.     As an initial matter, the Rent Stabilization Laws give tenants the right to indefinitely possess owners' properties and thus **strip owners of their right to exclude** (a

corollary of the right to **possess**), which is a "fundamental element of the property right." *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979); *see Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994).

71.     As discussed previously, the Rent Stabilization Laws require owners to allow their tenants to renew their leases with rent increases set by the Rent Guidelines Board. By forcing owners to renew leases—not based on a "temporary" emergency, but forever—the Rent Stabilization Laws deprive owners of their right to exclude, which indicates that there has been a physical taking in violation of the Fifth Amendment. *See Loretto*, 458 U.S. at 435.

72.     And this renewal right, as noted above, is not restricted to the original or current tenant:

> any member of [the] tenant's family . . . who has resided with the tenant in the housing accommodation as a primary residence for a period of no less than two years, or where such person is a 'senior citizen,' or a 'disabled person'. . . for a period of no less than one year, immediately prior to the permanent vacating of the housing accommodation by the tenant, or from the inception of the tenancy or commencement of the relationship, if for less than such periods, *shall be entitled to be named as a tenant on the renewal lease*.

N.Y. COMP. CODES R. & REGS TIT. 9 § 2523.5(b) (emphasis added). What is more, the term "family member" is not a limited one: it includes "[a] spouse, son, daughter, stepson, stepdaughter, father, mother, stepfather, stepmother, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law or daughter-in-law of the tenant or permanent tenant" as well as "[a]ny other person residing with the tenant . . . who can prove emotional and financial commitment, and interdependence between such person and the tenant." *Id.* § 2520.6(o).

73. After offering an initial lease, then, the owner has no control over who may later move into the apartment and ultimately become a permanent tenant,[7] and can be forced to continue renting out the unit at a below-market rate to a completely different tenant who is a stranger that the owner objects to—so long as the tenant fits into one of these broad categories, moves into the unit at the appropriate time, and wishes to remain. Again, then, by mandating that owners renew leases with strangers, the Rent Stabilization Laws deprive owners of their right to exclude—which is a physical taking in violation of the Fifth Amendment. *See Loretto*, 458 U.S. at 435.

74. As the Supreme Court has explained, "an owner suffers a special kind of injury when a stranger directly invades and occupies the owner's property" and

> [t]o require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury; such an occupation is qualitatively more severe than a regulation of the use of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion.

*Id.* at 436.

75. And the Tenant Protection Act has also cuts off owners' ability to exclude tenants in yet another way: it limits the ability of owners to evict tenants who have failed to pay rent by altering and compounding the steps involved in what is supposed to be a "summary" proceeding.

a. The Tenant Protection Act adopted a number of changes to summary proceedings that lengthen the time frame for eviction proceedings, such as extending the time of an adjournment to a *minimum* of fourteen days, when previously it was a *maximum* of ten days. *See generally* Tenant Protection Act, Part M. In the City of New York, the Tenant

---

[7] In this regard, New York's Real Property Law requires a landlord to accept the presence in apartment of not only the tenant's immediate family, but also an unrelated occupant, who may— and not infrequently does— later claim to be a non-traditional family member entitled to succeed to the tenancy. *See* N.Y. REAL PROP. LAW § 227-f.

Protection Act implemented a number of additional provisions that will operate to lengthen the summary proceedings; for example, it allows *additional* adjournments beyond the number previously permitted. And the former requirement that a tenant be required to pay rent to the Court or vacate the premises after the proceedings had been pending for a given length of time now is no longer mandatory; and even when payment is ordered, the sanction has no teeth, because the Court is no longer empowered to strike a tenant's pleading if its order is disregarded.

b.  The Tenant Protection Act also provides that if the tenant pays the full rent due at any time prior to the hearing on the petition to require eviction, the landlord is required to accept the payment and the proceeding is mooted. *See* Tenant Protection Act, Part M § 13.

c.  Even after a judgment has been entered in favor of the landlord and eviction has been ordered for nonpayment of rent, the Tenant Protection Act provides that "the court shall vacate a warrant upon tender or deposit with the court of the full rent due at any time prior to its execution, unless the petitioner establishes that the tenant withheld the rent due in bad faith." *Id.* at Part M § 19.

d.  Once eviction has been ordered, under the Tenant Protection Act the normal time period for the actual execution of the eviction warrant is several days longer than it was before.

e.  Most important, even in so called "holdover" cases in which the owner has established its absolute right to possession, the court may stay eviction for up to one year (previously, this was six months in New York City), without even requiring payment of accrued arrears. *See* Tenant Protection Act, Part M § 21.

76.  These provisions ensure that nonpaying tenants—even those who have been found by a court to meet the requirements for eviction—will be allowed to remain in possession of rental

units over the owners' objection. Yet again, these provisions deprive owners of their right to exclude—which constitutes a physical taking.

77.     The Tenant Protection Act also stripped owners of the right of owners to exclude tenants with a history of nonpayment.

a.  Prior to the Tenant Protection Act's enactment, the New York State Unified Court System sold data about actual pending and disposed cases (which are matters of public record) to the major consumer credit reporting bureaus, which would then include this information on reports they would generate and provide to landlords to enable them to see a renter's past rental history if an applicant consented to allowing a landlord to obtain such a report. The Tenant Protection Act bars this system. Worse, owners cannot even look at the public records themselves without there being a presumption that any such record review resulted in an illegal discriminatory rejection of an applicant. New York law now will "[n]ot permit the unified court system to sell any data regarding judicial proceedings related to residential tenancy, rent or eviction to any third party." Tenant Protection Act, Part M § 26. The law prohibits owners from using such data, stating that "[n]o landlord of a residential premises shall refuse to rent or offer a lease to a potential tenant on the basis that the potential tenant was involved in a past or pending landlord-tenant action or summary proceeding under article seven of the real property actions and proceedings law." *Id.* at Part M § 5.

b.  Owners thus cannot refuse to rent units to tenants who may be at high risk of failing to pay rent, or who may have engaged in such dangerous and unlawful activities as hiring an unlicensed contractor to cut into live gas lines without owner consent or permits.

c.  Prior to enactment of the 2019 amendments, Plaintiffs 335-7, 431, and 226 routinely screened potential tenants by, among other things, reviewing a report that detailed any

previous landlord-tenant litigation. These reports allowed Plaintiffs to reject not only tenants with poor payment histories, but also tenants who had been evicted for various unlawful activities, ranging from criminal offenses such as the sale of narcotics to civil matters such as illegal sublets, hoarding, and unauthorized alterations. The inability to exclude applicants based on a documented history of undesirable behaviors impacts not only 335-7, 431, and 226, but all of their residents—and diminishes the value of Plaintiffs' investments. This again injures their right to exclude.

78.     As the Legislature realized when enacting the 2019 amendments, *see supra* Background on Rent Stabilization Section III, those amendments give tenants a right to remain in their units—to the degradation of Plaintiffs' right to exclude.

79.     Given (1) the ironclad renewal requirements—which apply to various individuals other than the existing tenant—and the necessity even after one regulated tenant has vacated to replace him with another; (2) the rules governing evictions; and (3) the ban on considering rental history, the Rent Stabilization Laws and these other provisions have eliminated the related rights to exclude and possess—which means that a per se physical taking has occurred.

80.     The Rent Stabilization Laws also **deprive owners of their right to use** their property, which, again, indicates a per se physical taking. *See Loretto*, 458 U.S. at 435. This deprivation of the right to use property takes a number of forms. Most notably, it deprives owners of their *personal* right to make use of their property, because under the Rent Stabilization Laws, owners are severely limited in their ability to recover their rented property for personal use.

81.     Owners may recover only one unit for personal use (or the personal use of a family member); this provision alone prohibits owners of rent-stabilized property from putting the vast majority of units to their preferred personal use; for example, if an owner's building contains

twenty rent-stabilized units, he or she may only recover five percent of that building for personal use.

82.     Co-owners of buildings cannot both recover units—only one may. N.Y. COMP. CODES R. & REGS TIT. 9 § 26-511(9)(b).

83.     And if an owner holds a property as a shareholder, partner, or member of an entity (as is the case with every Plaintiff herein), the owner cannot recover an apartment for personal use. *See id.* (requiring owners to be natural persons by permitting recovery only "for his or her own personal use and occupancy").

84.     The owner seeking to recover a unit must also show "immediate and compelling necessity for the unit's use," *id.*, a standard which is impossible to meet in all but a tiny minority of cases, even in those buildings in which it might be feasible to convey title from an entity (which will often have multiple investors) to a natural person or persons. In contrast, the tenant who lives in the unit is not required to make such a showing—or *any* showing, for that matter—for the tenant to remain in the unit past the terms of his or her existing lease, blocking the owner's personal use.

85.     And an owner will face additional difficulties if he or she seeks to recover a unit from a tenant who (1) has been living in the building for fifteen or more years; (2) is sixty-two or older; or (3) has a disability. If the tenant fits into one of these categories, the owner must "offer[] to provide and if requested, provide[] an equivalent or superior housing accommodation at the same or lower stabilized rent in a closely proximate area." *Id.*

86.     Additionally, the Rent Stabilization Laws prohibit owners from changing the use of their property in other ways. As discussed previously, owners no longer have a viable path to converting rent-stabilized properties into cooperatives or condominiums, and they cannot rent the property out for retail use, office space, or storage. And the owner cannot even put their property

to use in connection with a business which the owner owns and operates without obtaining approval from the Division—which in any event is not a viable option for any of the Plaintiffs herein.

87. In these various ways, the Rent Stabilization Laws commit a per se physical taking by stripping owners of their right to use their property.

88. The Rent Stabilization Laws also **deprive owners of their right to dispose of** their property, which is indicative of a per se physical taking. *See Loretto*, 458 U.S. at 435.

89. The Rent Stabilization Laws do so in a number of ways that have previously been discussed. An owner is generally required to continue to rent out rent-stabilized property unless: (1) the owner intends to use the building in connection with an owner-owned and operated business; (2) the cost of remedying dangerous living conditions "would substantially equal or exceed the assessed valuation of the structure"; or (3) the owner proves to the Division that he or she plans to demolish the building and is able to do so—in which case the owner will be required to either relocate the tenants to similar housing (and pay reasonable moving expenses and a $5000 stipend to the tenant and any increased rent costs for six years) or to pay the tenant a stipend as set by the Division. N.Y. UNCONSOL. LAW TIT. 23 § 2524.5(b). For all the reasons set forth above, none of these options are viable in any but a tiny minority of cases, and none are viable for any of the Plaintiffs herein. In other words, owners are *not* free to dispose of their property as they see fit; they may not even decline to renew current tenancies, and, from a practical economic standpoint, they cannot allow a building to sit vacant without incurring substantial financial losses.

90. Similarly, owners no longer have a viable road to condominium or cooperative conversions. *See supra* Background on Rent Stabilization Section II. Owners no longer may implement an eviction conversion plan and must obtain purchase agreements from fifty-one

percent of bona fide tenants in occupancy for a non-eviction plan. This "basically eliminates the possibility of converting occupied residential buildings to co-ops or condos," as Jeffrey Schwartz, who has been a real estate attorney for over three decades and has been counsel to numerous condominium buildings, put it, *Are Co-op and Condo Conversations a Thing of the Past?*, HABITAT, June 20, 2019, https://bit.ly/2UkKvXr, and "[c]ondo conversions are effectively dead" in New York, as Stuart Saft, the chairman of the Council of New York Cooperatives and Condominiums, stated, Josh Barbanel & Will Parker, *New York Condo Conversions Near the End, a Casualty of Rent Reform*, WALL STREET JOURNAL, July 9, 2019, https://on.wsj.com/2UbfnJL.

91.     Unable to exclude and possess, use, or dispose of their property—and thus deprived of the most important "sticks" in the bundle of property ownership, *see Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)—owners of rent-stabilized property have suffered a per se physical taking.

C.      *The Rent Stabilization Laws Engage in a Physical Taking Because They Deprive Owners of Their Reversionary Interests in Leased Property.*

92.     When examined in light of what the Rent Stabilization Laws do to owners' reversionary interests, it is yet again clear that the Rent Stabilization Laws commit an uncompensated per se physical taking.

93.     It has long been recognized that an owner of property who chooses to lease that property out retains a vital interest in the property: a reversionary right to possess and use the property after the term of the lease ends. As the Second Restatement of Property puts it, "the landlord has a reversionary interest in the leased property" and there will be an "eventual resumption of possession by the landlord" after the term of the lease comes to an end. REST. 2D OF PROPERTY, LAND. & TEN. § 12.2 cmt. C (1977). The right to possess the leased property upon termination of the lease forms the heart of this reversionary interest.

44

94.     No less than an easement or a leasehold, this reversionary interest is a form of property that cannot be taken for public use without just compensation. *See Manocherian v. Lenox Hill Hosp.*, 643 N.E.2d 479, 485 (N.Y. 1994) (considering "reversionary property interests" when assessing a takings claim); *Rent Stabilization Ass'n of New York City, Inc. v. Higgins*, 630 N.E.2d 626, 633–34 (N.Y. 1993) (intimating that in the context of a takings claim, owners of rent-stabilized units may be "deprived of their reversionary interest" if tenancies were made "perpetual" by law); *520 E. 81st St. Assocs. v. Lenox Hill Hosp.*, 555 N.Y.S.2d 697, 701 (N.Y. App. Div. 1990), *rev'd on other grounds*, 573 N.E.2d 567 (N.Y. 1991) (holding that a law was a physical taking under *Loretto* because it "transferr[ed a property owner's] reversionary interest . . . to the tenant . . . the existence of which is, to all intents and purposes, perpetual"); *cf.* 17B Carmody-Wait New York Practice with Forms § 108:34 (2d ed. 2019) ("The determination of whether a property interest exists to support a takings claim is typically the threshold inquiry. . . . This right or interest may be . . . a life or reversionary interest . . . ."); *see also Preseault v. United States*, 100 F.3d 1525, 1549–52 (Fed. Cir. 1996) (en banc) (finding that when the government had taken away a reversionary interest, there was a physical taking that had to be compensated).

95.     Here, the Defendants have done just that: they have prevented owners from recovering their property at the end of a leasehold and thus taken owners' reversionary interests. An owner is forced to renew a lease even over his or her objection, and an owner cannot put his or her rent-stabilized property to a different use. This is the ultimate taking of a reversionary interest—that must be compensated to avoid running afoul of the Takings Clause.

96.     In this regard, enactment of the Tenant Protection Act was decisive: as long as rent stabilization was a temporary emergency measure, the law—even if it was no more than a legal fiction—held that an owner's reversion would be restored as soon as the temporary emergency

ended. Instead, perpetual tenancies are now possible, and as Judge Bellacosa observed in *Higgins*, 630 N.E.2d at 635, is inevitable that, in at least some cases, rent-stabilized tenancies will be "functionally transformed into perpetual stakeholds." In each such instance, the owner is literally deprived of its reversion, just as it is in the case of those not-for-profit corporations that are now free to install an endless rotating succession of "at risk" subtenants in any rent-stabilized apartment they rent. *See supra* note 6. As the destruction of the reversionary interest by the Rent Stabilization Laws is no longer a temporary "emergency" measure, the Laws now create the possibility of perpetual tenancies, a taking under New York's own Court of Appeals precedent, and, absent just compensation, an unconstitutional taking under the Fifth and Fourteenth Amendments as well.

D.  *There is No Temporary Emergency Justification for the Rent Stabilization Laws That Overrides the Takings Clause.*

97.  The purported declarations of "emergency" by the State and City of New York do not change the Takings Clause analysis because such declarations no longer are temporary.

98.  In a pair of cases decided almost a century ago, the Supreme Court rejected Takings Clause challenges to rent regulation in the District of Columbia and in New York. *See Block v. Hirsh*, 256 U.S. 135 (1921); *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170 (1921).

99.  As an initial matter, these cases are no longer good law; they predate the development of the modern doctrinal framework for takings analysis, which has moved away from the understanding of the interaction between takings claims and the police power that the Supreme Court previously held. *Cf. Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1022–24 (1992) (discussing developments in the Supreme Court's jurisprudence that occurred after the 1920s); *see Block*, 256 U.S. at 156–57 (discussing the relationship between police power and takings).

100.     But even assuming that *Block* and *Marcus Brown* are still good law, this case does not fall within their ambit—or, more precisely, their reasoning supports finding a taking in this case.

101.     The *Block* Court upheld the laws in part because they were "made necessary by emergencies growing out of [World War I]." 256 U.S. at 154. A year later, the Court emphasized the limited nature of this temporary emergency exception, explaining that "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change" and noting that *Block* involved a law "dealing with the congestion of Washington . . . caused by the war, [that] dealt with laws intended to meet a *temporary* emergency." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) (emphasis added).

102.     The Rent Stabilization Laws have existed in some form or another since 1969— that is, for fifty years—which means they are anything but temporary. And by passing the Tenant Protection Act and eliminating the need for renewal of the law authorizing rent stabilization every four to eight years, the State confirmed that rent stabilization is no temporary emergency matter in the State of New York.

103.     The permanent nature of the Rent Stabilization Laws brings them out from under *Block* and *Marcus*, where the laws at issue were "justified *only as a temporary measure*." *Block*, 256 U.S. at 157 (emphasis added). Indeed, the Court in *Block* recognized that permanent rent regulation would not survive the Takings Clause on the basis of an emergency justification, reasoning that "[a] limit in time, to tide over a passing trouble, well may justify a law that *could not be upheld as a permanent change*." *Id.* at 157 (emphasis added). Thus, as Justice Rehnquist explained, "the very fact that there is no foreseeable end to the emergency"—here, one that New

York purports has existed for fifty years—"takes [a] case outside the Court's holding in *Block v. Hirsh*." *See Fresh Pond Shopping Ctr., Inc. v. Callahan*, 464 U.S. 875, 878 (1983) (Rehnquist, J., dissenting from dismissal for want of substantial federal question). In truth, the now-permanent Rent Stabilization Laws, deemed necessary "to protect the public health, safety and welfare," *see* Tenant Protection Act, Part D § 1, plainly seek to achieve that goal by "a shorter cut than the constitutional way of paying for the change," *Mahon*, 260 U.S. at 416.

104.    Defendants therefore cannot point to the purported "emergency" nature of the Rent Stabilization Laws, because those laws are not temporary in nature—and are subject to a standard Takings Clause analysis (which they fail).

> E.    *These Physical Takings Have Deprived Plaintiffs of Their Property Without Any Compensation.*

105.    Defendants have engaged in physical takings of Plaintiffs' property—but have not provided any compensation, let alone "just compensation," for the takings.

106.    Specifically, the permanent forced physical occupation of Plaintiffs' rent-stabilized apartments, subject to perpetually decreasing net operating income, and in the case of 699 Venture subject to drastic immediate reductions in net operating income, has devalued these properties in an amount to be determined at trial, believed to be between thirty and fifty percent of their value.

## II.    THE RENT STABILIZATION LAWS ARE A REGULATORY TAKING OF PRIVATE PROPERTY WITHOUT JUST COMPENSATION.

107.    Just as the Takings Clause prohibits the physical, direct taking of private property without just compensation, it also bars regulations that so interfere with property rights that they amount to an indirect, uncompensated taking. Without that protection "the natural tendency of human nature" would be to extend regulations "until at last private property disappears." *Mahon*, 260 U.S. at 415. Therefore, "while property may be regulated to a certain extent, if regulation goes

too far it will be recognized as a taking." *Id.* And a regulation "goes too far" in this context if it "unjustly imposes a burden on [landlords] that should 'be compensated by the government, rather than remaining disproportionately concentrated on a few persons.'" *Yee v. City of Escondido, Cal.*, 503 U. S. 519, 531 (1992) (brackets in original omitted) (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)).

108.    The amended Rent Stabilization Laws go far beyond the threshold for regulatory takings. They depress landlords' rental income and reduce the value of rent-stabilized buildings. In doing so, the Rent Stabilization Laws clearly run afoul of the Takings Clause's core principle: that government may not "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

A.    *The Rent Stabilization Laws Have Taken Plaintiffs' Property Under the* Penn Central *Test.*

109.    Although there is no "set formula" for evaluating regulatory takings, the Supreme Court often considers three factors first distilled in *Penn Central Transportation Company v. City of New York*. That test provides that

> when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.

*Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (quotation marks omitted).

110.    Although the Supreme Court has never applied the *Penn Central* factors to rent control statutes, in *Yee* it indicated that numerous features of rent control might support a regulatory takings claim, such as whether the regulation "transfers wealth only to the incumbent [tenants]," *Yee*, 503 U.S. at 530, or "deprives [property owners] of the ability to choose their

incoming tenants," *id.* at 530–31. (The Court declined to reach the regulatory takings theory in *Yee* because the plaintiffs had failed to raise a regulatory takings question in their petition for certiorari. *See id.* at 535–38.)

111.     Similarly, in *Pennell v. City of San Jose*, 485 U.S. 1, 9–10 (1988), the Court held premature another Takings Clause challenge to a rent-control ordinance that allowed the city to take into account the "hardship" to a tenant when deciding whether an individual landlord's rent was reasonable. But Justice Scalia, joined by Justice O'Connor, disagreed with the majority that the challenge was premature and concluded on the merits that that the ordinance was a regulatory taking without just compensation because it "establish[ed] a welfare program privately funded by those landlords who happen to have 'hardship' tenants," even though the landlords were neither "the source [n]or the beneficiary of the high-rent problem." *Id.* at 22 (Scalia, J., concurring in part and dissenting in part).

112.     As Justice Scalia explained, the "traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities—a problem caused by society at large—has been the distribution to such persons of funds raised from the public at large through taxes . . . ." *Id.* at 21. Indeed, precisely because of the Takings Clause, "this is the only manner our Constitution permits." *Id.* at 22. San Jose's "hardship" ordinance attempted an end-run around this traditional and constitutionally mandated method of establishing welfare programs and sought instead to impose a disproportionate burden on landlords to subsidize "hardship" tenants. "[W]ith relative invisibility and thus relative immunity from normal democratic processes," *id.*, the city had attempted to accomplish with a private wealth transfer what it could not dare politically to implement through taxation.

113. Justice Scalia's analysis of rent regulation in *Pennell* is compelling and no majority of the Supreme Court has ever ruled otherwise. On the basis of his argument in *Pennell*, the Rent Stabilization Laws clearly effect a regulatory taking. Indeed, further balancing of the *Penn Central* factors is unnecessary once it is recognized that the 2019 amendments permanently entrench what is in substance a "private wealth transfer" aimed at paying for a welfare program that Defendants are unwilling to finance through taxation. *Id.*

114. Like the private welfare program established by San Jose in *Pennell*—which the city sought as a substitute for the traditional "process of taxing and spending," *id.* at 23—the Rent Stabilization Laws transfer wealth from owners of rent-stabilized property to tenants who live in rent-stabilized property. New York's highest court certainly understands the Rent Stabilization Laws this way, acknowledging that the rent stabilization regime

> is an exceptional regulatory scheme that enables a specifically targeted group of tenants to maintain housing in New York City. This uncommon regulatory program reflects the legislative intent to *create a benefit for certain individuals who fall below certain income or rent thresholds*, based upon the legislature's conclusion that there is a continuing housing emergency. While the rent-stabilization laws do not provide a benefit *paid for* by the government, *they do provide a benefit conferred by the government through regulation aimed at a population that the government deems in need of protection.*

*In re Santiago-Monteverde*, 22 N.E.3d 1012, 1016 (N.Y. 2014) (some emphases added). The New York Court of Appeals therefore has confirmed that Defendants' rent-stabilization regime subsidizes the perceived needs of one class of society at the expense of another. *See also supra* Background on Rent Stabilization Section I (discussing how the Rent Guidelines Board considers the affordability of rent-stabilized housing for low-income tenants when setting the annual rent increases for rent-stabilized units). Following Justice Scalia's cogent discussion of this issue in *Pennell*, the Rent Stabilization Laws are a regulatory taking.

115. Justice Scalia's persuasive analysis in *Pennell* should inform this Court's application of the *Penn Central* test. But even setting *Pennell* aside, a straightforward application of the *Penn Central* factors demonstrates that the amended Rent Stabilization Laws are an uncompensated regulatory taking of Plaintiffs' property.

116. **Significant Economic Impact.** The economic consequences of the amended Rent Stabilization Laws on Plaintiffs are severe. Two such effects are especially notable.

117. First, the Rent Stabilization Laws self-evidently reduce the rent rates paid by tenants to Plaintiffs. Even before the 2019 amendments, median regulated rents in Manhattan were approximately fifty-three percent below those market rents in the Borough. Josh Barbanel, *Wealthy, Older Tenants in Manhattan Get Biggest Boost From Rent Regulations*, WALL STREET JOURNAL, June 12, 2019, https://tinyurl.com/yyfr73aa. New York's own Department of Finance estimates that the income from unregulated units built in Manhattan before 1973 can be as much as sixty to ninety percent higher than those similarly situated units subject to rent stabilization. NEW YORK CITY DEPARTMENT OF FINANCE, *FY 2020 Guidelines for Properties Valued Based on the Income Approach, Including Office Buildings, Retail, and Residential Properties*, Jan. 15, 2019, https://tinyurl.com/y4ax65cw. And those are only averages. In the lower Manhattan buildings operated by Plaintiffs 226 and 431, unregulated rents run some two-and-a-half times the regulated levels, allowing the regulated tenants to reap an average annual windfall of $25,000 based on the sole criterion of the length of their occupancies.

118. And the disparity between stabilized and market rent rates has only grown over time, in large part because the Rent Guidelines Board in recent years has authorized only de minimis annual rent increases for stabilized units. For example, between 2014 and 2017, while the median monthly contract rent for market units increased 3.22% annually—a 10% increase over

the three-year period—the rent for stabilized units averaged annual increases of only 0.85%—a 2.6% increase over the same period. NEW YORK CITY RENT GUIDELINES BOARD, *2018 Income and Affordability Study*, Apr. 5, 2018, https://bit.ly/2GXxv1Y.

119.    Perhaps most important, even the Rent Guidelines Board has recognized that its annual rent increases do not keep pace with property owners' operating expenses. For instance, while the Board estimates that owner expenses have increased approximately 5.4% on average over the last twenty years—a cumulative cost increase of 169%—it has approved rent increases at only half that rate—a cumulative increase of only 66%. *Compare* NEW YORK CITY RENT GUIDELINES BOARD, *2018 Price Index of Operating Costs*, Apr. 12, 2018, https://bit.ly/2H1BlqY, *with* NEW YORK CITY RENT GUIDELINES BOARD, *1999 Price Index of Operating Costs*, May 4, 1999, https://bit.ly/2S4b5SP. This chasm between owners' expenses and their rental income directly impacts net operating incomes, which have likewise decreased each year under the Rent Stabilization Laws. For units with long-term tenants, property owners subject to the Rent Guidelines Board's low rent-rate increases are already receiving grossly depressed rents, and often already operating those apartments at a loss. And now, with all alternative potential sources of revenue growth choked off, even units that recently turned over, or that may turn over in the future, will grow increasingly less profitable—or more unprofitable. Ultimately, rent-stabilized owners, including Plaintiffs herein, risk having no net operating income at all, a far cry from the *increasing* net operating income that most investors reasonably expect.

120.    Second, because they reduce rental income and restrict property owners' disposition of their own units, the Rent Stabilization Laws unsurprisingly work a dramatic reduction in the value of rent-stabilized buildings. The value of real property, like other assets, is a function of the net present value of future expected income. In addition to the above described

diminution of net operating income caused over time by the Rent Guidelines Board and exacerbated by the Tenant Protection Act, the overcharge liability and corresponding rent reductions—not only from existing claims, but from unknown claims yet to be filed, which have no statute of limitations—faced by 699 Venture, and thousands of regulated landlords similarly situated, threaten open-ended exposure to damages, compounded by a permanent reduction to net operating income. The elimination of any statute of limitations on a rent overcharge complaint, combined with the mandate that a fact finder examine the entire rent history of an apartment in adjudicating a complaint[8]; the new cumbersome eviction procedures; the inability to properly screen incoming tenants; and of course the inability to exit the business have all taken their toll. And the impact is not speculative: already, the first major transaction in the multifamily rent-stabilized market reflects a drop in value of almost forty percent, consistent with the one-third loss in value incurred by Plaintiff FGP. See Georgia Kromei & Rich Bockman, *A&E Real Estate Buys Huge Rent-Stabilized Portfolio at Deep Discount*, THE REAL DEAL, Nov. 19, 2019, https://bit.ly/301IOil. And that is for a seller fortunate enough to find a buyer: already the volume of transactions has fallen by fifty percent. *Id.* There can be no serious dispute that the economic impact of the Tenant Protection Act is deep and dire for the industry.

121.    Plaintiffs' own properties demonstrate the reality that rent stabilization lowers rental value. For example, in the lower Manhattan buildings operated by Plaintiffs 226 and 431, unregulated rents run some two-and-a-half times the regulated levels, allowing the regulated

---

[8] While it is unclear exactly how far back such an inquiry might go, the amended Rent Stabilization Laws and Emergency Tenant Protection Act mandate, at minimum, review of any irregularity contained within the registration history, which now spans thirty-five years, a span which increases every year. In theory, there is nothing to prevent examination of the history dating to the dawn of rent stabilization, now fifty years ago. It is possible to envision a future under the current Rent Stabilization Laws in which an overcharge complaint brings up for review and analysis rental events that occurred prior to the birth of any party or potential witness.

tenants to reap an average annual windfall of $25,000 based on the sole criterion of the length of their occupancies. And in the case of 431's building at 172 Prince Street, if the stabilized units commanded rents comparable to the unregulated ones, income for the twenty-five-unit building would increase by some $145,000 per annum, conservatively adding $3 million to the building's value.

122.     Plaintiffs, too, have suffered losses from the 2019 amendments. For example and as noted, FGP had an accepted offer to sell 309 West 109th Street for $2.7 million; upon passage of the Tenant Protection Act, the offer immediately dropped to $1.8 million.

123.     **Interference with Investment-Backed Expectations.** When the State adopted its first rent-stabilization statute in 1974, it justified the measure because of a housing "emergency" caused by World War II and a resulting vacancy rate below five percent. *See infra* Background on Legal Claims Section IV.B.i. No one expected rent stabilization to be a permanent feature of the State's housing law. The State Legislature declared as much when passing the statute. *See* N.Y. Unconsol. Law Tit. 23 § 8622 (McKinney) (explaining that "the ultimate objective of state policy" is "the transition from regulation to a normal market of free bargaining between landlord and tenant"). Any reasonable property owner in the years following that declaration would surely have thought that rent stabilization was only a temporary measure calibrated to improving the vacancy rate, and, relying on the State's own word, such a property owner would have invested accordingly.

124.     These expectations were strongly reinforced by, in particular, the Rent Regulation Reform Acts in the 1990s, which as noted above had as their stated goals effecting the eventual transition to a free market, incentivizing the improvement of the housing stock, and relieving owners of the onerous burden of maintaining rent records indefinitely. Further, implicit in their

goals and in the structure of the reformed regulatory scheme they ushered in was that vacancy and longevity allowances, luxury deregulation, statutorily mandated individual apartment improvement increases, and rational limitations on rent overcharge complaints would collectively offset the inherently confiscatory nature of the Rent Guidelines Board rate setting process. Simply put, the Rent Regulation Reform Acts created a reasonable investment-backed expectation that owners could realize a reasonable return even while operating in an inherently irrational system that subsidized an arbitrary subset of renters—indigent and affluent alike, though more often affluent—based essentially on how long they had been tenants in their apartments.

125.    And, of course, Plaintiffs themselves held these expectations, and, like the rest of the New York real estate industry, reasonably relied on them in purchasing and/or holding and/or improving their properties. Plaintiff 335-7, for example, relied on the major capital improvement provisions, embodied in the original Rent Stabilization Law and continued (and reaffirmed) for fifty years, in investing $800,000 on a major capital improvement at their 14th Street properties, an investment which at minimum has been diminished, but which will further be subject to new needlessly detailed requirements and restrictions such as a requirement to submit "before" photographs that Plaintiff does not have—which by a reading of the Tenant Protection Act's plain language will bar collection of the major capital improvement. Further, any increases granted by the Division based on this major capital improvement cannot be collected until at least sixty days after the Division finally approves the increase—a process that cannot begin until work is complete and then often takes several years, and the cost of financing the improvement cannot form the basis for any rent increase.

126.    Before the 2019 amendments, 335-7 would have ultimately been entitled to retroactively increase rents, beginning when 335-7 submitted its application. But that allowance

has now been repealed. Beginning with the Division's approval (assuming it approves the full $800,000), 335-7 can collect an additional $27,429 per year in rent on its regulated units— assuming no vacancies and no uncollected arrears. Prorating the $800,000 cost, these units account for $342,857 of the total outlay. But because the 2019 amendments limit annual rent increases for any individual tenant to 2%, the $27,429 increase, which represents roughly a 6.8% increase in the annual regulated rent roll for 335-7, will take between three and five years to phase in (depending on the amount of each tenant's rent). Assuming a modest 4.5% interest rate and adding that cost to 335-7's investment during the period in which 335-7 will be unable to collect any increase, 335-7's cost of funds on a $370,000 investment amounts to $16,650 per year. Over the roughly twenty-seven years of full rent collection, 335-7 will recover about $291,000 on its initial outlay—a negative return even without accounting for the time value of money, vacancies, and unrecovered arrears.

127.    Thus, under the post Tenant Protection Act Rent Stabilization Laws, performing major capital improvements turns out to be yet another money losing proposition, a result obviously inconsistent with every investment-backed expectation created by the history of rent stabilization, not to mention inconsistent with the reasonable expectation of any investor.

128.    The purpose of consideration of a plaintiff's reasonable investment-backed expectations in the context of a *Penn Central* regulatory takings analysis is, in the first instance, to limit recovery in such cases to property owners who can demonstrate that they acquired their property in reliance on a regulatory scheme that did not include the changes they challenge. *See Cienega Gardens v. U.S.*, 331 F.3d 1319, 1345–46 (Fed. Cir. 2003). Notwithstanding this limitation, the fact that a plaintiff has long been involved in a particular business does not defeat a regulatory takings claim. As the Supreme Court held in *Palazzolo v. Rhode Island*, 533 U.S. 606,

627 (2001), regulatory takings arguments "assert[ing] that a particular exercise of the State's regulatory power is so unreasonable or onerous as to compel compensation" are not restricted only to those who acquire the burdened property *before* the challenged regulation was enacted. Otherwise, "the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable" and would essentially "put an expiration date on the Takings Clause." *Id.* This principle was reaffirmed and strengthened by the Supreme Court in *Murr v. Wisconsin*, in which the Court, citing *Palazzolo*, noted that "[a]lthough property interests have their foundations in state law . . . States do not have the unfettered authority to shape and define property rights and reasonable investment-backed expectations." 137 S. Ct. 1933, 1944–45 (2017) (quotation marks omitted). Put simply, state regulations that are unreasonably burdensome "do not become less so through passage of time or title." *Palazzolo*, 533 U.S. at 627. In point of fact, *Palazzolo* and *Murr* ensure that the inherently confiscatory rent setting procedures of the Rent Guidelines Board will be unconstitutional for future owners as well as for present ones. With that said, however, the existing state regulatory scheme is the starting point for evaluating whether a new challenged enactment interferes with reasonable investment-backed expectations to a degree severe enough to constitute a regulatory taking.

129.    Applying the foregoing analytical framework, there should be little doubt that the Tenant Protection Act works a dramatic and unconstitutionally excessive interference with Plaintiffs' actual reasonable investment-backed expectations. And, as also noted, the Tenant Protection Act marked not merely a change in the scope of the Rent Stabilization Laws, but a radical alteration of their purposes and functions. Consider the expectations of owners and investors prior to the Tenant Protection Act—all based on the existing state law statutory scheme—

and how they have all been dashed: (1) previously, an owner could reasonably expect net operating income to increase over time; (2) previously, an owner could expect the value of its investment to increase over time; (3) previously, an owner could expect to recoup its investment in individual apartment improvements and major capital improvements; (4) previously, an owner could expect that, if so advised, it could convert a property to condominium or cooperative ownership; (5) previously, an owner could expect to be able to exclude tenants based upon a history of being sued by prior landlords; and (6) previously, an owner could expect repose from meritless rent overcharge complaints attacking ancient justified rent increases.[9]

130.   Owners' expectations, based entirely on existing law, were as such reasonable by definition. Under the Tenant Protection Act, they have not merely been modified. They have been abrogated. The economic impact of the amendments on property owners is already dire. Two studies have concluded that rent-stabilized properties lost between twenty and forty percent of their (already depreciated) value the instant the 2019 amendments were passed. *See* YARDI MATRIX, *New York Rent Control: Paved With Good Intentions* at 2 (July 2019), https://bit.ly/2GROtyI (click on "available for download" to access bulletin) (finding that "the values of properties with stabilized units dropped anywhere between 20–40 percent overnight"— which comes out to a loss of between $520 billion and $1.04 trillion (based on a value of $2.6 trillion)); *see also* Bill Johnson, *Assessing the Impact of New York's Rent Control Law*, YIELD

---

[9] The probability of rent rollbacks, *see infra* Background on Legal Claims Section V, reinforces that the 2019 amendments now box owners into a business with perpetually diminishing returns. Of course, all this was completely unanticipated and in violation of owners' reasonable investment-backed expectations; they never expected that they could be liable for decades-old rent increases merely because they failed to retain records—in reliance on the previous law. The effect of this change in the law is to impose arbitrary retroactive liability on property owners that is akin to the retroactive liability that the Supreme Court held unconstitutional in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998).

PRO, Aug. 7, 2019, https://bit.ly/2Z5fn0z. This gutting of value reflects the draconian effects of the Tenant Protection Act. Combined with owners' new inability to exit the market, it is no exaggeration to say that owners of rent-stabilized housing in New York have gone from being independent business operators—albeit in a regulated industry—to being providers of a subsidized product deemed necessary by the State, at a controlled price that, sooner or later, will deny them a fair return on their investments. Based on the extent of interference with reasonable investment-backed expectations, the Tenant Protection Act is a regulatory taking.

131.    **Extraordinary Character of the Regulation.** Whenever a regulation destroys "one of the most essential sticks in the bundle of rights [that] are commonly characterized as property," such as the right to exclude or the right to control the disposition of property, it is more likely a taking. *Hodel v. Irving*, 481 U.S. 704, 715 (1987) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).

132.    As described above, *see supra* Background on Legal Claims Section I, the amended Rent Stabilization Laws are a per se taking because they prevent owners from holding many of the "essential sticks" of the property-rights bundle. And even if the Rent Stabilization Laws are not enough of a physical invasion to constitute a per se taking, they would come so close to that threshold that their character weighs heavily in favor of at least deeming them a regulatory taking.

133.    Moreover, a statute is more likely to be a regulatory taking when it lacks a "'reciprocity of advantage' to everyone concerned." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1018 (1992) (quoting *Mahon*, 260 U.S. at 415), or when the "whole benefit gained" by the regulation is not greater "than the sum of the burdens imposed," *Hodel*, 481 U.S. at 716. Where these features are present, it is "more likely that the property 'is being pressed into some form of public service under the guise of mitigating serious public harm.'" *Tahoe-Sierra Preservation*

*Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 350 (2002) (quoting *Lucas*, 505 U.S. at 1018).

134.    Here, the Rent Stabilization Laws do not yield an "average reciprocity of advantage" to both landlords and tenants. *Lucas*, 505 U.S. at 1018

135.    At every turn and in nearly every conceivable way, New York's rent stabilization scheme in the Tenant Protection Act era is tailored only to benefit tenants, especially those already living in stabilized units. Indeed, that is arguably the explicit purpose of the rent stabilization regime. *See Santiago-Monteverde*, 22 N.E.3d at 1016 (explaining that rent stabilization in New York is a "benefit . . . aimed at a population that the government deems in need of protection," namely tenants).

136.    The rent-regulated apartments owned by Plaintiffs 335-7, 431, and 226 are not profitable. Averaging operating costs (not including mortgage interest costs) for the buildings owned by these Plaintiffs on a per unit basis and then comparing those costs to the rents they are allowed to collect shows that the thirty-seven regulated units in these buildings operated at a loss of $227,000 in 2019. And, while prior to the 2019 amendments these Plaintiffs could expect to increase rents and often deregulate units upon vacancy, those options have now been largely foreclosed. Further, the lease renewal increases allowed by the Rent Guidelines Board have not kept pace with increases in these Plaintiffs' operating costs.  As such, under the 2019 amendments, the losses on these Plaintiffs' regulated units are guaranteed to increase over time.

137.    Property owners receive no reciprocal benefits from the Rent Stabilization Laws. They lose the right to control and dispose of their property; they lose the value of their property; and they lose whatever profit they could otherwise make from their property. But they receive

nothing in return. This complete lack of reciprocity demonstrates rent stabilization's true nature: conscripting Plaintiffs' property in the exclusive service of tenants.

138.    And the balance of benefits and burdens under the Rent Stabilization Laws evince a regulatory taking.

139.    Unlike a traditional "public program adjusting the benefits and burdens of economic life to promote the common good," *Penn Central*, 438 U.S. at 124, pursued through across the board taxes, *see Pennell*, 485 U.S. at 21 (Scalia, J., concurring in part and dissenting in part), the benefits here are concentrated on a subset of New York tenants. So, too, the burdens are concentrated on a portion of New York landlords.

140.    Because neither the benefits nor the burdens are diffuse, the Rent Stabilization Laws have effects akin to a law taking property from A and giving it to B. That constitutes a taking under the Constitution.

141.    And, in any event, many owners have suffered a regulatory taking as a result of the Rent Stabilization Laws under the theory adopted in *Lucas v. South Carolina Coastal Council*. In *Lucas*, the Supreme Court re-invigorated the rule "that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." 505 U.S. at 1019. Under the Rent Stabilization Laws, owners are suffering a slow but nevertheless real taking under *Lucas*: even if their rent-stabilized properties may have an economically beneficial use at the moment, the laws ensure that their properties will continue to lose value until they eventually have no economically beneficial use. The first rent increase approved by the Rent Guidelines Board after enactment of the 2019 amendments illustrates this reality; the Board only permitted a 1.5% or 2.5% increase in rents for rent-stabilized apartments—a sum that does not come close to keeping

pace with property owners' increasing costs. It does not matter that such a result will occur in the future; *Lucas* surely would not permit a law that explicitly deprived an owner of all economically beneficial uses of their property in five years, and the fact that the Rent Stabilization Laws do so implicitly does not change the outcome: that there has been a regulatory taking.

      B.      *The Rent Stabilization Laws Have Taken Plaintiffs' Property Because They Constitute a Land-Use Exaction.*

      142.    Aside from the *Penn Central* test, the Supreme Court has also held that certain land-use exactions are regulatory takings for which just compensation is due under the *Nollan/Dolan* analysis. *See Dolan v. City of Tigard*, 512 U.S. 374 (1994); *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987). According to these cases, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013).

      143.    The Court in *Yee* noted that if a rent-control ordinance in practice transferred wealth only to a small group of beneficiaries, that fact "may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance," 503 U.S. at 530 (citing *Nollan*, 483 U.S. at 834–35), thus making clear that rent control laws implicate the *Nollan/Dolan* inquiry. The *Yee* Court further invoked these cases when explaining that any statute "compel[ling] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy" might be a regulatory taking. *Yee*, 503 U.S. at 528 (citing *Nollan*, 483 U.S. at 831–32).

      144.    The Court's statements in *Yee* indicate that a regulatory takings challenge to the Rent Stabilization Laws may proceed under the Court's *Nollan/Dolan* line of cases. And, indeed, New York has long recognized that *Nollan/Dolan* analysis is appropriate in evaluating the

constitutionality of the rent laws. *See Seawall Assocs. v. City of New York*, 542 N.E.2d 1059, 1068 (N.Y. 1989) (finding New York City's law compelling rental of single-room occupancy units unconstitutional under *Nollan* because, although the stated aim of the statute was to reduce homelessness, vacant units were not earmarked for homeless renters and reasoning that "[w]hile, of course, any increase in the supply of low-cost housing would benefit some prospective tenants, it is by no means clear that it would benefit the homeless"); *see also Manocherian v. Lenox Hill Hosp.*, 643 N.E.2d 479, 483 (1994); *Rent Stabilization Ass'n of New York City, Inc. v. Higgins*, 630 N.E.2d 626, 633–34 (N.Y. 1993).[10]

145.    Applying the *Nollan*/*Dolan* line of cases, the Rent Stabilization Laws are clearly a regulatory taking. These cases prohibit "the . . . government [from] us[ing] its substantial power and discretion . . . to pursue governmental ends that lack an essential nexus and rough proportionality to the effects" on the use of the owner's property, "thereby diminishing without justification the value of the property." *Koontz*, 570 U.S. at 614.

146.    For the same reasons presented elsewhere in this complaint, the purported ends of the amended Rent Stabilization Laws—stated in the Tenant Protection Act at Part D § 1 as prevention of uncertainty, potential hardship and dislocation of all tenants, regulated and unregulated alike, and protection of "the public health, safety and general welfare," and more generally defined as preventing "speculative, unwarranted and abnormal increases in rents," "uncertainty, hardship and dislocation," "unjust, unreasonable and oppressive rents," and to

---

[10] In *Manocherian*, the New York Court of Appeals, over the dissent of Judge Levine, evaluated the constitutionality of an amendment to the Rent Stabilization Code independently of the Rent Stabilization Code as a whole and found that the amendment lacked the required nexus to the stated aims of rent stabilization. The *Manocherian* court, like the Supreme Court in *Yee*, also stressed that the statute in issue benefitted only a small and discrete group of tenants rather than the public as a whole.

"forestall profiteering, speculation and other disruptive practices," *id.* at Part G § 2—lack the nexus and rough proportionality needed to justify the government's exaction and transfer of Plaintiffs' reversionary interest in their properties, to say nothing of the destruction of Plaintiffs' equity.

147.    As explained in *Yee*, when the government's restrictions compromise the landlord's reversionary interest in a manner that does not amount to a complete permanent occupation, the regulation still implicates *Nollan/Dolan* analysis if, in its application, it has the effect of "compel[ling] a landowner over objection to rent his property." *Yee*, 503 U.S. at 528. And, while the Rent Stabilization Laws theoretically exist to benefit the public as a whole, in practice they benefit a relatively small and discrete class of existing tenants—tenants who would otherwise suffer no harm from Plaintiffs making their properties available for residential rent, much less a harm that is proportionate to the costs the Rent Stabilization Laws impose on Plaintiffs. And finally, *Yee* counsels that where, as here, a rent control ordinance has the effect, in its application, of compelling a landlord to rent at controlled rates, that effect is a "condition" on the landlord's right to operate its property, and therefore subject to *Nollan/Dolan* scrutiny. *See id.* at 532.

148.    The *Nollan/Dolan* nexus requirement is satisfied only when an owner's use of his or her property causes harms to the broader public that would provide a proper basis for the government forbidding the use altogether and these harms can be partly remedied by transferring a portion of the property to the government for public use. *See Nollan*, 483 U.S. at 837 (land-use exaction fails nexus requirement if it does not further an end that could be advanced to justify outright prohibition on owner's proposed use). Far from causing harms that the Rent Stabilization Laws are designed to redress, Plaintiffs' use of their property—renting it out to residential tenants—actually *reduces* those same harms. If Plaintiffs were prohibited from renting their apartments, vacancy rates would decrease, overall residential rental prices would rise with the

decline in supply, and there would be fewer apartments available for rent by low-income residents and racial and ethnic minorities. In renting their apartments for residential use, Plaintiffs reduce rather than contribute to all of the problems that the Rent Stabilization Laws supposedly address.

149. Forcing Plaintiffs to give up their interests in obtaining a fair return on their investments and in possessing, using, and disposing of their property (along with other interests, *see supra* Background on Legal Claims Section I) as conditions of renting it on the residential market also fails *Dolan*'s "rough proportionality" requirement. As discussed elsewhere in this complaint, the 2019 amendments dramatically reduce the value of Plaintiffs' property and deprive Plaintiffs of many of their most essential ownership rights. These severe effects on Plaintiffs' properties are wholly out of proportion to any social ills supposedly caused by Plaintiffs' decision to make their apartments available for rent.

C. *The Rent Stabilization Laws' Hardship Increases Do Not Save the Laws From Effecting a Taking.*

150. The hardship provisions, which purport to allow some owners of rent-stabilized properties to obtain rent increases above the ceiling permitted by rent stabilization, *see* N.Y. UNCONSOL. LAW TIT. 23 § 26-511.c(6), c(6-a), do not prevent the Rent Stabilization Laws from violating the Takings Clause.

151. This is so because the hardship provisions are onerous and there is no requirement that the Division adjudicate hardship applications within a reasonable period of time—let alone *any* period of time. *See id.* Owners must fill out a lengthy set of forms in order to even apply for a hardship exemption. *See* N.Y. STATE DIVISION OF HOUSING AND COMMUNITY RENEWAL, *Form RTP-45, RTP-45A, RTP-45B, RTP-45C, RTP-45D, RTP-45E, RTP-45F, RTP-45G*, https://on.ny.gov/39dSLfN. And owners must meet a set of rigorous and nearly impossible-to-meet requirements in order to be entitled to a hardship increase. *See, e.g.*, N.Y. STATE DIVISION OF

HOUSING AND COMMUNITY RENEWAL, *Fact Sheet: #39 Comparative and Alternative Hardship*, June 2019, https://on.ny.gov/39fqkhM. What is more, there is no requirement that the Division adjudicate these requests with any promptness; indeed, it often takes years for there to be a final determination on a request for an increase under the hardship exemption.

152.    All this means that the hardship exemptions are not a viable option for the vast majority of owners. Data on the number of hardship applications that owners have filed in recent years backs this up: in 2011—the busiest year for hardship applications between 2011 and 2015—four applications were filed, and in 2015 not a single application was filed. Nathan Tempy, *In Search of the Elusive Struggling Rent-Stabilized Landlord*, GOTHAMIST, Oct. 19, 2016, https://bit.ly/385aEgB. The hardship provisions thus do undermine the reality that the Rent Stabilization Laws effect a taking of owners' property.

153.    In sum, because the Rent Stabilization Laws, and especially the Tenant Protection Act, do not redress any injuries visited upon society by Plaintiffs' land use, but nevertheless force property owners to relinquish many of the sticks in the property-rights bundle and diminish owners' property values, they lack a "sufficient nexus between the[ir] effect . . . and the objectives [they are] supposed to advance," *Yee*, 503 U.S. at 530. Therefore, whether analyzed under the *Penn Central* test or the *Nollan*/*Dolan* test, the Rent Stabilization Laws, and especially the Tenant Protection Act, are a regulatory taking for which Plaintiffs are due just compensation.

III.    THE RENT STABILIZATION LAWS ARE A CONFISCATORY TAKING BECAUSE THEY DO NOT PROVIDE LANDLORDS WITH A FAIR RETURN ON THEIR INVESTMENTS.

154.    The Supreme Court has long held that certain property owners subject to price ceilings are entitled under the Constitution to "just and reasonable" rates. *Fed. Power Comm'n v. Nat. Gas Pipeline Co. of Am.*, 315 U.S. 575, 585 (1942). A "just and reasonable" rate is contrasted

with an unjust and "confiscatory" one. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989); *see also Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 391–92 (1974).

155.    In determining whether a given rate is "unreasonable," courts ask whether the rate "enable[s] the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 605 (1944). Reasonable rates under that standard may also be calculated based on "historical cost." *Duquesne Light Co.*, 488 U.S. at 310. These historical costs include "the cost of prudently invested capital used to provide the service," which incentivizes property owners to "make smart investments deserving a 'fair' return." *Verizon Commc'ns, Inc. v. F.C.C.*, 535 U.S. 467, 485–86 (2002); *see also Duquesne Light Co.*, 488 U.S. at 314 (explaining that the central focus of the fair-return test is "the return [prudent] investors expect given the risk of the enterprise").

156.    A property owner therefore "is entitled to such rates as will permit it to earn a return . . . equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties." *Duquesne Light Co.*, 488 U.S. at 314–15 (quoting *Bluefield Water Works & Improvement Co. v. Public Service Comm'n of West Virginia*, 262 U.S. 679, 692–693 (1923) (omission in *Duquesne Light Co.*)). Further, a reasonable return "generally requires . . . an opportunity to recover all . . . reasonably incurred costs." Thomas W. Merrill, *Constitutional Limits on Physician Price Controls*, 21 HASTINGS CONST. L. Q. 635, 654 (1994).

157.    Courts have generally applied the fair-return standard to public utilities because the "partly public, partly private status of utility property creates its own set of questions under the Takings Clause of the Fifth Amendment." *Duquesne Light Co.*, 488 U.S. at 307. The *reason* public

utilities tend to raise special problems under the Takings Clause is because unlike most private property owners, public utilities are usually required by law to "serve the public, and must furnish service on demand to all applicants at government-determined rates." *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993); *see also Yakus v. United States*, 321 U.S. 414, 437 (1944) ("The present [price-control] statute is not open to the objection that petitioners are compelled to serve the public as in the case of a public utility . . . ."). When courts have rejected claims under the fair-return standard raised by property owners outside utility industries, they have done so precisely because the property owners *could* leave the relevant market. *See, e.g.*, *Bowles v. Willingham*, 321 U.S. 503, 517 (1944) (rejecting a rent-control challenge because there was "no requirement that the apartments in question be used for purposes which bring them under the [statute]," namely, that they continue to be offered as accommodations for rent); *Garelick*, 987 F.2d at 916 (rejecting a fair-return claim by anesthesiologists because "unlike public utilities, [they] are under no legal duty to provide services to the public and to submit to price regulations"); *Whitney v. Heckler*, 780 F.2d 963, 972–73 (11th Cir. 1986) ("It is well established that government price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry."); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 445–47 (8th Cir. 1984) (noting that "nursing homes, unlike public utilities, have freedom to decide whether to remain in business and thus subject themselves voluntarily to the limits imposed by [the State] on the return they obtain from investment of their assets in nursing home operation"); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 883–84 (7th Cir. 1983) (similar with Medicare participants).

158.    The fair-return standard applies here, because New York has made Plaintiffs the equivalent of public utilities. This is so because the Rent Stabilization Laws—especially those

changes wrought by the 2019 amendments—make it practically impossible for Plaintiffs to exit the residential rental market. For the same reasons that the Rent Stabilization Laws physically take Plaintiffs' property without just compensation, they also force Plaintiffs to remain in the very market that the laws regulate. *See supra* Background on Legal Claims Section I. Most notably, the amended Rent Stabilization Laws (1) compel owners of rent-stabilized units to renew rent-stabilized tenancies indefinitely, leaving the choice to end the tenancy solely in the hands of the tenant and (2) eliminate owners' ability to exit the regulated residential rental market. Indeed, the strength of the analogy between landlords, who are traditionally thought to own *private* property, and utilities, who own *quasi-public* property, betrays the extraordinarily intrusive nature of the Rent Stabilization Laws.

159.     Applying the fair-return standard, Plaintiffs here are entitled to just compensation because the rental rates set by the Rent Guidelines Board—combined with limitations on rent increases resulting from individual apartment improvements or major capital investments—do not provide them with a rate of return "equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties." *Duquesne Light Co.*, 488 U.S. at 314–15 (quoting *Bluefield Water Works & Improvement Co.*, 262 U.S. at 692–93). Put simply, the rents dictated by the Rent Stabilization Laws and the Rent Guidelines Board deprive landlords of any opportunity to recover their reasonably incurred costs and therefore to earn a fair return on their prudentially made investments. *See supra* Background on Legal Claims Section II.A. This is especially evident when comparing Plaintiffs' investments to those made "in other business undertakings which are attended by corresponding risks and uncertainties." *Duquesne Light Co.*, 488 U.S. at 314–15. Unlike landlords who own rent-stabilized property in New York, landlords who own residential

rental property that is *not* rent-stabilized are not deprived of any reasonable opportunity to recoup their investments.

160.    In contrast, a rent-stabilized landlord is deprived, most notably, of anything remotely approximating a reasonable return on individual apartment improvements and major capital improvements. First, under the Tenant Protection Act a landlord investing in an individual apartment improvement is only entitled to increase the rent by either by one one-hundred-sixty-eighth or one one-hundred-eightieth of the cost of the improvement, excluding both financing costs and the landlord's own internal administrative costs—a return of roughly six to seven percent. But because only the first $15,000 in individual apartment improvement costs can be recovered—and that maximum only once every fifteen years—the actual yield on improvements will typically be far lower. For example, on an investment of $80,000, an owner would reap a return of only $1,000 per year—a mere 1.25% return on an investment in which there would be no ultimate return of the principal. Even that return will vanish after thirty years, with the owner having recovered less than half its initial investment (not even accounting for the reduction based on a present value calculation). And that calculation does not even take into account the cost of the funds necessary to undertake the work. If those funds are borrowed, the "return" on the investment, even in absolute dollar terms, will be less than the interest costs incurred. Alternatively, an owner contemplating investing its own funds in improvements could only conclude that such funds would be better off left idle. It is self-evident that this is not a reasonable return and that it is insufficient to attract capital to invest in individual apartment improvements. *See, e.g.*, Daniel Geiger, *Blackstone Halts Stuy Town Upgrades in Wake of Rent-Regs Overhaul*, CRAIN'S NEW YORK BUSINESS, July 12, 2019, https://bit.ly/35CdmrW.

161.    The calculations for major capital improvements, while less dire, are similar: a major capital improvement in a building with more than thirty-five apartments costing $150,000 will yield annual income of $12,000 (subject to downward adjustment by the Division and further subject to a phase that may reduce the amount of the income for a number of years), but the payout will not begin until several years after the initial investment, and the owner will incur additional costs during the lengthy application process. Because any rent increases are temporary and because the improvement will by its nature depreciate over time, the initial investment of principal will never be recovered. The cost of the money invested, whether measured by interest charged by a lender or by the opportunity cost to the owner, similarly cannot be recovered: the temporary rent increase granted cannot take account of those costs. Yet, if those costs are deducted from the additional rent collected through the temporary rent increase, the amount left will not even cover the capital outlay itself. The example above of a $150,00 investment will illustrate: assuming even a very modest 4.5% interest rate and an also modest $5,000 cost to see the application through the Division, the outlay will already be $166,250 by the time rent collection begins. Thus the $12,000 annual rent collection will need to fund interest costs of $7,480 per year, leaving only $4,520 toward recoupment of capital—a total over thirty years of just $135,600. And while there will be modest Rent Guidelines Board increases compounded into the rent collected, there will also be inflation and allowances for vacancies and improper nonpayment by tenants. The bottom line is that investment in major capital improvements, even when they are not merely prudent but necessary, will yield a negative financial return.

162.    The drafters of the Tenant Protection Act seem to have believed that eliminating the financial viability of individual apartment improvements and major capital improvements would not harm landlords because such improvements are somehow optional and/or because they

pay for themselves simply by increasing the value of a property. In truth, however, neither individual apartment improvements nor major capital improvements are ultimately optional. They can be deferred, but they cannot be indefinitely avoided. The items involved in individual apartment improvements—floors, appliances, kitchen and bathroom cabinets and fixtures, and electrical service—deteriorate over time and must ultimately be replaced, even if such replacement has become a money-losing investment. And the same holds even more true for such major capital improvements as roof replacement, boiler replacement, and façade work. Further, the notion that such replacements increase property value likewise rests on a fallacy: as noted, these physical assets depreciate over time, so that replacement does no more than maintain property value. An accurate examination of the realities of owning property should make this self-evident: left unrenovated, a desirable apartment will in time turn into an undesirable one. The appliances and cabinets that were state of the art and brand new in 1990 will, thirty years later, be old and in need of replacement. Yet the Tenant Protection Act takes no account of this reality.

163.    Further, as also noted above, the Rent Guidelines Board process for setting rent increases—the increases owners must now rely upon—is structurally designed to ensure that rent increases do not keep pace with increased operating costs. Such a structure is not only inconsistent with the unregulated rental real estate market but is inconsistent even with the ratemaking procedures that govern recognized utilities. It is extraordinary to take into account the needs of indigent customers for ratemaking—for the express purpose of subsidizing the price charged to *all* customers, indigent and affluent alike.

164.    Meanwhile, the Rent Stabilization Laws also contain a feature inconceivable to any utility: the ability of the customer to challenge the rate charged by a procedure that compels the owner to account for increases taken in the distant past, despite the fact that the Legislature itself—

with the subsequent blessing of New York courts—specifically assured owners they could safely dispose of the ancient documents needed to support current rents. This feature, among its many constitutional infirmities, compounds the already inherent unreasonableness of a ratemaking structure that denies landlords recovery of necessary costs prudently incurred and deprives them of increases that keep pace with the costs of operation.

165.    The Rent Stabilization Laws also impose an unreasonable rate of return on owners because they do not enable them "to operate successfully," "to maintain [their] financial integrity," "to attract capital," or "to compensate [their] investors for the risks assumed." *Hope Nat. Gas Co.*, 320 U.S. at 605. Again, for many of the reasons why the Rent Stabilization Laws are a taking under the *Penn Central* standard—they work a devastating economic impact on Plaintiffs and substantially interfere with their reasonable investment-backed expectations—they are also confiscatory under that standard. *See supra* Background on Legal Claims Section II.A.

166.    Many landlords with rent-stabilized properties cannot hope to "operate successfully" or maintain "financial integrity" under the Rent Stabilization Laws. Instead, they face the prospect of economic ruin as capital projects cannot be recouped and net income is squeezed to zero.

a.   And with so little prospect of any profitable turnaround under the rent stabilization regime, it is likewise no wonder that owners of rent-stabilized properties cannot "attract capital" to maintain their properties.

b.   For the same reasons, reasonable players in the real estate sector are unwilling to even assume the risk associated with *any* type of financial involvement with rent-stabilized properties. For example, before the 2019 amendments, Plaintiff 699 Venture received weekly offers from various brokers and investors to purchase its building or other rent-

stabilized buildings owned by its principals. Since June 14, 2019, those offers have completely stopped; its principals have not received a single offer. *See also supra* Standing. This is a clear indicator that the Rent Stabilization Laws do not permit owners of rent-stabilized property or investors in this sector to be compensated for the risks they reasonably assumed by entering the rent-stabilized property marketplace.

167.    Because New York's rent-stabilization system does not adequately compensate landlords for the investments they have made to improve the City's housing stock or to maintain a fair income stream, landlords are entitled to the just compensation guaranteed to them by the Takings Clause.

## IV.    THE RENT STABILIZATION LAWS TAKE PRIVATE PROPERTY FOR A NON-PUBLIC USE AND THEREFORE MUST BE ENJOINED.

168.    As discussed previously, *see supra* Background on Legal Claims Sections I, II, and III, Defendants have taken Plaintiffs' property through the Rent Stabilization Laws.

169.    The Takings Clause also specifies that government may exercise the eminent-domain power only if the private property at issue is taken "for public use." U.S. CONST. amend. V; *see also Phillips v. Wash. Legal Found.*, 524 U.S. 156, 163–64 (1998) (acknowledging the public-use requirement's applicability to the States through the Fourteenth Amendment).

170.    If the government takes private property for a non-public use, then "just compensation" in the form of damages is not an adequate remedy. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) ("[I]f a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement . . . that is the end of the inquiry. No amount of compensation can authorize such action."). Rather, an injunction must issue to prevent the government from effecting the taking. *See, e.g.*, *Carole Media LLC v. New Jersey Transit Corp.*, 550 F.3d 302, 308 (3d Cir. 2008) ("A plaintiff that proves that a government entity has

taken its property for a private, not a public, use is entitled to an injunction against the unconstitutional taking, not simply compensation."); *Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 17 (1st Cir. 2010) (same).

171.    For each of the three independent reasons laid out below, the Rent Stabilization Laws take private property for a non-public use, and thus must be enjoined.

A.    *The Rent Stabilization Laws Benefit a Particular Class of Individuals—Tenants of Rent-Stabilized Apartments—and Thus Engage in Takings for a Non-Public Use.*

172.    The Supreme Court has repeatedly indicated that if a law is enacted "to benefit a particular class of identifiable individuals," the taking is for a non-public use. *See Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984); *Kelo v. City of New London, Conn.*, 545 U.S. 469, 478 (2005). "A purely private taking"—that is, a transfer of property from one private party to another private party to benefit the second private party—"could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void." *Midkiff*, 467 U.S. at 245.

173.    Here, the Rent Stabilization Laws were clearly enacted to benefit a particular class of identifiable individuals: tenants who live in rent-stabilized apartments. This reality is based on the text of the laws; at every turn, the Rent Stabilization Laws prefer rent-stabilized tenants over owners, ensuring that a benefit accrues to all such tenants—at the expense of takings from the owners.

174.    The statements of the legislators who ushered in the Tenant Protection Act confirm that the Rent Stabilization Laws exist solely to protect tenants: these reforms give New Yorkers "the strongest tenant protections in history" (Senator Stewart-Cousins); "[t]he Housing Stability and Tenant Protection Act of 2019 will shift the balance toward helping renters throughout New York State to stay in their homes" (Senator May); and "[t]he legislation that we have adopted today

protects rent stabilized tenants" (Senator Mayer). THE NEW YORK STATE SENATE, *Senate Passed Strongest Tenant Protections in State History*, June 14, 2019, https://bit.ly/39fErne.

175.     The fact that the Rent Stabilization Laws benefit a particular class of individuals differentiates this case from cases in which the Supreme Court has found that a taking was for a public use.

176.     For example, in *Kelo* the city of New London, Connecticut, justified its challenged redevelopment plan largely because it was projected "to increase tax and other revenues, and to revitalize an economically distressed city." 545 U.S. at 472 (quotation marks omitted). Raising general tax revenues through an integrated redevelopment plan is likely driven by some public purpose to help the community at large.

177.     In contrast, the Rent Stabilization Laws *decrease* the City's property tax revenue each year. A study using data from the 2010 census estimated that the City loses about $283 million in property tax revenue each year because of rent regulation. CITIZENS BUDGET COMMISSION, *Rent Regulation: Beyond the Rhetoric* at 19, June 2010, https://tinyurl.com/y4bm3kpg.

178.     The Tenant Protection Act makes things far worse from a tax revenue perspective. A 2019 analysis estimates that the steep decline in property values caused by the 2019 amendments will result in a $2 billion loss in property tax revenue every year. REAL ESTATE BOARD OF NEW YORK, *Testimony of the Real Estate Board of New York Before the Rent Guidelines Board Regarding Lease Renewal Guidelines for 2019*, Apr. 25, 2019, https://tinyurl.com/y33womrm. And that estimate does not account for the anticipated decrease in economic activity caused by the 2019 amendments' effect on major capital improvements and individual apartment improvements—which will further decrease tax revenue.

179.    Because the Rent Stabilization Laws transfer property from one private party to another solely to further the interests of the receiving private party—individuals who happen to be rent-stabilized tenants—and do not further general public interests like increased tax revenue, they "serve no legitimate purpose of government"; are takings not for public use; and are "thus . . . void." *See Midkiff*, 467 U.S. at 245.

B.      *New York's Rent Stabilization Laws Are Not Rationally Related to a Public Purpose, and Thus Commit Takings for a Non-Public Use.*

180.    Even assuming that taking an owner's property interest and giving it to a tenant is not "[a] purely private taking," *id.*, the Rent Stabilization Laws still go beyond the bounds of the "public use" limitation.

181.    The Supreme Court's "cases have repeatedly stated that one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid" and found that when the government takes property its taking must be "rationally related to a conceivable public purpose." *See id.* at 241 (internal quotation marks omitted).

182.    Courts have found that, in some cases, rent regulation may be so irrational as to violate the public use requirement. *See Hall v. City of Santa Barbara*, 833 F.2d 1270, 1280–81 (9th Cir. 1986), *abrogated in part not relevant by Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992) (recognizing that rent regulation, on some facts, might run afoul of *Midkiff*'s rational relationship standard); *Richardson v. City & Cty. of Honolulu*, 759 F. Supp. 1477, 1492–96 (D. Haw. 1991) (holding that a rent regulation was not rationally related to a conceivable public purpose and thus was invalid).

183.    This is just such a case: there is no rational basis for Defendants' adoption of the Rent Stabilization Laws—and thus the laws engage in a taking for a non-public use.

184.    Contrary to their asserted justifications, the Rent Stabilization Laws have repeatedly failed to improve any purported "emergency"; reduced rather than increased the vacancy rate; negatively impacted the quality of existing rental units; and failed to provide affordable housing to low-income individuals. The fact that Defendants have renewed and expanded the Rent Stabilization Laws time and time again despite the fact that they have done nothing to further their purported ends indicates that the laws have no rational relationship to any conceivable public purpose. The Rent Stabilization Laws thus commit takings for non-public use.

       i.       <u>Even Before the 2019 Amendments, Rent Stabilization Was a Taking for a Non-Public Use.</u>

185.    The Rent Stabilization Laws have **repeatedly failed to improve any purported "emergency"**—which means that Defendants' decisions to renew and reinforce them have no rational relationship to this purported justification.

186.    The Rent Stabilization Laws were first enacted—and have been retained and expanded—because of a purported "housing emergency." But that "emergency," first declared by the City in 1969, was supposedly precipitated by World War II and its aftermath. *See supra* Background on Rent Stabilization Section I. Given that World War II had already ended some twenty-five years before that first declaration, it was already questionable whether the State and City could rationally attribute the housing "emergency" to the Second World War.

187.    When the New York State Legislature enacted the Emergency Tenant Protection Act in 1974—nearly three decades after the war's conclusion—the State invoked the same war-time rationale adopted by the City. Perhaps recognizing the increasingly untenable reliance on a war that had ended nearly thirty years before, the State Legislature added that the emergency declaration was justified by an "acute shortage of housing accommodations." N.Y. UNCONSOL. LAW TIT. 23 § 8622 (McKinney).

188.     In 1974, however, the State Legislature still seemed to assume that the "emergency" was not interminable and would end once that shortage subsided. The Legislature demonstrated this by delegating to the City authority to declare a housing emergency only when "the vacancy rate for the housing accommodations within [the] municipality is not in excess of five percent." *Id.* § 8623(a). And with that delegation came certain responsibilities: for the City to justify whether the mere existence of an "emergency" provides grounds for "the need for regulating and controlling residential rents"; whether specific classes of housing accommodations should be exempted from the emergency; and whether the regulation of rents served to abate the emergency. *Id.* § 8623(a), (b). Thus, although the Legislature proffered no reason to support a five-percent threshold for declaring a housing "emergency," it at least established some objective criterion to justify the continued existence of the Rent Stabilization Laws.

189.     That five-percent threshold has remained in place ever since 1974—without any further justification for its existence. And despite the array of Rent Stabilization Laws that the "emergency" spawned, the vacancy rate city-wide has never crossed the threshold in the forty-five years since it was established. In point of fact, the Rent Stabilization Laws themselves, by artificially depressing rents, ensured that there would correspondingly be a depressed supply of housing. This self-perpetuating nature of the "temporary emergency" has long been recognized, as has the corresponding reality that in the unregulated market the vacancy rate has long exceeded five percent, as it has even in the higher rent levels of the stabilized market.

190.     Nonetheless, the New York City Council has, without serious deliberation, reflexively declared a housing "emergency" every three years since 1974—most recently in 2018.

191.     During the City Council's 2018 hearing on whether to re-declare a housing "emergency" in the City, proponents of the Rent Stabilization Laws, perhaps realizing that the

Rent Stabilization Laws were failing to increase the low vacancy rate of regulated housing, instead focused heavily on the goal of providing affordable housing to low-income individuals.

192.    For example, the Assistant Commissioners of Policy and Strategy at the New York City Department of Housing, Preservation and Development testified that "[r]ent stabilized apartments . . . enable residents to remain in their homes and exercise the choice to stay in their neighborhoods." *Housing Vacancy Survey and Rent Stabilization: Hearing before the New York State Assembly Comm. on Housing* at 19:50–20:25, May 2, 2019, https://bit.ly/396eYMW (statement of Lucy Joffe and Elyzabeth Gaumer, Assistant Commissioners, New York City Dept. of Housing Preservation and Development).

193.    This history of the Rent Stabilization Laws demonstrates that there is no rational relationship between those laws and solving any purported housing emergency; the Laws' perpetual failure to remedy such an "emergency" means that their renewal and expansion has no rational basis—and they take private property for a non-public use.

194.    To the extent that the Rent Stabilization Laws are predicated on attempting to improve New York's vacancy rate, they lack a rational basis. The Rent Stabilization Laws have **repeatedly failed to decrease the vacancy rate**, which indicates that they are a taking for a non-public use because Defendants' continued decisions to adopt and implement them are irrational.

195.    Since 1974, the vacancy rate in the City of New York has never crossed the five percent line. Thus, New York's Rent Stabilization Laws prior to 2019 failed to push the vacancy rate above the statutory five percent threshold.

196.    The Rent Stabilization Laws, like every price ceiling, cause a shortage of supply. When a price ceiling sits below the market's equilibrium price (at which demand equals supply), the quantity demanded will exceed the quantity supplied. And the results of such a regime are

tragically familiar: the limited supply will have to be rationed and the lucky few will reap the benefits of the below-market price, while everyone else is unable to obtain the price-regulated good.

197.     On the demand side, the lower rent rates encourage tenants to live (and stay) in their rent-stabilized units regardless of their housing needs.

198.     These combined effects have *decreased* rather than increased the vacancy rate. For example, in 2017 the vacancy rate for non-stabilized units in New York City was 6.07%—safely above the five-perfect threshold established in 1974—while the vacancy rate for rent-stabilized units was only 2.06%, dragging the overall vacancy rate below the statutory threshold. These statistics underscore that there is no housing emergency that justifies rent stabilization and that, to the extent there is a shortage in housing, that shortage is caused by rent stabilization.

199.     The Rent Stabilization Laws, *by their very nature*, ensure that the vacancy rate will never exceed five percent. They thus perpetuate the very vacancy problem they purport to mitigate and have no rational basis.

200.     Despite their purported justification of providing affordable housing for the needy, the Rent Stabilization Laws **have never routinely provided affordable housing for those in need,** which indicates their repeated adoption has been irrational.

201.     The Rent Stabilization Laws do not even consider—let alone target—tenants' financial needs. It is thus no surprise that real-world data indicates that the laws do not primarily benefit those with lower incomes.

202.     Contrary to Defendants' asserted interest in helping those most in need, the "biggest beneficiaries of rent regulation in New York are not low-income tenants across New York City, but more affluent, white residents of Manhattan." Josh Barbanel, *Wealthy, Older Tenants in*

*Manhattan Get Biggest Boost From Rent Regulations*, WALL STREET JOURNAL, June 12, 2019, https://tinyurl.com/yyfr73aa. For example, a typical renter with an income in the top quarter of all New York households paid about $1,650 in rent for a regulated unit, while similarly situated renters paid $2,700 in rent in the private market—a thirty-nine percent discount for the rent-stabilized tenant. *Id.* Meanwhile, renters with a bottom-quarter income only received a fifteen percent discount under the Rent Stabilization Laws. *Id.*

203.    These high-income beneficiaries of the Rent Stabilization Laws are not unicorns; they are plentiful. Data from the 2010 census showed that roughly 22,000 rent-stabilized households in the City had incomes of more than $199,000 and 2,300 rent-stabilized households had incomes of more than $500,000. James Fanelli, *Rent-Stabilized Apartments Are Being Occupied by Millionaires, Records Show*, DNA INFO, Apr. 30, 2014, https://bit.ly/3bm5grQ.And if numbers do not tell the whole story, anecdotes of notable cases are not difficult to come by: the former Philip Morris executive living in a rent-stabilized apartment for nearly twenty years, while he and his wife bought a weekend home in the Berkshires; the magazine editor and her husband who owned a photo agency living in a rent-stabilized unit in the Upper West side for twenty-seven years, while owning a cottage on a seven-acre property in upstate New York; and the married college professors who refused to live with each other because they each wanted to keep their rent-stabilized apartments (for which they paid $2,070 and $1,500 a month, respectively), and rather than sacrifice even one of the apartments, instead purchased a vacation home in the Catskills.

204.    High-income households are the primary beneficiaries of rent stabilization.

205.    Indeed, study after study across several decades shows beyond dispute that benefits from the Rent Stabilization Laws are, at best, randomly distributed across both high- and low-income groups. *See, e.g.*, CITIZENS BUDGET COMMISSION, *Rent Regulation: Beyond the Rhetoric*

at 11, June 2010, https://tinyurl.com/y4bm3kpg; Dirk W. Early, *Rent Control, Rental Housing Supply, and the Distribution of Tenant Benefits*, 48 J. URBAN ECON. 185–204 (2000); Peter Linneman, *The Effect of Rent Control on the Distribution of Income Among New York City Renters*, 22 J. URBAN ECON. 14–34 (1987).

206.     Because the Rent Stabilization Laws have always failed to provide affordable housing for those in need, Defendants' choice to continue to adopt them has been irrational—and thus the laws engage in takings not for public use.

207.     Rent stabilization also **systemically has a negative impact on the quality of existing rental units.**

208.     A ceiling on rents reduces the quantity and quality of housing available. *See* Rebecca Diamond et. al., *The Effects of Rent Control Expansion on Tenants, Landlords, and Inequality: Evidence from San Francisco* at 5, Mar. 2019, https://stanford.io/35Alr0q (finding that in San Francisco "rent control led to a 15 percentage point decline in the number of renters living in treated buildings and a 25 percentage point reduction in the number of renters living in rent-controlled units"); David P. Sims, *Out of Control: What Can We Learn from the End of Massachusetts Rent Control?*, 61 J. URBAN ECO. 129–51 (2007) (estimating that rent regulation held thousands of units off the rental market in Boston).

209.     Moreover, by incentivizing tenants to remain indefinitely in rent-stabilized units, the Rent Stabilization Laws make it practically impossible for property owners to significantly re-develop or improve the units, because landlords are limited as to the physical alterations they can engage in when a tenant is still living in a unit.

210.     The consistent negative impact that the Rent Stabilization Laws have had on the quality of existing rental units makes the repeated adoption and expansion of those laws fundamentally irrational.

211.     The Rent Stabilization Laws have also failed to further any other legitimate interest that Defendants might have had in adopting and implementing them.

ii.     The 2019 Amendments Confirm That Rent Stabilization Is a Taking for a Non-Public Use.

212.     Against all logic and experience, the 2019 amendments inexplicably doubled down on the Rent Stabilization Laws' long-standing failures and irrationally exacerbated the deleterious effects of New York's rent stabilization regime on the City's housing system in several ways.

213.     *First*, by eliminating both the luxury and high-income decontrols, the 2019 amendments removed the *only* financial qualification on rent-stabilized housing.

214.     Before the amendments, units could be decontrolled if the owner earned income over $250,000 and the rent exceeded the luxury threshold. Now, neither of these factors can trigger decontrol, further irrationally divorcing the Rent Stabilization Laws from the purported goal of providing affordable housing for low-income families.

215.     *Second*, the 2019 amendments eliminated both the statutory vacancy allowance and the longevity increase. Depriving property owners of these already modest opportunities to increase rent rates, along with the Rent Guidelines Board's incredibly low rent increases over time, also substantially deprives property owners of income that otherwise could be used to fund property redevelopment.

216.     *Third*, the 2019 amendments significantly restrict property owners' ability to recover expenditures for individual apartment improvements by (1) placing a $15,000 aggregate cap on the recoverability of individual apartment improvements over a fifteen-year period; (2)

substantially increasing the amortization period for recovering those investments; and (3) capping the total period of recovery to thirty years, after which the rent increases must be removed.

217.    After paying taxes owed on rent increases, under the 2019 Rent Stabilization Laws property owners will not be able to fully recover the present value of any significant individual apartment improvements.

218.    Suppose, for example, that a tenant departs a rent-stabilized apartment after years of occupancy and the property owner wishes to invest $50,000 of repairs and restorations in preparing the unit for the market. After the 2019 amendments, that landlord can recover only $15,000 of those repairs from the new tenant. And if the apartment is in a building with thirty-five units, the landlord could only recover about $62 a month after taxes. Assuming the individual apartment improvement was funded with a loan carrying only a four percent interest rate, the property owner would never fully recover the present value of the $15,000 investment, let alone the other $35,000 that cannot lawfully be passed to the tenant. No rational property owner would make such an investment; rather, he or she is far more likely to rent the unit with minimal improvements, leading to the gradual deterioration of the apartment. Therefore, the supply of housing will only further degrade after the 2019 amendments.

219.    *Fourth*, like their effect on individual apartment improvements, the 2019 amendments limit recovery for expenditures on major capital improvements by (1) increasing the amortization period for recovery; (2) capping the total period of recovery to thirty years; and (3) limiting rent increases needed to pay for major capital improvements to two percent per year.

220.    As with the new restrictions on individual apartment improvements, these changes will prevent property owners from recovering the cost of many important major capital improvements, without which buildings will become dilapidated and removed from the housing

stock. Far from increasing housing supply—and increasing the vacancy rate—the 2019 amendments will only shrink the City's housing stock and extend the City's purported housing "emergency," which means that their adoption can only be described as irrational.

221.    One recent analysis estimates that the 2019 amendments' changes to major capital improvements recovery could put over 414,000 rent-stabilized units at risk for heating outages, vermin infestations, mold, and other housing-quality issues within just five years. TAXPAYERS FOR AN AFFORDABLE NY, *Rent Regulation Reform Discussion* at 15, Apr. 2019, https://tinyurl.com/y6swjqj3.

222.    These predicted effects are already becoming reality. For example, one institutional landlord recently halted renovations on more than 11,000 units in Stuyvesant Town and Peter Cooper Village because of the 2019 amendments' changes to individual apartment improvements and major capital improvements recovery. The landlord abandoned renovations on vacant units and larger construction projects, continuing only urgent maintenance like stopping leaks or ensuring hot-water service. Michelle Cohen, *Blackstone Halts Improvement Work on Stuy Town Apartments Following Rent Law Changes*, 6SQFT, July 15, 2019, https://tinyurl.com/y2vzsj7s. This is not an isolated incident; in the five months that followed the adoption of the 2019 amendments, "[l]andlords started 535 fewer renovation projects . . . in rent-regulated buildings" than they had "over the same period in 2018, a decline of 44%" while "[t]he number of apartment renovations in other older buildings not covered by rent regulation were unchanged during the same period." Josh Barbanel, *New York Landlords Slow Apartment Upgrades, Blame New Rent Law*, WALL STREET JOURNAL, Dec. 19, 2019, https://on.wsj.com/2tCcGWu.

223.    In sum, the Tenant Protection Act builds on the prior failures of the Rent Stabilization Laws—and continues to ensure that the laws fail to fulfill their purported public

purposes. By doubling down on past policies that have repeatedly failed to meet their purported ends, the Tenant Protection Act is "palpably without reasonable foundation," *see Midkiff*, 467 U.S. at 241, and has no relationship with the purported ends of the Rent Stabilization Laws. The Rent Stabilization Laws thus take property for a non-public use in violation of the Fifth Amendment.

C.    *In Any Event, Under a Correct Understanding of "Public Use," New York's Rent Stabilization Laws Blatantly Run Afoul of the Fifth Amendment.*

224.    Under a proper understanding of the Fifth Amendment, New York's Rent Stabilization Laws violate its requirement that a taking be for *public* use. As Justice Thomas has correctly explained, "the Public Use Clause is most naturally read to authorize takings for public use only if the government or the public actually uses the taken property." *Kelo v. City of New London, Conn.*, 545 U.S. 469, 514 (2005) (Thomas, J. dissenting); *see Horne v. Dep't of Agriculture*, 135 S. Ct. 2419, 2433 (2015) (Thomas, J., concurring) ("Th[e] [public use] requirement, as originally understood, imposes a meaningful constraint on the power of the state— the government may take property only if it actually uses or gives the public a legal right to use the property." (quotation marks omitted)).

225.    The Rent Stabilization Laws clearly violate this requirement: neither the government nor the public writ large have a legal right to use Plaintiffs' properties. Rather, the Rent Stabilization Laws give particular individuals the right to possess and remain in Plaintiffs' property. As Richard Epstein has explained, "[t]he standard rent control statute gives the tenant the identical private ownership that any other tenant enjoys under an ordinary lease. There is the naked transfer from A to B that the Constitution prohibits, regardless of the details of the compensation system that is provided." Richard A. Epstein, *Rent Control and the Theory of Efficient Regulation*, 54 BROOK. L. REV. 741, 746 (1988); *see also* Richard A. Epstein, *The Unfinished Business of* Horne v. Department of Agriculture, 10 NYU J.L. & LIBERTY 734, 772

(2016) ("Textually, rent control is a transfer of a term interest in property to the tenant at a price below its fair market value, without any public use . . . justification."). As laid out above, New York's laws fit this exact pattern—and thus engage in takings not for public use.

226.    Plaintiffs thus preserve the argument that *Kelo* and its predecessor cases that have broadly expanded the definition of "public use" were incorrectly decided and should be overruled by the Supreme Court.

## V.    THE RENT STABILIZATION LAWS' OVERCHARGE PROVISIONS VIOLATE PLAINTIFFS' RIGHT TO PROCEDURAL DUE PROCESS.

227.    Under the Rent Stabilization Laws, the primary way in which price controls are enforced is by granting stabilized tenants a cause of action against landlords who charge amounts in excess of the legal regulated rent. In New York, a tenant who feels he is being overcharged has a choice of three procedural routes. He can file a complaint with the Division; he can commence an action in court against his landlord; or he can withhold rent until his landlord sues him for nonpayment and interpose defenses and counterclaims sounding in rent overcharge.

228.    While the cause of action for rent overcharge is as old as the rent laws themselves, the procedural rules governing the cause of action have of necessity evolved over time. Initially litigation of overcharge disputes was simple: the federal government froze rents, and any rent increase was by definition an overcharge. However, as has been seen, over time the rent regulatory system became ever more byzantine, with complex formulas for setting rent-controlled rents and multiple avenues for landlords to increase rents in order to combat abandonment and disinvestment.

229.    As the years passed, and turned into decades, rent overcharge litigation also grew ever more complex and burdensome. Whereas once a given apartment had a regulated history of a few months, in time that history became so long that necessary records were lost and material

witnesses either died or could no longer recall dispositive facts. The ultimate solution to this problem was the 1997 enactment of the four-year look back limitation, which established the rule that, for purposes of adjudicating the legal regulated rent of an apartment, the starting point was four years prior to the filing of an overcharge complaint.

A.    *The 2019 Amendments Fundamentally Changed New York's Overcharge Provisions.*

230.    While the existing system for adjudicating overcharge disputes prior to 2019 was tilted against landlords who owned rent-stabilized units, the State Legislature's passage of the 2019 amendments stacked the procedural deck so strongly against property owners that they can only be described as fundamentally unfair and thus in violation of the Due Process Clause. *See* U.S. CONST. amend. XIV. Four features of 2019 amendments' overcharge provisions considered together render such proceedings a violation of Plaintiffs' due-process rights.

231.    *First*, the prior law required tenants to file overcharge claims within four years of the first overcharge alleged; limited recovery of overcharge penalties to those four years; and permitted the agency and courts to examine only those four years of rental history when deciding the claim. *See* N.Y. UNCONSOL. LAW TIT. 23 § 26-516(a), (a)(2) (McKinney) (2015). The 2019 amendments did away with the four-year statute of limitations—permitting tenants to file overcharge claims "at any time"–and expanded the recovery period from four to six years. *See* Tenant Protection Act, Part F § 1. Moreover, the 2019 amendments *require* the state agency and the courts to review "all available rent history which is reasonably necessary" to determine the existence and magnitude of an alleged overcharge, *without any time limit*. *Id.* at Part F § 2.

232.    *Second* and relatedly, although the 2019 amendments state that they do not require landlords to keep records for more than six years, *id.*, they nevertheless state that a landlord's "election not to maintain records shall not limit the authority of the [Division] and the courts to

examine the rental history and determine legal regulated rents pursuant to" the amendments, *id.* at Part F § 5.

233. Among the non-record evidence the courts may consider is simply "whether an unexplained increase in the registered or lease rents . . . rendered such rent or registration unreliable." *Id.* at Part F § 2.

234. In defending a rent overcharge claim, the burden falls to the defendant landlord to justify the rent charged. Before the Tenant Protection Act, this burden could often be met by a simple application of the statute of limitations and the look back limitation. The new Tenant Protection Act provisions, however, require the court or the Division (whichever is adjudicating the complaint) to examine the basis for any increased rent that may appear on a registration history dating to 1984 and to permanently reduce the legal regulated rent and award the tenant six years' worth of damages for any unexplained increase—even if the owner's lack of explanation is caused by his election not to keep records for the rental history prior to the four-year period previously required by law.

235. *Third*, even before the 2019 amendments, the Rent Stabilization Laws presumed willfulness of rent overcharges whenever a landlord was found by the state agency, "after a reasonable opportunity to be heard, to have collected an overcharge above the rent authorized" and permitted treble damages for such willfulness. N.Y. UNCONSOL. LAW TIT. 23 § 26-516(a) (McKinney) (2015). Only if the landlord can establish "by a preponderance of the evidence that the overcharge was not willful" can he escape liability. *Id.* The 2019 amendments added an additional rule of evidence:

> After a complaint of rent overcharge has been filed and served on an owner, the voluntary adjustment of the rent and/or the voluntary tender of a refund of rent overcharges shall not be considered by the [Division] or a court of competent jurisdiction as evidence that the overcharge was not willful.

Tenant Protection Act, Part F § 4. Here again, the change enacted by the Tenant Protection Act is both manifestly unfair and potentially ruinous: landlords are forced to defend not only ancient rent increases they themselves took (about which, although they may have justifiably disposed of documentation, they can at least testify), but even increases taken by predecessors in title— possibly even by owners several transactions removed, possibly by owners who are deceased, and possibly based on work performed by contractors also deceased. And that is today. With the look back limitation permanently removed and the Rent Stabilization Laws themselves now permanent, the day will inevitably arrive when a landlord will be required to justify a rent increase in which all possible relevant witnesses are dead—with the resultant overcharge found willful based on a presumption that can only be honestly described as absurd.

236. *Fourth*, despite the dramatic nature of the above three changes to overcharge proceedings, the 2019 amendments specified that they would not only take immediate effect, but also that they would apply to "any claims pending." *Id.* at Part F § 7.

237. In sum, the 2019 amendments (1) extend indefinitely the period for which tenants can raise an overcharge claim; (2) extend the period of overcharge recovery from four to six years; (3) require courts to examine any "reasonably necessary" rental history of unlimited duration, including decades before the six-year recovery window; (4) require courts to presume the willfulness of any "unexplained increase" in rents even if the lack of explanation stems from the landlord's prior election not to maintain records outside the four-year window previously required by law; (5) exclude from consideration of landlord willfulness any evidence of subsequent remedial measures; and (6) apply each of the prior changes retroactively.

B. *The Rent Overcharge Provisions Violate the Due Process Clause.*

238.     These features, taken together as a whole, run afoul of the Constitution by rendering any overcharge proceeding in New York a violation of landlords' procedural due process right to "fundamental fairness." *Lassiter v. Dep't of Social Servs. Of Durham County, N.C.*, 452 U.S. 18, 24 (1981); *see also Project Release v. Prevost*, 722 F.2d 960, 975 (2d Cir. 1983) (analyzing New York's civil commitment scheme by asking whether the statutory scheme "as a whole" violated procedural due process); *cf. Santosky v. Kramer*, 455 U.S. 745, 775 (1982) (Rehnquist, J., dissenting) ("[I]t is obvious that a proper due process inquiry cannot be made by focusing upon one narrow provision of the challenged statutory scheme. . . . Courts must examine *all* procedural protections offered by the State, and must assess the *cumulative* effect of such safeguards.").

239.     Whether a statutory regime affords procedural due process usually depends on three factors: "(A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017) (citing *Mathews v. Eldridge*, 424 US. 319, 335 (1976)). Each of these tilts decisively in favor of Plaintiffs.

240.     *First*, Plaintiffs' affected property interests are cumulatively significant.

241.     By extending the statute of limitations for overcharge claims indefinitely, the 2019 amendments dramatically expand not only the scope of Plaintiffs' potential liability, but also the legal fees and costs that they will have to expend in order to mount defenses against the flood of overcharge claims that were previously barred.

242.     Moreover, the systematic procedural biases introduced against owners—including granting courts authority to examine a rental history of unlimited duration, instructing them to presume the willfulness of any "unexplained increase," and requiring them to exclude any evidence of subsequent remedial measures—all increase the likelihood that owners will ultimately

be found liable for rent overcharges, and guarantee with absolute certainty that there will be cases in which tenants prevail and obtain treble damages on overcharge claims that are in fact meritless, but against which landlords are powerless to defend.[11]

243.    The 2019 amendments likewise guarantee that landlords will pay more for any overcharge imposed they would have under the prior laws by extending the recovery period from four to six years.

244.    And the likelihood of treble damages heightens the risk to Plaintiffs' interests. Rather than requiring a landlord held liable to simply return the overcharge to the tenant, the Rent Stabilization Laws affirmatively punish them by demanding payment of treble damages. Plaintiffs' interest in avoiding such a punitive, penalizing outcome—which could cost them tens of thousands of dollars for long-standing overcharges applied to multiple units—brings these procedures outside the mine-run procedural due process case in which the purported private interest is only the maintenance of a *benefit*.

245.    The case of 699 Venture highlights everything that is fundamentally unfair in the new rules for adjudicating overcharge claims. 699 Venture purchased 699 East 137th Street in 1995, just as the Bronx was finally beginning its emergence from the disastrous abandonment crisis brought about by the rent control laws. At the time, the building was severely dilapidated, partially abandoned, and far from financially self-sustaining. 699 Venture's principals, John Corcoran and Martin Rooney, themselves laborers in the building trades, renovated the building with sweat equity and the services of an electrician. The modest increases they took in legal

---

[11] The potential overcharge awards are significant. In *Altschuler v. Jobman, 478/480, LLC.*, 135 A.D.3d 439, 439 (N.Y. App. Div. 2016), the tenant was awarded $876,619.10. In *Arnold v. 4-6 Bleecker Street LLC*, 2019 NY Slip Op. 33216(U) (Sup. Ct. NY Co.), Exhibit 1, the court, applying the new formulas required by the Tenant Protection Act to recalculate damages, increased the aggregate award for four plaintiffs from $1,010,061.66 to $2,080,224.91.

regulated rents were based mostly on the cost of materials, for the simple reason that no funds were available to compensate them for their labor. Then, over the ensuing years, apartments were vacated at various times, and 699 Venture added lawful vacancy increases to the rents. In time, the building was fully renovated and became profitable.

246.    The overwhelming majority of the increases now being challenged—by ten different tenants—took place between 1997 and 2001. Prior to enactment of the 2019 amendments, these increases were subject to challenge only if a tenant could make a prima facie showing that they were fraudulent. Ten of 699 Venture's tenants attempted to make such a showing; all ten failed. Then, following passage of the 2019 amendments, all ten tenants interposed new motions, demanding that 699 Venture prove that the ancient increases were legitimate. Based on the 2019 amendments, the motions were granted. *See, e.g.*, *699 Venture Corp. v. Zuniga*, 105 N.Y.S.3d 806 (Civ. Ct. Bronx Cty. 2019).

247.    699 Venture will accordingly be compelled to defend its increases. In doing so, it— and the court—will be bound by the evidentiary standards long established by the Division, as modified by the 2019 amendments. First, the Division requires that any rent increase reflected in a lease be established by production of that lease. The mere fact that historical registrations filed with the Division reflect such leases does not suffice: where the lease is not produced, neither guideline increases, nor vacancy increases, nor even increases for individual apartment increases will be permitted. *See, e.g.*, Order and Op. Denying Pet. for Administrative Review, *Matter of 1589 Ocean Realty Associates*, DHCR Administrative Review Docket #YH210027RO (Dec. 3, 2010), Exhibit 2.[12] Further, proof of individual apartment improvements, though it can take several

---

[12] In the *1589 Ocean Realty* case, the Division further penalized the owner's failure to produce a lease history by utilizing its "default formula" to set the tenant's rent. Under this formula,

forms, must generally include either cancelled checks, invoices marked paid in full, signed contracts, and/or a contractor's affidavit. In any case, the documentation must specify the work performed and the cost, and it must be specifically referable to the apartment involved. For example, invoices and checks that do not reference a specific apartment will not suffice to establish an individual apartment improvement rent increase. *See, e.g.*, Order and Op. Denying Pet. for Administrative Review, *Matter of Avemm Corporation*, DHCR Administrative Review Docket #XI210053RO (Dec. 7, 2009), Exhibit 3.

248.    699 Venture has neither cancelled checks nor invoices that reference work performed in specific apartments. Its principals cannot honestly testify as to the specific materials purchased and expenditures incurred in association with any particular work, and even the work itself can at best be described in general terms. And although its files include leases dating a number of years, many of the leases justifying challenged rent increases were discarded in reliance on what had been well-established law. As such, applying the Division's own standards, 699 Venture faces the prospect of significant overcharge liability and rent rollbacks for its complaining tenants. Further, although 699 Venture has an additional thirty-seven apartments in its buildings in which no overcharge claims have yet been asserted, there is no longer any statute of limitations on such claims, and if and when they are filed, 699 Venture will face the same impediments to a successful defense. And those impediments will only worsen with time.

249.    Further, in light of the immense challenges landlords will face to recover their costs or even return modest profits on rent-stabilized units, the foregoing punitive consequences—faced

---

the rent is generally rolled back to the amount of the lowest rent registered for any similar regulated apartment in the building.

to a greater or lesser degree by all rent-stabilized owners—have a magnified effect on Plaintiffs' underlying property interests.

250.    In short, Plaintiffs' private interests in avoiding costly litigation, crippling damages, curtailed incomes, reduced ability to sell their buildings, and finally the loss of their rent-stabilized properties are substantial interests.

251.    *Second*, the risk to landlords of being erroneously deprived of their property interests is not merely significant: erroneous outcomes are guaranteed, because the overcharge procedures are so one-sided in favor of tenants that they have nothing to do with the pursuit of a true determination of whether a rent overcharge was willful.

252.    The Rent Stabilization Laws have long presumed that any overcharge is willful, subject only to rebuttal by the owner. While that presumption standing alone may not offend procedural due process, coupling it with 2019 amendments' other evidentiary and decisional rules makes it virtually impossible for an owner to credibly rebut the presumption. He or she is liable for an "unexplained" rent increase that occurred at *any prior time* during the tenancy, or even long before the tenancy and long before he or she owned the building, even when he or she had no notice before the 2019 amendments that the decision not to keep older records could be fatal to the case. And owners are disallowed from rebutting willfulness even through sincere, remedial actions that are potentially probative of their personal integrity and state of mind.

253.    The only explanation for these rules is that the State sought to erect a set of procedures ensuring that thousands of rent-stabilized apartments would have their rents drastically reduced, regardless of the merits of the case. While this might hypothetically serve the State's supposed interest in "preserving affordable housing"—housing which, as noted, is not even targeted to the needy—it does so only by subjecting landlords to an adjudicatory process in which

they are in many cases (including the 699 Venture cases) literally unable to obtain justice. In point of fact, the purpose of the new procedures is probably better reflected in the November 29, 2019, tweet of Democratic Socialist Cea Weaver, director of the Upstate/Downstate Housing Alliance and a prime lobbyist behind Tenant Protection Act, who reacted on Twitter to an industry alarm that several hundred thousand stabilized units face financial distress by exclaiming about "250K units that we can reclaim as social housing." Cea Weaver (@ceaweaver), TWITTER (Nov. 29, 2019, 10:31 AM), https://bit.ly/2FxQxuY. This aim has nothing to do with providing due process and everything to do with reinforcing rent stabilization as a deliberately confiscatory welfare subsidy program to be funded by private landlords—until their resources are exhausted and, as happened previously, the State simply takes ownership of their property. There certainly is no evidence suggesting that tenants must have access to the new Tenant Protection Act procedures in order to obtain a fair adjudication or that most overcharges are actually imposed willfully, which indicates that this system for handling overcharge complaints unfairly deprives property owners of the fundamental due process right to be heard "in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

254. Thus, because Defendants have stacked the deck against owners like Plaintiffs, the risk to owners of being erroneously deprived of their property interests is significant.

255. *Third*, the State's interest in requiring these procedures is insignificant. Substitute procedures that give landlords a fair opportunity to be heard, to rebut evidence of willfulness, and to escape crippling and erroneously imposed liability would not create the sort of "fiscal and administrative burdens" that weigh against a procedural due process challenge. *See Mathews*, 424 U.S. at 335. Indeed, enjoining the Tenant Protection Act and returning to prior law would immediately ameliorate the worst of the current injustices.

256.     Replacing systemically biased procedures with more balanced ones would not require additional administrative or judicial expenditures of money or time. Instead, abrogating the 2019 amendments and returning to pre-2019 procedures will *reduce* administrative and judicial burdens in at least two concrete ways.

257.     As an initial matter, reinstating the four-year statute of limitations on rent overcharge claims, and especially the four-year look back limitation, will stem the tide of overcharge cases stoked by the 2019 amendments. With fewer overcharge claims even being filed, the Division and the courts will be able to turn their attention to other pressing landlord-tenant disputes.

258.     What is more, by removing the new requirement that the Division and courts must examine all "reasonably necessary" rental history and returning to a review of only four years of rental history, implementation of the pre-2019 procedures would reduce the burdens inherent in each overcharge proceeding.

259.     Finally, when the government has "no countervailing interests" in the outcomes resulting from its challenged procedures, the scheme will almost certainly fail to provide due process. *Nelson*, 137 S. Ct. at 1258.

260.     While the preceding discussion assumes that the State has a legitimate interest in prohibiting overcharges, that assumption is unwarranted. As discussed extensively above, New York's entire rent stabilization regime is illegitimate. *See supra* Background on Legal Claims Section IV. It is nothing more than an enormous private transfer of wealth from landlords to tenants, pursued by politicians to curry favor with a certain segment of the State's population and without any basis in fundamental economics or the American tradition of governance. And in

doing so, it systematically deprives landlords of both physical control over their property and the economic value thereof.

261.    Those unjust deprivations are likely themselves a cause of landlords' occasional overcharges that may violate the letter of the Rent Stabilization Laws but that would never strike a reasonable person as unfair.

262.    For example, suppose a landlord overcharges a tenant relative to the rent set by the Rent Guidelines Board to recover the costs of an individual apartment or major capital improvement. Suppose further that the improvement both improved the tenants' quality of life *and* made economic sense to the landlord. Assuming that the Rent Stabilization Laws themselves prevent such economically and morally sound investments, does the State really have a strong interest in preventing *that* overcharge? The answer is "yes" only if one assumes the rents dictated by the State and City are themselves legitimate, which they are not.

263.    Absent any good reason for more strongly enforcing an illegitimate scheme, the State's interest in preserving procedures that perpetuate the Rent Stabilization Laws does not deserve any weight under *Mathews*, and the 2019 amendments' overcharge provisions violate due process.

## CLAIMS FOR RELIEF

### Claim I (Against All Defendants):
### Physical Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983)

264.    Plaintiffs incorporate by reference the preceding allegations of this complaint.

265.    Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be compelled to rent their residential real property indefinitely; Plaintiffs to

be deprived of their right to possess, use, and dispose of their real property; and Plaintiffs to be deprived of their reversionary interests in their leased real property.

266.    Through the Rent Stabilization Laws—particularly the 2019 amendments—Defendants have compelled owners of rent-stabilized units to continue to rent out their property at a below-market rate and required owners to continue to renew tenancies regardless of whether they wish to do so. Defendants have done so by severely limiting the ability of owners to recover their property for personal use; by essentially closing off owners' ability to convert their properties into cooperatives or condominiums; by preventing owners from putting their property to the vast majority of non-residential uses; by disallowing owners from tearing down their buildings without government approval and without incurring expensive relocation costs; by barring vacancy and longevity increases and luxury or high-income decontrol; and by making it economically infeasible for owners to let rent-stabilized units remain vacant. And Defendants have forced owners to renew rent-stabilized tenancies in perpetuity—with very few exceptions and only at below-market rates that have been approved by the Rent Guidelines Board. All this constitutes a physical taking by Defendants.

267.    Through the Rent Stabilization Laws—particularly the 2019 amendments—Defendants have destroyed Plaintiffs' rights to possess (and exclude), use, and dispose of their property. By giving tenants the right to indefinitely possess owners' properties, Defendants have stripped Plaintiffs of their right to exclude. Defendants likewise have denied Plaintiffs their right to use their property as they see fit; they cannot freely put it to personal use or change the use from residential rentals. And Defendants have deprived owners of the right to dispose of their property; Plaintiffs are not free to exit the residential rental marketplace whenever and however they choose.

Defendants' deprivations of Plaintiffs' rights to possess (and exclude), use, and dispose of property constitute physical takings.

268.    Through the Rent Stabilization Laws—particularly the 2019 amendments— Defendants have deprived owners of their reversionary right to possess and use their property after the terms of rental leases expire; this also is a physical taking.

269.    Defendants have failed to compensate this physical taking. Plaintiffs thus are entitled to just compensation, including for the lost access to their property and the value of their lost profits.

270.    Plaintiffs are likewise entitled to declaratory and injunctive relief on this count because absent such relief Plaintiffs will continue to suffer irreparable harm caused by the deprivation of their Constitutional rights.

**Claim II (Against All Defendants):**
**Regulatory Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983)**

271.    Plaintiffs incorporate by reference the preceding allegations of this complaint.

272.    Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be deprived of their real property without just compensation in violation of the Takings Clause of the Constitution.

273.    By adopting and enforcing the Rent Stabilization Laws—and particularly the 2019 amendments—Defendants have effected an enormous negative economic impact on Plaintiffs, whose buildings containing rent-stabilized units have plummeted in value and who will experience significantly lower rates of return on their rent-stabilized units.

274.    By adopting and enforcing the Rent Stabilization Laws—and particularly the 2019 amendments—Defendants have acted in a manner that is wholly inconsistent with Plaintiffs' investment-backed expectations: the 2019 amendments have eliminated various ways that property

owners could raise rents, obtain deregulation, and improve their property's value—in a complete aberration from any prior statutory scheme.

275.     By adopting and enforcing the Rent Stabilization Laws—and particularly the 2019 amendments—Defendants have adopted a regulatory scheme that is egregiously extraordinary in nature: it is tailored only to benefit a subset of tenants while harming a subset of landlords (including Plaintiffs). What is more, the purported ends of the Rent Stabilization Laws lack the nexus and rough proportionality necessary to justify them—largely because Plaintiffs' use of their properties as residential rentals creates no harms, and in fact reduces the harms that the 2019 amendments are designed to redress.

276.     For these reasons, Defendants have engaged in a regulatory taking of Plaintiffs' properties.

277.     Defendants have failed to compensate this regulatory taking. Plaintiffs thus are entitled to just compensation, including for the lost access to their property and the value of their lost profits.

278.     Plaintiffs are likewise entitled to declaratory and injunctive relief on this count because absent such relief Plaintiffs will continue to suffer irreparable harm caused by the deprivation of their Constitutional rights.

### Claim III (Against All Defendants):
### Confiscatory Taking (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983)

279.     Plaintiffs incorporate by reference the preceding allegations of this complaint.

280.     Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be deprived of their real property at a confiscatory rate in violation of the Takings Clause of the Constitution.

281.    By adopting and enforcing the Rent Stabilization Laws—and particularly the 2019 amendments—Defendants have made Plaintiffs the equivalent of public utilities by ensuring that it is practically impossible for Plaintiffs to legally exit the residential rental market.

282.    By adopting and enforcing the Rent Stabilization Laws—and particularly the 2019 amendments—Defendants have guaranteed that Plaintiffs are unable to receive a just and reasonable rate of return on their rent-stabilized properties.

283.    By adopting the Rent Stabilization Laws, Defendants have prevented Plaintiffs from operating their businesses successfully, maintaining their financial integrity, attracting capital, and compensating their investors for the risks assumed.

284.    By adopting the Rent Stabilization Laws, Defendants have disallowed Plaintiffs from earning a return equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties.

285.    For these reasons, Defendants have engaged in a confiscatory taking of Plaintiffs' properties.

286.    Defendants have failed to compensate this confiscatory taking. Plaintiffs are thus entitled to just compensation, including for the lost access to their property and the value of their lost profits.

287.    Plaintiffs are likewise entitled to declaratory and injunctive relief on this count because absent such relief Plaintiffs will continue to suffer irreparable harm caused by the deprivation of their Constitutional rights.

**Claim IV (Against All Defendants):**
**Taking For Non-Public Use (U.S. Const. Amends. V and XIV; 42 U.S.C. § 1983)**

288.    Plaintiffs incorporate by reference the preceding allegations of this complaint.

289.   Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs' property to be taken for non-public use.

290.   For the reasons given in Claim I, Claim II, and Claim III, Defendants have taken Plaintiffs' property through the Rent Stabilization Laws.

291.   Defendants' taking is not for public use. The amended Rent Stabilization Laws benefit a particular arbitrary class of individuals (tenants of rent-stabilized apartments) without regard to need; they are not rationally related to a public purpose; and *Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005), and its predecessor cases that have broadly expanded the definition of "public use" were incorrectly decided.

292.   Plaintiffs are entitled to damages for this unlawful taking that was not for public use, including for the lost access to their property and the value of their lost profits.

293.   Plaintiffs are likewise entitled to declaratory and injunctive relief on this count because absent such relief Plaintiffs will continue to suffer irreparable harm caused by the deprivation of their Constitutional rights.

### Claim V (Against All Defendants): Due Process Violation (U.S. Const. Amend. XIV; 42 U.S.C. § 1983)

294.   Plaintiffs incorporate by reference the preceding allegations of this complaint.

295.   Defendants, acting under color of New York law, have caused, and will continue to cause, Plaintiffs to be deprived of their due process rights by implementation of the overcharge provisions in the 2019 amendments.

296.   By adopting and enforcing the new rent overcharge provisions, Defendants have (1) extended indefinitely the period for which tenants can raise an overcharge claim; (2) extended the period of overcharge recovery from four to six years; (3) required courts to examine any "reasonably necessary" rental history of unlimited duration, including decades before the six-year

recovery window; (4) permitted courts to speculate on the willfulness of any "unexplained increase" in rents, even if the lack of explanation stems from the landlord's prior election not to maintain records outside the four-year window previously required by law; (5) excluded from consideration of landlord willfulness any evidence of subsequent remedial measures; and (6) applied each of the prior changes retroactively.

297.    Taken together, these changes violate Plaintiffs' procedural due process rights. Plaintiffs' interests in avoiding costly litigation, crippling damages, and the loss of their rent-stabilized properties are substantial interests. Because the rent overcharge provisions are tilted heavily in favor of tenants and indeed guarantee with absolute certainty that landlords of rent-stabilized apartments will incur erroneous and unjust judgments for rent overcharges caused solely by their inability to defend overcharge complaints due to the provisions of the Tenant Protection Act, owners have been and will continue to be deprived of their property interests without due process of law. The State's interest in requiring these procedures is insignificant and substituting other procedures for them will not place any burden on the State.

298.    Plaintiffs are entitled to damages for past violations of their due process rights, including for the value of overcharges penalties and costs and fees spent litigating them that they were forced to pay and incur due to the 2019 amendments to the rent overcharge provisions.

299.    Plaintiffs are likewise entitled to declaratory and injunctive relief on this count, because absent such relief Plaintiffs will continue to suffer irreparable harm caused by the deprivation of their Constitutional rights.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court:

A. Declare that the Rent Stabilization Laws in their entirety effect an unlawful physical taking of private property without just compensation;

B. Declare that the 2019 amendments effect an unlawful physical taking of private property without just compensation;

C. Enjoin the application and enforcement of the Rent Stabilization Laws in their entirety as an unlawful physical taking of private property;

D. Enjoin the application and enforcement of the 2019 amendments as an unlawful physical taking of private property;

E. Award Plaintiffs just compensation for the unlawful physical takings in an amount to be proven at trial;

F. Declare that the Rent Stabilization Laws in their entirety effect an unlawful regulatory taking of private property without just compensation;

G. Declare that the 2019 amendments effect an unlawful regulatory taking of private property without just compensation;

H. Enjoin the application and enforcement of the Rent Stabilization Laws in their entirety as an unlawful regulatory taking of private property;

I. Enjoin the application and enforcement of the 2019 amendments as an unlawful regulatory taking of private property;

J. Award Plaintiffs just compensation for the unlawful regulatory takings in an amount to be proven at trial;

K. Declare that the Rent Stabilization Laws in their entirety effect an unlawful confiscatory taking of private property without just compensation;

L.      Declare that the 2019 amendments effect an unlawful confiscatory taking of private property without just compensation;

M.      Enjoin the application and enforcement of the Rent Stabilization Laws in their entirety as an unlawful confiscatory taking of private property;

N.      Enjoin the application and enforcement of the 2019 amendments as an unlawful confiscatory taking of private property;

O.      Award Plaintiffs just compensation for the unlawful confiscatory takings in an amount to be proven at trial;

P.      Declare that the Rent Stabilization Laws in their entirety effect an unlawful taking of private property for purposes other than public use;

Q.      Declare that the 2019 amendments effect an unlawful taking of private property for purposes other than public use;

R.      Enjoin the application and enforcement of the Rent Stabilization Laws in their entirety as an unlawful taking of private property for purposes other than public use;

S.      Enjoin the application and enforcement of the 2019 amendments an unlawful taking of private property for purposes other than public use;

T.      Award Plaintiffs damages in an amount to be proven at trial for the unlawful taking of private property for purposes other than public use;

U.      Declare that the rent overcharge provisions of the 2019 amendments violate procedural due process;

V.      Enjoin the application and enforcement of the rent overcharge provisions of the 2019 amendments as an unlawful violation of procedural due process;

W.     Award Plaintiffs damages in an amount to be proven at trial for the unlawful deprivation of their procedural due process rights through the rent overcharge provisions of the 2019 amendments;

X.     Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this action; and

Y.     Grant Plaintiffs such other relief as may be just and proper.

Dated: February 6, 2020                          Respectfully submitted,

Todd A. Rose[†]                                  Charles J. Cooper*
Paul Coppe (PC9245)                              David H. Thompson[†]
David P. Haberman (DPH6629)                      Peter A. Patterson[†]
ROSE & ROSE                                      Brian W. Barnes[†]
291 Broadway, 13th Floor                         Nicole Frazer Reaves[†]
New York, NY 10007                               COOPER & KIRK, PLLC
(212) 349-3366                                   1523 New Hampshire Avenue, NW
trose@roseandroselaw.com                         Washington, DC 20036
                                                 (202) 220-9600
*Attorneys for Plaintiffs*                        ccooper@cooperkirk.com

                                                 *Attorneys for Plaintiffs*

* Motion to proceed *pro hac vice* filed simultaneously with this Complaint.
[†] Motion to proceed *pro hac vice* forthcoming.