# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

335-7 LLC, FGP 309 LLC, 226 LLC, 431 HOLDING
LLC, and 699 VENTURE CORP.,

                              Plaintiffs,

     v.

CITY OF NEW YORK, NEW YORK CITY RENT
GUIDELINES BOARD, and RUTHANNE
VISNAUSKAS (in her official capacity as
commissioner of the New York State Division of
Homes and Community Renewal),

                              Defendants.

No. 1:20-cv-01053-ER-DCF

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

June 29, 2020

Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
Brian W. Barnes*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com

Todd A. Rose†
Paul Coppe (PC9245)
David P. Haberman (DPH6629)
ROSE & ROSE
291 Broadway, 13th Floor
New York, NY 10007
(212) 349-3366
trose@roseandroselaw.com
* Appearing *pro hac vice*.
† Motion to proceed *pro hac vice*
forthcoming.

*Attorneys for Plaintiffs*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

I.    History of Rent Stabilization and the 2019 Amendments. ........................ 2

    A.    The 2019 Amendments Prevent Owners From Ceasing To Rent Their
        Property for Residential Purposes............................................................ 4

    B.    The 2019 Amendments Prevent Owners of Rent-Stabilized Property
        From Earning a Reasonable Return on Their Property............................. 7

II.   The Purpose of Rent Stabilization Is To Subsidize Tenants at the Expense
    of Property Owners. ................................................................................. 10

III.  Plaintiffs File This Litigation.................................................................. 11

ARGUMENT ...................................................................................................... 12

I.    Defendants' Enforcement of the Amended RSL Constitutes a Physical Taking
    of Plaintiffs' Property. ............................................................................ 12

    A.    The Government Commits a Physical Taking When It Compels Owners
        To Rent Their Property to Rent-Stabilized Tenants in Perpetuity........... 12

    B.    The Amended RSL Compels Plaintiffs To Rent Their Property to
        Rent-Stabilized Tenants in Perpetuity. .................................................. 17

        1.    There Is No Lawful Means By Which Plaintiffs Can Choose To Exit
            The Market for Rent-Stabilized Apartments Without Subjecting
            Themselves to Some Other Form of Uncompensated Taking. ................ 17

        2.    The Amended RSL Cuts Off All Practical Means By Which
            Plaintiffs Could Exit the Market for Rent-Stabilized Apartments........... 21

II.   Defendants' Enforcement of the Amended RSL Constitutes a Regulatory Taking
    of Plaintiffs' Property. ............................................................................ 24

    A.    The Amended RSL Has Taken Plaintiffs' Property Under *Penn Central*. ........... 25

        1.     Significant Economic Impact................................................... 28

2.      Interference with Investment-Backed Expectations. ................................31

3.      Extraordinary Character of the Regulation. ................................................32

B.      The Amended RSL is Subject to Scrutiny Under *Nollan* and *Dolan*. ..................34

C.      Defendants' Enforcement of the Amended RSL Constitutes a Confiscatory Taking. ..............................................................................................................35

D.      Plaintiffs' Regulatory Takings Claims Are Ripe. ..................................................39

III.    To the Extent that the Amended RSL Takes Property, It Violates the Public Use Clause. ....................................................................................................................39

IV.    Plaintiffs' Claims Are Not Barred by the Statute of Limitations.......................................42

CONCLUSION...............................................................................................................................43

## **TABLE OF AUTHORITIES**

**Cases**                                                                                           **Page**

*Armstrong v. United States*, 364 U.S. 40 (1960) .........................................................................25

*Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004)................................................................20

*Bowles v. Willingham*, 321 U.S. 503 (1944)................................................................................36

*Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948 (9th Cir. 2011)................................43

*Copeland v. Vance*, 893 F.3d 101 (2d Cir. 2018) ........................................................................23

*CRV Enterprises, Inc. v. United States*, 626 F.3d 1241 (Fed. Cir. 2010) ....................................21

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) .............................................................................34

*Dunn v. Blumstein*, 405 U.S. 330 (1972) .....................................................................................20

*Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989).....................................................35, 36, 38

*Ex parte Young*, 209 U.S. 123 (1908).........................................................................................40

*FCC v. Florida Power Corporation*, 480 U.S. 245 (1987)...................................................15, 16

*FHLMC v. New York State Dep't of Housing & Community Renewal*,
    83 F.3d 45 (2d Cir. 1996) .......................................................................................................15

*FPC v. Nat. Gas Pipeline Co. of Am.*, 315 U.S. 575 (1942).......................................................35

*FPC v. Texaco Inc.*, 417 U.S. 380 (1974)............................................................................35, 36

*Garelick v. Sullivan*, 987 F.2d 913 (2d Cir. 1993)......................................................................36

*Greystone Hotel Co. v. City of New York*,
    No. 98-9116, 1999 U.S. App. LEXIS 14960 (2d Cir. 1999) ..................................................15

*Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir. 1986) ..................................................41

*Harmon v. Markus*, 412 Fed. App'x 420 (2d Cir. 2011) .............................................................15

*Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984)............................................................40, 41

*Hodel v. Irving*, 481 U.S. 704 (1987) .................................................................................32, 33

*Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264 (1981) ..............................28

*Horne v. Department of Agriculture*, 576 U.S. 350 (2015) ............................................16, 21, 23

*In re Santiago-Monteverde*, 22 N.E.3d 1012 (N.Y. 2014) ..................................10, 11, 27, 28, 33

*Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005).......................................................40, 41

*Knick v. Township of Scott*, 139 S. Ct. 2162 (2019) ...................................................................39

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013)......................................20, 34

*Kuhnle Bros., Inc. v. City of Geauga*, 103 F.3d 516 (6th Cir. 1997).............................................42

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005)....................................................................35

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)...................12, 13, 18, 24

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)...........................................20, 33

*Manocherian v. Lenox Hill Hosp.*, 643 N.E.2d 479 (N.Y. 1994) ..............................................3, 14

*Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*,
    742 F.2d 442 (8th Cir. 1984) ....................................................................................36, 37

*Murr v. Wisconsin*, 137 S. Ct. 1933 (2017) ..............................................................................25

*Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987) ..........................................12, 13, 34

*Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978)...............25, 33

*Pennell v. City of San Jose*, 485 U.S. 1 (1988).........................................................26, 27, 32, 34

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)..............................................................24

*Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998)..........................................23, 24

*Pumpelly v. Green Bay Co.*, 13 Wall. (80 U.S.) 166 (1872)........................................................12

*Regina Metro. Co., LLC v. N.Y.S. Div. of Hous. & Cmty. Renewal*,
    2020 WL 1557900 (Apr. 2, 2020) ...................................................................................43

*Resolution Tr. Corp. v. Diamond*, 18 F.3d 111, 123–24 (2d Cir.)................................................15

*Richardson v. City & Cty. of Honolulu*, 759 F. Supp. 1477 (D. Haw. 1991) ..............................41

*Sherman v. Town of Chester*, 752 F.3d 554 (2d Cir. 2014) .........................................................42

*Simmons v. United States*, 390 U.S. 377 (1968) .......................................................................20

*South Lyme Property Owners Ass'n v. Town of Old Lyme*,
    539 F. Supp.2d 547 (D. Conn. 2008)..............................................................................42

*Southview Associates, Ltd. v. Bongartz*, 980 F.2d 84 (2d Cir. 1992) ..........................................15

*St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872 (7th Cir. 1983)................................................. 37

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) ...........33

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011)...............................................................23

*United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002)........................................................22, 23

*United States v. Salerno*, 481 U.S. 739 (1987) ..........................................................................22

*Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467 (2002)................................................................36

*West 95 Housing Corp. v. New York City Dep't of Housing Preservation and Development*,
    31 Fed. App'x 19 (2d Cir. 2002).....................................................................................15

*Whitney v. Heckler*, 780 F.2d 963 (11th Cir. 1986)....................................................................36

*Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985).....39

*Yakus v. United States*, 321 U.S. 414 (1944)..............................................................................36

*Yee v. City of Escondido*, 503 U. S. 519 (1992)....................................12, 14, 15, 22, 24, 25, 26, 41

## Constitutions and Statutes

U.S. CONST. amend. V ................................................................................2

Second Circuit Local Rule 32.1.1 ..............................................................15

9 N.Y. COMP. CODES R. & REGS.

    § 2502.7.................................................................................................7
    § 2522.8(a) ............................................................................................7

N.Y. Comp. Codes R. & Regs Tit.

9 § 2524.5(a)(2) ........................................................................................22

S.B. 6458

    ..........................................................................................................
    ..........................................................................................................
    Part D § 5 ..........................................................................................5, 6
    Part G at 15:53 ...................................................................................10
    Part M...................................................................................................9

    Part N § 1 (codified at N.Y. GEN. BUS. LAW § 352-eeee.1(b))................5

N.Y. GEN. BUS. LAW

    § 352-eeee.1(b) (McKinney 1988)................................................4, 5
    § 352-eeee.1(c) (McKinney 1988)................................................4

N.Y. UNCONSOL. LAW TIT. 23

    § 26-504.1 (McKinney 2011) ..............................................................5
    § 26-504.2 (McKinney 2015) ..............................................................5
    § 26-504.3 (McKinney 2015) ..............................................................5
    §26-510(b) (McKinney).....................................................................27
    § 26-511(c)(5-a) (McKinney 2015) .....................................................7
    § 26-511(c)(6) (McKinney)..................................................................8
    § 26-511(c)(6) (McKinney 2015) ........................................................8
    § 26-511 (c)(9)(b) ..............................................................................17
    § 26-511(c)(13) (McKinney)...............................................................9
    § 26-511(c)(13) (McKinney 2015) ......................................................9
    § 2524.5(a)(1) (McKinney).................................................................6
    § 2524.5(a)(1)(ii).................................................................................6
    § 2524.5(b)...........................................................................6, 18, 21
    § 8622 (McKinney).............................................................................32
    § 8624 (McKinney)..............................................................................2

N.Y.C. Admin. Code § 26-511(c)(9)(b) ....................................................18

**Other Authorities**

Reply Br. at 39, *Loretto v. Teleprompter Manhattan CATV Corp.*, No. 81-244,
    1982 WL 608698 (U.S. March 20, 1982) .......................................24

REST. 2D OF PROPERTY, LAND. & TEN. § 12.2, Cmt. C (1977) ...................13

## INTRODUCTION

On June 14, 2019, the New York Legislature passed the most sweeping and onerous rent stabilization provisions that the United States has ever seen. The 2019 amendments, which are now part of New York's Rent Stabilization Laws ("RSL"), made rent stabilization permanent in the State; closed off every viable opportunity for owners of rent-stabilized property to exit the residential rental market; ensured that rent-stabilized units will not be profitable in the long-run; and instantly reduced the value of rent-stabilized properties by between twenty and forty percent. All this takes New York's law beyond any other rent control legislation that has previously been considered by the federal courts.

The amended RSL violates the Takings Clause of the Fifth Amendment. There is no question that Defendants have failed to provide any compensation to owners of rent-stabilized properties; all that is at issue is whether Defendants have committed a taking (which they have—in numerous ways), and whether that taking was for public use (which it was not).

As an initial matter, the 2019 amendments effect a physical taking. The amended RSL compels owners of rent-stabilized units to continue to rent out their property at below-market rates and requires owners to continue to renew tenancies regardless of whether they wish to do so. The 2019 amendments—by eliminating high-income and luxury destabilization along with all viable condominium and cooperative conversions—foreclosed the last surviving practical mechanisms by which owners of rent-stabilized property could previously exit the residential rental market. And, because *tenants* have a unilateral right to renew their leases and owners cannot leave the residential rental market, the 2019 amendments have deprived owners of their reversionary right to possess and use their property after the terms of rental leases expire. This is a physical taking.

The 2019 amendments also effect a regulatory taking. The 2019 amendments had an enormous negative economic impact on Plaintiffs, whose buildings containing rent-stabilized units

1

have plummeted in value from the already depressed value they had thanks to the previous version of the RSL. The sharply diminished value of Plaintiffs' properties reflects the fact that they will not be able to generate a reasonable rate of return on their investments in these properties in the future. This was wholly inconsistent with Plaintiffs' investment-backed expectations and amounts to a regulatory taking.

The 2019 amendments also commit a confiscatory taking under the Supreme Court's ratemaking precedents. The amended RSL requires Plaintiffs to continue renting out their property for residential purposes, but then places a below-market cap on the amount that Plaintiffs can collect in rent and makes it impossible for Plaintiffs to fully recoup the costs of necessary improvements. Because of the 2019 amendments, Plaintiffs can no longer receive a fair rate of return on their investments—and, again, the 2019 amendments violate the Fifth Amendment's mandate that the government pay just compensation for the taking of private property.

Finally, the 2019 amendments violate the requirement that government may only take property "for public use." U.S. CONST. amend. V. The 2019 amendments take Plaintiffs' property for the impermissible non-public use of enriching an arbitrary subset of private tenants. Defenders of the RSL point to a variety of supposed public benefits, but those public benefits are illusory. Because the amended RSL effects a taking that is not for public use, it is inherently invalid.

For these reasons, Defendants' motions to dismiss should be denied.

## BACKGROUND

### I.      History of Rent Stabilization and the 2019 Amendments.

New York first adopted rent stabilization in 1969. N.Y. UNCONSOL. LAW TIT. 23 § 8624 (McKinney). Broadly, rent stabilization limits the rent that owners can charge residential tenants living in apartments that contain at least six units and were constructed prior to January 1974,

while requiring owners to renew the leases of their tenants every one or two years and providing

multiple additional tenant protections. Compl., Doc. 1 at ¶ 28 (Feb. 6, 2020). The RSL also created

the Rent Guidelines Board and empowered it to determine whether and how much rents for rent-

stabilized units may be raised on an annual basis. *Id.* New York has always intended the Rent

Stabilization Laws to benefit tenants by allowing them to remain in their rental units. As New

York's highest court has explained,

> [b]y regulating rents and providing occupants with statutory rights to tenancy
> renewals under rent stabilization . . . the State *intended to protect dwellers* who
> could not compete in an overheated rental market . . . The regulation of this field
> has been maintained to prevent uncertainty, hardship and *dislocation*.

*Manocherian v. Lenox Hill Hosp.*, 643 N.E.2d 479, 480 (N.Y. 1994) (quotation marks omitted;

emphases added).

On June 14, 2019, the New York Legislature passed Senate Bill 6458 ("S.B. 6458"), which

prevents owners of rent-stabilized apartments from exiting the residential rental market or

obtaining a reasonable return on their rent-stabilized properties. S.B. 6458 enacted massive and

sweeping changes, transforming New York's rent-stabilization law into the most onerous rent-

control law in the Nation's history. In a joint statement, Senate Majority Leader Stewart-Cousins

and Assembly Speaker Heastie lauded the bill as "giv[ing] New Yorkers the strongest tenant

protections in history." Compl. ¶ 52. And the Legislature carefully crafted S.B. 6458 to give

tenants a virtually ironclad right to remain in their rental units—even if the owner wished to

recover the unit for his own use and regardless of the tenant's income. Senator May said that the

law will "shift the balance toward helping renters throughout New York State to stay in their

homes." *Id.* at ¶ 174.

S.B. 6458 is a seventy-four-page law that changed New York's preexisting rent-

stabilization system in a number of critical respects. As laid out in detail below, among other

amendments, the law (A) made it impossible as a practical matter for the vast majority of owners of rent-stabilized units—including Plaintiffs—to cease renting out their properties for residential purposes, and (B) foreclosed owners of rent-stabilized property from being able to earn a reasonable return on their property.

## A.    The 2019 Amendments Prevent Owners From Ceasing To Rent Their Property for Residential Purposes.

A number of S.B. 6458's provisions make it impossible for the vast majority of owners—including Plaintiffs—to exit the rent-stabilized residential rental marketplace.

*First*, S.B. 6458 severely restricts owners' ability to convert their rent-stabilized property into cooperatives or condominiums in New York City. Prior to the 2019 amendments, if the owner could persuade fifty-one percent of occupants to agree to buy their units, the owner could convert a complex to a cooperative or a condominium and (after waiting several years) evict the remaining tenants. *See* N.Y. GEN. BUS. LAW § 352-eeee.1(c) (McKinney 1988). Although theoretically possible, such so-called "eviction conversions" were extraordinarily rare due to the high percentage of tenants who had to participate. Compl. ¶ 46(a). An alternative and, prior to 2019, much more common mechanism for converting rent-stabilized apartments to condominiums was through so-called "non-eviction conversions." *Id.* Under the prior law, such conversions could occur if the owner found buyers for fifteen percent of the units in the building, and there was no requirement that these buyers already be tenants in the building. *See* N.Y. GEN. BUS. LAW § 352-eeee.1(b) (McKinney 1988). This type of conversion could not be used to evict tenants who wished to remain in the building, but as tenants gradually vacated their units over time the units could be sold as cooperatives or condominiums rather than rented out to new tenants at a rent-stabilized rate. *Id.*

4

S.B. 6458 began by eliminating eviction conversions. S.B. 6458, Part N § 1. What is more, under the new law fifty-one percent of bona fide tenants in occupancy must execute written purchase agreements for there to be a non-eviction conversion. *Id*. (codified at N.Y. GEN. BUS. LAW § 352-eeee.1(b)). In other words, to carry out a non-eviction conversion after the 2019 amendments, an owner must meet the threshold for tenant participation that previously applied to eviction conversions—a threshold that years of experience under the old law shows to be unattainable. Compl. ¶ 46(b). As a practical matter, the 2019 amendments block most owners' last hope for leaving the marketplace for rent-stabilized apartments by ensuring that a bare plurality of tenants can always veto the owner's proposal to convert a building into condominiums. *See id.* (citing source that documents the large number of last-minute conversion plans that landlords filed shortly before S.B. 6458 was enacted and pointing to this rush as "a sign that some big landlords believe the New York law will end conversions").

*Second*, S.B. 6458 repealed both luxury decontrol and high-income decontrol. Up until the 2019 amendments, the RSL allowed for deregulation of rent-stabilized apartments when rent hit a certain ceiling and the unit became vacant (often called "luxury decontrol") *or* when the tenant was high-income and the rent hit a certain ceiling (often called "high-income decontrol"). *See* Compl. ¶¶ 39, 46(c). Before S.B. 6458, an apartment was eligible for luxury decontrol if its rent met the luxury decontrol maximum and it became vacant. *See* N.Y. UNCONSOL. LAW TIT. 23 § 26-504.2 (McKinney 2015). Furthermore, before S.B. 6458, an apartment was eligible for high-income decontrol if it met the luxury decontrol maximum and the tenant had an annual income of over $200,000 for the past two years. *See id.* § 26-504.1 (McKinney 2011); *id.* § 26-504.3 (McKinney 2015). However, S.B. 6458 closed off these options; now—even if a tenant is high-income and the rent has reached a luxury level—the unit must remain rent-stabilized. S.B. 6458,

5

Part D § 5. The amendments thus closed off a critical means by which owners could previously exit the market for rent-stabilized apartments while at the same time divorcing rent stabilization from the need of the tenant and the luxury level of the unit.

The few remaining options to exit the market for rent-stabilized apartments are seldom used and unavailable to Plaintiffs. In the wake of the 2019 amendments, an owner can only put a rent-stabilized property to a different use if he or she can prove to the Division a plan to "withdraw any or all housing accommodations from both the housing and nonhousing rental market without any intent to rent or sell all or any part of the land or structure," N.Y. UNCONSOL. LAW TIT. 23 § 2524.5(a)(1) (McKinney), either (1) to use it "in connection with a business which he or she owns and operates" or (2) because the cost of remedying dangerous living conditions "would substantially equal or exceed the assessed valuation of the structure," *id.* at § 2524.5(a)(1)(ii). These options are limited to the small number of landlords who (1) wish to both own and operate a business in their former residential property where such use would be permissible under applicable zoning laws or (2) have allowed the conditions in their apartment building to become so dangerous as to make repairs infeasible. And an owner may withdraw rent-stabilized property from the rental market to *destroy* it only if the owner can prove to the Division that he or she plans to demolish the building and is able to do so. Compl. ¶ 46(e). To take this avenue, the owner is required to either relocate the tenants to similar housing (and pay reasonable moving expenses and a $5,000 stipend to the tenant and any increased rent costs for six years) or to pay the tenant a stipend as set by the Division for six years. N.Y. UNCONSOL. LAW TIT. 23 § 2524.5(b). This option is limited to landlords who have the means to pay their tenants large sums to move *and* who are able to convince the Division to permit them to demolish the building. None of these options are

viable for Plaintiffs' fully tenanted buildings; the amended RSL as applied to Plaintiffs contains no exit options. Compl. ¶¶ 46–47.

B.     **The 2019 Amendments Prevent Owners of Rent-Stabilized Property From Earning a Reasonable Return on Their Property.**

A number of S.B. 6458's provisions guarantee that owners cannot earn a reasonable return on their property—including both the provisions already discussed and various additional provisions.

*First*, S.B. 6458 repealed vacancy and longevity increase provisions that helped compensate for the inadequate renewal increases set by the Board. Before S.B. 6458's passage, New York law permitted owners to increase rent by up to twenty percent when an apartment became vacant (or passed from all tenants named on a lease to a family member for a second time)—a "vacancy increase." *See* N.Y. Unconsol. Law Tit. 23 § 26-511(c)(5-a) (McKinney 2015); 9 N.Y. Comp. Codes R. & Regs. §§ 2502.7, 2522.8(a). Similarly, New York law previously permitted a longevity increase on top of this vacancy increase if a tenant had remained in the unit for a period of eight years or more. N.Y. Unconsol. Law Tit. 23 § 26-511(c)(5-a) (McKinney 2015). S.B. 6458 repealed both of those avenues for raising rent, and it banned rent control boards from adopting adjustments targeted to when an apartment becomes vacant. *See* S.B. 6458, Parts B, C.

*Second*, S.B. 6458 drastically decreased the ability of landlords to pass along the costs incurred from making necessary major capital improvements and in fact turned such improvements into a money losing proposition. In this regard, two considerations are paramount: first, major capital improvements depreciate over time, and second, the value of any multifamily residential property is a function of the operating income it generates. The physical improvement an owner makes—for example, a new boiler—will in time be worthless, since it has a discrete useful life

which will eventually end. Compl. ¶ 162. Prior to the 2019 amendments, however, an owner making a major capital improvement was entitled to a permanent rent increase, such that the cost of the improvement could be partially offset by an increase in the value of the property. But under the amended RSL, the rent increase is temporary, so that not only the value of the physical asset but also the underlying increase in property value simply evaporates over time. This leaves only the temporary increased rental income to compensate for the cost of the improvement. But under S.B. 6458, the rent increase may only be two percent (previously, that amount was six percent). *Compare* N.Y. Unconsol. Law Tit. 23 § 26-511(c)(6) (McKinney 2015), *with* § 26-511(c)(6) (McKinney). What is more, the minimum period over which any increase may be amortized is significantly longer under S.B. 6458: twelve years (as opposed to eight) for buildings with thirty-five or fewer units and twelve-and-a-half years (as opposed to nine) for buildings with more than thirty-five units. *Compare* N.Y. Unconsol. Law Tit. 23 § 26-511(c)(6) (McKinney 2015), *with* § 26-511(c)(6) (McKinney). And since financing costs cannot be included as part of the cost basis for calculating the temporary rent increase, *id.* § 26-511(c)(6) (McKinney), even the lengthened amortization schedule is not a true reflection of an owner's ability to recover its outlay.

*Third*, S.B. 6458 drastically decreased the ability of landlords to pass along costs from individual apartment improvements. Individual apartment improvements are an essential tool for landlords of rent-stabilized properties. *See* Compl. ¶ 216. Because rent stabilization incentivizes tenants to stay in units longer than they otherwise would, *id.* ¶ 209, their extended residency necessitates substantial work on a unit before returning it to the market. These improvements can include the replacement of windows, doors, flooring, wiring, and plumbing, and renovations in the kitchen and bathroom. Almost without exception, the cost of such individual apartment improvements significantly exceeds $15,000. *See id.* ¶ 218. Yet under the 2019 amendments,

owners may only recover a maximum of $15,000 for improvements over a fifteen-year period. N.Y. UNCONSOL. LAW TIT. 23 § 26-511(c)(13) (McKinney). Financing charges may not be recovered. *Id.* And monthly rent may only be increased by one one-hundred-sixty-eighth of the cost of the improvement (for buildings with thirty-five or fewer units) or one one-hundred-eightieth of the cost of the improvement (for buildings with more than thirty-five units); previously, these amounts were one-fortieth and one-sixtieth, respectively. *Compare id.* § 26-511(c)(13) (McKinney 2015), *with* § 26-511(c)(13) (McKinney). These increases must be rescinded after thirty years. *Id.* § 26-511(c)(13) (McKinney). Owners are barred from passing along various costs to tenants as individual apartment improvements; landlords may not pass along "any costs that exceed reasonable costs established by rules and regulations promulgated by the division of housing and community renewal." *Id.* The effect of the 2019 amendments is to force landlords to choose whether to invest in a costly individual apartment improvement for which they will never recover the cost or to accept the slow but inevitable deterioration of the unit. Compl. ¶ 218. In short, given the limits on financing major capital improvements and individual apartment improvements, the new law essentially ensures that a landlord will suffer a loss if the landlord attempts to make any significant improvements to a rent-stabilized apartment.

*Fourth*, S.B. 6458 lengthened the time periods governing eviction proceedings and the execution of eviction orders, *see* S.B. 6458, Part M, which will also increase owners' operating costs by permitting tenants who are failing to pay rent and should be evicted to remain in units longer than they otherwise would be permitted. *See* Compl. ¶ 49(f).

And *sixth*, S.B. 6458 likewise made rent stabilization a permanent fixture of New York law. Although formerly the RSL expired every four to eight years, S.B. 6458 eliminated these provisions—ensuring that rent stabilization will continue to exist indefinitely. *See* Compl. ¶ 102.

II.     **The Purpose of Rent Stabilization Is To Subsidize Tenants at the Expense of Property Owners.**

The clear purpose of New York's rent-stabilization system is to subsidize tenants—by ensuring that those who live in rent-stabilized units will be able to remain in those units with minimal rent increases each year—at the expense of owners of rent-stabilized units. What is more, in passing S.B. 6458, the New York Legislature explicitly intended to aid a certain population: tenants in rent-stabilized units. S.B. 6458 banned luxury and high-income decontrol and eviscerated increases for improvements "in order to prevent uncertainty, hardship and *dislocation*" of tenants. S.B. 6458, Part G at 15:53. And the statements from various members of the Legislature laid out above confirm this reality: S.B. 6458 "shift[s] the balance toward helping *renters* throughout New York State to stay in their homes." Compl. ¶ 174.

New York courts have long recognized the nature of rent stabilization: it subsidizes tenants at the expense of their landlords. Indeed, rent stabilization provides a public assistance benefit *to tenants*. As New York's highest court recently explained,

> [t]he rent-stabilization program has all of the characteristics of a local public assistance benefit . . . Rent stabilization provides assistance *to a specific segment of the population* that could not afford to live in New York City without a rent regulatory scheme. And the regulatory framework provides benefits *to a targeted group of tenants*—it protects them from rent increases, requires owners to offer lease renewals and the right to continued occupancy, imposes strict eviction procedures, and grants succession rights for qualified family members.

*In re Santiago-Monteverde,* 22 N.E.3d 1012, 1015–16 (N.Y. 2014) (emphases added). "Like other public assistance benefits," the New York Court of Appeals continued, "the Rent Stabilization Law *serves a select, defined group of New Yorkers* who struggle, in this case, to afford suitable housing"; it "is an exceptional regulatory scheme that enables *a specifically targeted group of tenants* to maintain housing in New York City." *Id.* at 1016 (emphases added). And the public

10

assistance benefit of rent stabilization is paid for by the owners of rent-stabilized property—not

the government. Again, the New York Court of Appeals has recognized this reality:

> While the rent-stabilization laws do not provide a benefit *paid for* by the government, they do provide a benefit *conferred by* the government through regulation aimed at a population that the government deems in need of protection. Among other things, the Rent Stabilization Law caps legal rents . . . [T]he government, recognizing that housing protection is necessary to benefit a specific group of tenants, has created a public assistance benefit through a unique regulatory scheme *applied to private owners of real property*.

*Id.* at 1016–17 (first emphasis added).

**III.    Plaintiffs File This Litigation.**

Because of the onerous nature of these new rent-stabilization provisions, Plaintiffs, a group

of owners of rent-stabilized properties in New York City, each affected directly and individually

by the amended RSL as applied to them, filed suit challenging S.B. 6458. Plaintiffs 226 LLC, 335-

7 LLC and 431 Holding LLC own rent-stabilized buildings in lower Manhattan, where unregulated

rents are approximately two-and-a-half times higher than rents for comparable rent-stabilized

apartments. Compl. ¶¶ 9, 11, 12, 117. Even before the 2019 amendments, the RSL reduced the

value of the buildings owned by these Plaintiffs by millions of dollars, and the 2019 amendments

have diminished the value of these buildings even further.

Plaintiff 335-7 LLC owns two rent-stabilized buildings on West 14th Street. Compl. ¶ 9.

Prior to the 2019 amendments, it invested $800,000 in making major capital improvements to these

properties. *Id.* ¶ 125. If the 2019 amendments are allowed to stand, 335-7 LLC will be unable to

recover the cost of these improvements. Those losses are in addition to the broader losses it will

sustain as a result of how the 2019 amendments further reduce the returns generated by rent-

stabilized apartments.

Plaintiff 699 Venture owns and operates a rent-stabilized building in the Bronx that contains twenty-three rental apartments. Compl. ¶ 13. It also has sustained substantial losses as a result of the amended RSL.

Finally, Plaintiff FGP 309 LLC previously owned a rent-stabilized building located at 309 East 110th Street. It had received an offer to sell this building for $2,725,000 when S.B. 6458 was passed. Compl. ¶¶ 10, 22. Immediately following passage, the buyer withdrew this offer and the parties renegotiated a new sale price for the building of $1,800,000. *Id.* ¶ 22. Thus, as a direct result of the recent amendments to the RSL, this plaintiff suffered actual damages of $925,000.

## ARGUMENT

**I.    Defendants' Enforcement of the Amended RSL Constitutes a Physical Taking of Plaintiffs' Property.**

### A.    The Government Commits a Physical Taking When It Compels Owners To Rent Their Property to Rent-Stabilized Tenants in Perpetuity.

1. If laying a half-inch cable across an apartment building's roof is a per se physical taking, it cannot be seriously doubted that the same is true for filling a building's apartments with permanent squatters. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). The principal case upon which Defendants rely in urging dismissal of Plaintiffs' physical takings claim confirms this proposition: the government commits a physical taking whenever it "authorizes a compelled physical invasion of property." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992). The Supreme Court has reaffirmed this principle many times since its earliest takings cases. *See, e.g.*, *Pumpelly v. Green Bay Co.*, 13 Wall. (80 U.S.) 166, 177–78 (1872). Indeed, considerably less than permanent physical habitation of property will suffice to establish a per se physical taking; the first step in the Supreme Court's analysis in *Nollan v. California Coastal*

*Commission*, 483 U.S. 825, 831–32 (1987), was to recognize that a physical taking occurs when the government grants the public a "permanent and continuous right to pass to and fro" over land.

Thus, Defendants are wrong to the extent that they argue that the amended RSL is subject only to a regulatory takings analysis even if Plaintiffs can show that this law *requires* owners to open their buildings to rent-stabilized tenants in perpetuity. *See* City Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Compl., Doc. 63 at 12–13 (May 15, 2020) ("City Br."); Mem. of Law in Support of Intervenors' Mot. to Dismiss, Doc. 65 at 10–11 (May 15, 2020) ("Intervenor Br."). As Intervenors acknowledge, a "forced occupation" of apartments "deprives the owners of their possessory interests and results in [a] physical taking[ ]." Intervenor Br. 7 (quoting *Rent Stabilization Ass'n of N.Y.C. v. Higgins*, 630 NE.2d 626, 633 (N.Y. 1993)). A law that strips owners of their right to exclude others from real property and awards complete dominion over the property to someone else "is qualitatively more severe than a regulation of the use of property." *Loretto*, 458 U.S. at 436. Despite the State's suggestion to the contrary, *see* Mem. of Law in Supp. of State Defs.' Mot. to Dismiss the Compl., Doc. 61 at 14–15 (May 15, 2020) ("State Br."), such conduct qualifies as a per se physical taking irrespective of whether the government formally initiates condemnation proceedings or acknowledges that it is exercising its power of eminent domain.

The foregoing analysis is confirmed by focusing on the specific property interest that landlords have long been understood to retain when they rent real property: a reversionary right to possess and use the property after the term of the lease ends. As the Second Restatement of Property puts it, "the landlord has a reversionary interest in the leased property," and there will be an "eventual resumption of possession by the landlord" after the term of the lease comes to an end. REST. 2D OF PROPERTY, LAND. & TEN. § 12.2, Cmt. C (1977). The right to possess the leased

property upon termination of the lease forms the heart of this reversionary interest. No less than an easement or a leasehold, this reversionary interest is a form of property that cannot be taken for public use without just compensation. *See, e.g.*, *Manocherian v. Lenox Hill Hosp.*, 643 N.E.2d 479, 485 (N.Y. 1994) (considering "reversionary property interests" when assessing a takings claim).

2. The more substantial question this case presents is not whether a per se physical taking would occur if the government required Plaintiffs to let out their apartments to rent-stabilized tenants in perpetuity but whether that is what Defendants have done to Plaintiffs. As Defendants are quick to point out, in *Yee*, the Supreme Court rejected a facial physical takings challenge to city and state rent control laws. But the laws at issue in *Yee* did not compel property owners "once they have rented their property to tenants, to continue doing so." 503 U.S. at 527–28. Instead, *Yee* upheld laws that provided that an owner "who wishes to change the use of his land may evict his tenants, albeit with 6 or 12 months notice." *Id.* at 528. Those facts were critical to the outcome in *Yee*, and the Supreme Court concluded its analysis with a warning to state and local governments: "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* As the next section of this brief will explain, lawmakers failed to heed that warning when they enacted the amended RSL.

Defendants argue that under *Yee* and the Second Circuit decisions that have interpreted it, so long as Plaintiffs voluntarily rented their apartments in the first place, the government can compel Plaintiffs to continue in this economic relationship forever without providing any viable options for exiting the market and recovering possession of their property. *See* State Br. 15–16; City Br. 10. Implicit in Defendants' argument is the assertion that Defendants can even deprive

14

Plaintiffs of their previous viable exit options even after any initial voluntary rentals. But in *Yee* it was the *continued* voluntariness of the economic relationship that led the Court to conclude that there was no taking. *See Yee*, 503 U.S. at 528–29. That is why the Second Circuit, in upholding a prior, less onerous version of the RSL, specifically pointed to property owners' remaining exit options. *See Harmon v. Markus*, 412 Fed. App'x 420, 422 (2d Cir. 2011); *see also FHLMC v. New York State Dep't of Housing & Community Renewal*, 83 F.3d 45, 48 (2d Cir. 1996) (rejecting challenge to prior version of RSL because owner "acquiesced" to building's "*continued* use as rental housing" (emphasis added)); *Southview Associates, Ltd. v. Bongartz*, 980 F.2d 84, 95 (2d Cir. 1992) ("In *Yee*, there was no government compulsion because the mobile home park owners voluntarily rented their land to mobile home owners, *and they were not compelled to continue to do so*." (emphasis added)). Indeed, while Defendants give great weight to the Second Circuit's unpublished opinion in *Harmon*, they overlook the Second Circuit's observation in a published decision that "the temporary nature of the rent control laws is needed to insulate them from constitutional challenge." *Resolution Tr. Corp. v. Diamond*, 18 F.3d 111, 123–24 (2d Cir.), *cert. granted, judgment vacated*, 513 U.S. 801 (1994), *statement reaffirmed on remand*, 45 F.3d 665, 676 (2d Cir. 1995). To the extent that the amended RSL traps Plaintiffs in a *permanent* rather than a temporary economic relationship with rent-stabilized tenants, it effects a physical taking.[1]

Defendants cite *FCC v. Florida Power Corporation*, 480 U.S. 245 (1987), but that case is not to the contrary. *Florida Power Corp.* concerned regulatory modifications to leases for placing

---

[1] Defendants cite two other cases concerning an earlier version of the RSL that were decided by the Second Circuit by summary order prior to 2007. *See West 95 Housing Corp. v. New York City Dep't of Housing Preservation and Development*, 31 Fed. App'x 19 (2d Cir. 2002); *Greystone Hotel Co. v. City of New York*, No. 98-9116, 1999 U.S. App. LEXIS 14960 (2d Cir. 1999). The summary orders in those cases add nothing of substance, but in any event this Court should not rely upon them. Under Second Circuit Local Rule 32.1.1, these summary orders cannot even be cited to the court that issued them.

cables on telephone poles, and the Supreme Court held that there was no physical taking because the plaintiffs voluntarily entered into the leases. *Id.* at 251–52. Importantly, by the time the case reached the Supreme Court, the leases at issue were "terminable by either party on six months' notice." *Id.* at 248 n.2. Unlike here, the owners in *Florida Power Corp.* were not compelled by the government to continue leasing their property forever.[2]

Defendants' argument that Plaintiffs voluntarily submitted themselves to regulation under the amended RSL is also foreclosed by more recent Supreme Court precedent. In *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), the Court held that a federal program that required raisin growers to give the government a share of their crop effected a physical taking. The government attempted to defend this law by making the same sort of "voluntariness" argument that Defendants advance here; the government argued that the raisin producers had agreed to forfeit a portion of their produce by choosing to sell raisins rather than using their grapes for some other purpose. The Supreme Court rejected this argument as "wrong as a matter of law" because it "proves too much." *Id.* at 365. Referencing the Supreme Court's earlier decision in *Loretto*, the *Horne* Court explained that accepting the government's argument would lead to a *reductio ad absurdum* that comes close to the facts of this case. The government's voluntariness argument could not be right, the Court said, because it would imply that as a condition of renting out rooms in an apartment building, the government could "requisition a certain number of apartments as permanent government offices." *Id.* (quoting *Loretto*, 458 U.S. at 439 n.17). No less than in that hypothetical, the effect of the amended RSL is to requisition Plaintiffs' real property (here, for conferral upon government-favored tenants) in violation of the Takings Clause.

---

[2] Defendants further assert that the Complaint "disregards" the few limited exit options that remain in the amended RSL.  State Brief, 16.  In fact, the Complaint recites that none of these remaining options are viable for any of the Plaintiffs.  See Compl. ¶ 46.

**B.    The Amended RSL Compels Plaintiffs To Rent Their Property to Rent-Stabilized Tenants in Perpetuity.**

**1.    There Is No Lawful Means By Which Plaintiffs Can Choose To Exit The Market for Rent-Stabilized Apartments Without Subjecting Themselves to Some Other Form of Uncompensated Taking.**

*Yee*, *Harmon*, and the other cases that have upheld rent control laws make clear that these laws can only survive scrutiny under the Supreme Court's physical takings cases if landlords retain an option to exit the market and regain possession of their property. The courts in those cases did not have occasion, however, to grapple with a further question that this case presents: How extensively may the government restrict a landlord's ability to exit the market before a court must conclude that the landlord really has no exit options at all? Plaintiffs' physical takings claim must not be dismissed if the Court agrees with three propositions of law that together provide a partial answer to this question.

a. First, it is self-evident that the government cannot avoid liability for a physical taking by offering the owner the "choice" to avoid a physical invasion by doing something that is impossible or illegal. The state would have been no less liable for a per se physical taking in *Loretto* if a provision of New York law had said that Ms. Loretto could avoid having a cable laid across her building's roof by flying the building to a new location using helium balloons. The same goes for "options" that are legally impossible. The *Loretto* Court surely would not have reached a different result had New York law provided that no cable would be placed if Ms. Loretto shut off her tenants' heating in violation of city code and exposed herself to massive liability in the process. As these hypotheticals underscore, if a landlord's option to exit the market is what saves most rent control regimes from qualifying as physical takings, a per se physical taking will occur if a landlord's only exit options require doing something that is physically impossible or illegal. The "choice" to do something that cannot be done or that the law forbids is really no choice at all.

At least as applied to Plaintiffs, many of the exit options identified by Defendants would be physically impossible, illegal, or both. Defendants emphasize that some owners can recover possession of a single rent-stabilized unit if they have an immediate and compelling need to occupy the unit themselves. *See* N.Y.C. Admin. Code § 26-511(c)(9)(b). But Plaintiffs are three LLCs and a corporation; unlike natural persons such as the plaintiffs in *Harmon*, they cannot physically occupy an apartment. Even if they could, the legal provision that permits evictions under very narrow circumstances for the owner's personal use do not apply to rent-stabilized buildings owned by corporate entities. *See* Compl. ¶¶ 82–83. It is both impossible and illegal for Plaintiffs to evict even one of their tenants under this provision.

Defendants point to another legal provision that allows the owner of a rent-stabilized apartment to recover the apartment for use by the owner's business. But Defendants ignore the fact that Plaintiffs' buildings are not zoned for any such business use. Compl. ¶ 46(e). Plaintiffs therefore cannot lawfully invoke this option.

Defendants also note that an owner may withdraw a building from rent stabilization by showing that the cost of redressing dangerous building code violations "would substantially equal or exceed the assessed valuation of the structure." *See* N.Y. Unconsol. Law Tit. 23 § 2524.5(b). But to invoke this provision, Plaintiffs would need to violate the building code and allow their properties to fall into an extreme state of disrepair. Even if this option is in theory physically possible, it is illegal, and so not really a choice under *Yee*.

b. The second proposition that supports Plaintiffs' physical takings claim is that the government cannot avoid liability for a physical taking by leaving it up to someone other than the owner to decide whether a physical invasion will occur. The television company in *Loretto* had discretion to decide whether to run a cable across Ms. Loretto's roof. *See* 458 U.S. at 423–24. But

the fact that a third party could have chosen not to exercise its state license to invade Ms. Loretto's property did not make Ms. Loretto any less entitled to just compensation once the invasion took place. More fundamentally, what counts under *Yee* and its progeny is the *owner's* freedom to decide to exit the market; it is not enough for the government to give the choice to someone else.

Several of the exit options identified by Defendants suffer from this defect. The City Defendants say that Plaintiffs can exit the market by converting their buildings to cooperatives or condominiums, City Br. 13, but under the amended RSL any such conversion requires 51% of the building's tenants to purchase their units, *see* Compl. ¶¶ 46(b), 59(a). Putting aside the fact that such a high percentage of a building's rent-stabilized tenants are almost never able and willing to purchase their units, the critical point is that whether such a conversion will occur is up to the tenants.

Defendants also emphasize provisions of New York law that allow Plaintiffs to evict a so-called "unsatisfactory" tenant. City Br. 12; Intervenor Br. 8; *see* Compl. ¶ 61. But such evictions depend upon the conduct of the tenant; this is not a means by which Plaintiffs can unilaterally choose to exit the market. Indeed, after the eviction the tenant would just be replaced with another rent-stabilized tenant, so this is no exit option at all.

The City Defendants propose that Plaintiffs could wait for their tenants to move out and then leave the units vacant. City Br. 12. This option depends on a threshold decision by the tenant to leave and thus cannot be said to make Plaintiffs' continued participation in this market voluntary. Plaintiffs' properties are no less subject to a government-licensed physical invasion because the invaders can leave whenever they want.[3]

---

[3] Nor is leaving apartments vacant a genuine option when New York City imposes ownership costs averaging almost $1,000 per month per apartment. *See* Compl. ¶ 48.

19

c. A third type of "choice" that cannot absolve the government of liability under *Yee* is one in which the government conditions a landlord's exit from the market on the landlord acceding to some other form of uncompensated taking. Consider another hypothetical based upon the facts of *Loretto* in which Ms. Loretto is allowed to avoid the placement of the cable across her building's roof by agreeing to forgo all economically beneficial use of the building in the future—a per se regulatory taking under *Lucas v. South Carolina Coastal Commission*, 505 U.S. 1003 (1992). Surely the government cannot avoid its duty to pay just compensation for the property it takes by leaving it up to the owner to decide which property will be taken.

This issue arose in *Koontz v. St. Johns River Management District*, 570 U.S. 595, 601–02 (2013), in which permitting authorities told a landowner that he could select from a menu of possible land use exactions as a condition of receiving a permit to build on a portion of his property. The Court said that the Constitution required permitting authorities to offer the owner "at least one alternative that would satisfy" the Takings Clause. *Id.* at 611. The landowner prevailed in *Koontz* because all the options that permitting officials made available would have required the landowner to submit himself to a taking of one form or another. So too here, if Plaintiffs' only exit options would themselves involve an uncompensated taking, Defendants cannot avoid liability for licensing a physical invasion of Plaintiffs' property on the theory that Plaintiffs consented to the invasion.[4]

---

[4] Consistent with the analysis in the text, the Supreme Court has repeatedly said that the government cannot force someone to select which of two constitutional rights will be violated and then claim that the person voluntarily forfeited the right he or she chose to give up. *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330 (1972) (right to interstate travel versus right to vote); *Simmons v. United States*, 390 U.S. 377, 394 (1968) (Self Incrimination Clause versus Free Speech Clause); *see also Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004) (First Amendment versus Fourth Amendment).

Defendants note that Plaintiffs could exit the market by obtaining permission from the Division of Housing and Community Renewal to tear down their buildings and pay the evicted tenants a generous multi-year living stipend. *See* N.Y. UNCONSOL. LAW TIT. 23 § 2524.5(b); Compl. ¶ 89. In addition to the fact that demolition under the amended RSL does not offer a genuine exit, it is just another type of physical taking; physical takings "involve a physical occupation *or destruction* of property." *CRV Enterprises, Inc. v. United States*, 626 F.3d 1241, 1246 (Fed. Cir. 2010). And even if that were not so, tearing down the buildings would eliminate their potential for any economically beneficial use in the future—a per se regulatory taking under *Lucas*. Defendants cannot avoid their duty to pay just compensation for property that is taken by allowing Plaintiffs to choose between having their apartments permanently physically occupied and having them destroyed.[5] If "let them sell wine" did not defeat the taking claim in *Horne*, 576 U.S. at 365, "let them demolish their buildings" certainly cannot here.

### 2. The Amended RSL Cuts Off All Practical Means By Which Plaintiffs Could Exit the Market for Rent-Stabilized Apartments.

The preceding section explained why, as a matter of law, the exit options Defendants identify do not make Plaintiffs' continued participation in the market for rent-stabilized apartments voluntary under *Yee*. But there is a second, fully independent and factual reason why Defendants' proffered exit options do not bring this case within the rule of *Yee*: Defendants' exit options are totally unrealistic and impractical. *Yee* itself recognized that exit options that cannot, as a practical matter, be exercised are insufficient to make a landlord's participation in the market for rent-

---

[5] The State also suggests that Plaintiffs' physical takings claim fails because Plaintiffs could apply for a hardship exception to the limit on annual rent increases. *See* State Br. 16. In some years no one even applies for these exemptions because they are almost never granted, *see* Compl. ¶¶ 150–53, and even if Plaintiffs somehow received an exemption it would only allow them to increase rents—not end the government-licensed physical occupation of their property.

controlled properties voluntary. The *Yee* Court had before it only a facial challenge to a rent control regime, but it expressly left open the possibility that property owners could prevail in an as-applied challenge by showing that they are "not in fact free to change the use of their property" despite how things might otherwise appear from the face of the statute. *Yee*, 503 U.S. at 528. The Complaint contains detailed allegations of exactly this sort. *See* Compl. ¶¶ 45–48, 59–60.

Defendants, for example, suggest that Plaintiffs could apply to the Division of Homes and Community Renewal for permission to demolish their fully tenanted buildings. *See* N.Y. Comp. Codes R. & Regs Tit. 9 2524.5(a)(2). But while demolition may be a viable option for a deteriorated, mostly vacant building or a potential development assemblage, Plaintiffs, in order to obtain permission to demolish, would be effectively required to either relocate all their tenants to similar regulated affordable apartments (thus recreating the very perpetually regulated ownership they would supposedly be exiting) or to pay an equivalent stipend to every tenant. For Plaintiffs, demolition under the amended RSL is not an exit option.

Unable to deny that the purpose and effect of the recent amendments to the RSL is to make it impossible for all but a handful of rent-stabilized landlords (not including Plaintiffs) to exit the market, Defendants attempt to sidestep this issue by invoking the distinction between facial and as-applied challenges. First, Defendants point to *United States v. Salerno*, 481 U.S. 739, 745 (1987), and say that Plaintiffs' facial challenge fails because the Complaint admits that there are at least *some* circumstances under which it is possible for *some* landlords to exit the market. State Br. 19; City Br. 12. Defendants' argument rests of the premise that a facial challenge can succeed only if there are "no set of circumstances" under which the amended RSL could be constitutionally applied, *see Salerno*, 481 U.S. at 745. But a plurality of the Supreme Court has more recently indicated "that the standard for mounting a facial challenge is not as severe as *Salerno* had

suggested." *United States v. Quinones*, 313 F.3d 49, 60 n.8 (2d Cir. 2002) (discussing *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999). *Salerno*'s formulation applies, at most, "in cases of pre-enforcement facial vagueness challenges" under the First Amendment, *United States v. Farhane*, 634 F.3d 127, 138–39 (2d Cir. 2011), and Plaintiffs can succeed on a facial takings theory by showing that the amended RSL is unconstitutional in "a substantial amount" of the situations in which it applies, *Copeland v. Vance*, 893 F.3d 101, 111 (2d Cir. 2018). The Complaint easily satisfies that requirement.

Furthermore, regardless of whether the amended RSL is facially unconstitutional, the Complaint clearly alleges that it is unconstitutional as applied to Plaintiffs. Defendants fault the Complaint for not saying more about each Plaintiff's individual circumstances, but the Complaint is quite clear that the amended RSL makes it impossible as a practical matter for Plaintiffs to exit this market: under the amended RSL "the typical rent-stabilized landlord—*including every landlord Plaintiff in this action*—now finds itself permanently forced to remain in a business from which it cannot exit." Compl. ¶ 50 (emphasis added)). To the extent that the Court is not convinced that the 109-page complaint is sufficiently detailed on this point, it should grant Plaintiffs leave to amend.

Defendants also argue that Plaintiffs do not have a viable as-applied physical takings claim because Plaintiffs do not allege that they would retake physical possession of their apartments and refuse to rent them at any price if permitted to do so by New York law. Intervenor Br. 7–8, 12; *see also* City Br. 14. This argument is meritless. The property owners who prevailed in *Horne v. Department of Agriculture*, 576 U.S. 350, 356 (2015), were *commercial* raisin producers who resisted the government's physical seizure of almost half their crop because they wanted to sell it to someone else at a market price. Likewise, in *Phillips v. Washington Legal Foundation*, 524 U.S.

23

156, 170 (1998), the Court held that seizure of the interest associated with a bank account qualified as a physical taking without pausing to ask whether the account's beneficiaries would have been willing to part with the interest in exchange for a different (and larger) sum of money. And the plaintiff in *Loretto*, who sued for damages on behalf of a class, appears to have been content to have a cable placed on the outside of her building so long as she was adequately compensated. 458 U.S. at 423–24; *see* Reply Br. at 39, *Loretto v. Teleprompter Manhattan CATV Corp.*, No. 81-244, 1982 WL 608698 (U.S. March 20, 1982). As these examples show, Plaintiffs are not required to foreswear further rentals or other economically beneficial use of their apartments in order to complain that they have been subjected to a physical taking. The Fifth Amendment requires the payment of just compensation when property is physically taken, and this requirement is not suspended when the owner is willing to lease or sell its property for a market price.

## II.   Defendants' Enforcement of the Amended RSL Constitutes a Regulatory Taking of Plaintiffs' Property.

Just as the Takings Clause prohibits the direct, physical taking of private property for public use without just compensation, it also bars regulations that so interfere with property rights that they likewise amount to a taking. Without that protection "the natural tendency of human nature" would be to extend regulations "until at last private property disappears." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Therefore, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* And a regulation "goes too far" in this context if it "unjustly imposes a burden on [landlords] that should 'be compensated by the government, rather than remaining disproportionately concentrated on a few persons.' " *Yee v. City of Escondido*, 503 U. S. 519, 531 (1992) (brackets omitted) (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)).

The amended RSL goes far beyond the threshold for a regulatory taking. Most notably, the amended RSL (1) compels Plaintiffs to renew rent-stabilized tenancies indefinitely, leaving the choice to end the tenancy solely in the hands of the tenant; (2) bans vacancy and longevity increases; abolishes luxury decontrol and high-income decontrol; and eliminates full recovery of apartment and building improvement costs, ensuring that even when a new tenant takes possession, rent stabilization will continue uninterrupted with Plaintiffs compelled to rent their regulated apartments at rates that will not keep pace with costs; and (3) effectively eliminates Plaintiffs' ability to recover their rental property for personal use, non-residential use, or even *demolition*. Considered together, these features of the amended RSL "go too far" and effect a regulatory taking, for they run afoul of the Takings Clause's core principle: that government may not "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

## A.      The Amended RSL Has Taken Plaintiffs' Property Under *Penn Central*.

Although there is no "set formula" for evaluating regulatory takings, the Supreme Court often considers three factors first distilled in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). That test provides that

> when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.

*Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017).

As an initial matter, although the Supreme Court has never applied the *Penn Central* factors to rent control statutes, in *Yee* it indicated that numerous features of rent control might support a regulatory takings claim, such as whether the regulation "as applied . . . compel[s] a landowner over objection to rent his property or to refrain in perpetuity from terminating a

tenancy" or "deprives [property owners] of the ability to choose their incoming tenants." 503 U.S. at 520, 528. (The Court declined to reach the regulatory takings theory in *Yee* because the plaintiffs had failed to raise a regulatory takings question in their petition for certiorari. *See id.* at 535–38.)

Similarly, in *Pennell v. City of San Jose*, 485 U.S. 1, 9–10 (1988), the Court held premature another Takings Clause challenge to a rent-control ordinance that allowed the city to take into account the "hardship" to a tenant when deciding whether an individual landlord's rent was reasonable. But Justice Scalia, joined by Justice O'Connor, disagreed with the majority that the challenge was premature and concluded on the merits that that the ordinance was a regulatory taking without just compensation because it "establish[ed] a welfare program privately funded by those landlords who happen to have 'hardship' tenants," even though the landlords were neither "the source [n]or the beneficiary of the high-rent problem." *Id.* at 22 (Scalia, J., concurring in part and dissenting in part). As Justice Scalia explained, the "traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities—a problem caused by society at large—has been the distribution to such persons of funds raised from the public at large through taxes . . ." *Id.* at 21. Indeed, precisely because of the Takings Clause, "this is the only manner that our Constitution permits." *Id.* at 22. San Jose's "hardship" ordinance attempted an end-run around this traditional and constitutionally mandated method of establishing welfare programs and sought instead to impose a disproportionate burden on landlords to subsidize "hardship" tenants. "[W]ith relative invisibility and thus relative immunity from normal democratic processes," *id.*, the city had attempted to accomplish with a private wealth transfer what it could not dare politically to implement through taxation.

Justice Scalia's analysis of rent regulation in *Pennell* is compelling, and no majority of the Supreme Court has ever ruled otherwise. Intervenors say that the Supreme Court rejected Justice

Scalia's position in *Lingle*, but that is wrong. *Lingle* held that the Takings Clause does not require a heightened form of means-ends scrutiny for all property regulations; it did not address whether the Takings Clause permits private wealth transfers of the sort that was the focus of Justice Scalia's opinion in *Pennell*. On the basis of Justice Scalia's argument in *Pennell*, the amended RSL clearly effects a regulatory taking; Defendants suggest as much by their admission that the Rent Guidelines Board factors such items as "cost of living" into its determination of permissible annual rent increases, State Brief at 5, though they neglect to add that the RGB is required to—and does—consider such "additional material" as may be made available to it (*see* N.Y. UNCONSOL. LAW TIT. 23 § 26-510(b)), with the result that RGB increases have virtually never kept pace with operating costs.[6] Indeed, further balancing of the *Penn Central* factors is unnecessary once it is recognized that the 2019 amendments permanently entrench what is in substance a "private wealth transfer" aimed at paying for a welfare program that Defendants are unwilling to finance through taxation. *Id.*

Like the private welfare program established by San Jose in *Pennell*—which the city sought as a substitute for the traditional "process of taxing and spending," *id.* at 23—the amended RSL transfers wealth from owners of rent-stabilized property to tenants who live in rent-stabilized property. New York's highest court certainly understands the RSL this way: the rent-stabilization regime "reflects the legislative intent to *create a benefit for certain individuals*" and that "while the rent-stabilization laws do not provide a benefit *paid for* by the government, *they do provide a*

---

[6] Even after the 2019 amendments eliminated all other meaningful avenues for increasing income—and even after the Covid-19 pandemic drastically impaired the income of the real estate industry, the RGB in June 2020, in the face of its own research indicating that operating costs year over year had increased by 3.73%, allowed owners no increase whatsoever for 2020 rents.  *See* NYC Rent Guidelines Board, *Explanatory Statement - Apartment Order #5*, (June 17, 2020), https://bit.ly/38dKxFk.

*benefit conferred by the government through regulation aimed at a population that the government deems in need of protection.*" *In re Santiago-Monteverde*, 22 N.E.3d 1012, 1016 (N.Y. 2014) (some emphases added). The New York Court of Appeals therefore has confirmed that Defendants' rent-stabilization regime subsidizes the perceived needs of one class of society at the expense of another. Following Justice Scalia's cogent discussion of this issue in *Pennell*, the RSL effects a regulatory taking.

At an absolute minimum, Justice Scalia's persuasive analysis in *Pennell* should inform this Court's application of the *Penn Central* test. But even setting *Pennell* aside, a straightforward application of the *Penn Central* factors independently demonstrates that the amended RSL is a regulatory taking of Plaintiffs' property.[7]

**1. Significant Economic Impact.** The economic consequences of the amended RSL on Plaintiffs is severe. Two such effects are especially notable.

*First*, the RSL works a dramatic reduction in the value of rent-stabilized buildings. Prior to the 2019 amendments, New York's own Department of Finance estimated that the value of some rent-stabilized buildings was half the value of comparable unregulated buildings. Compl. ¶ 117 (citing NEW YORK CITY DEPARTMENT OF FINANCE, *FY 2020 Guidelines for Properties Valued Based on the Income Approach Including Office Buildings, Retail, and Residential Properties*, Jan. 15, 2019, https://tinyurl.com/y4ax65cw).[8] Two studies have concluded that rent-stabilized

---

[7] Plaintiffs assert both facial and as-applied regulatory takings challenges, and Defendants are wrong to the extent that they argue that facial challenges cannot be brought where *Penn Central* applies. *See Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 296 (1981).

[8] *See also id.* (data showing that in 2019, the market value of a building with twenty-five percent or fewer regulated units had a per-square-foot market value of $233—more than double the value of buildings in which seventy-five percent or more of the units were regulated). The Department conceded in guidelines released in 2019 that for rental properties built in Manhattan after 1973, unregulated properties had a value that was eleven to forty-five percent greater than

properties lost an *additional* twenty to forty percent of their (already depreciated) value the instant the 2019 amendments were passed. *See* Compl. ¶ 120; *id.* ¶ 130 (citing *New York Rent Control: Paved With Good Intentions*, YARDI MATRIX at 2, July 2019, https://tinyurl.com/yx8kb2tv (finding that "the values of properties with stabilized units dropped anywhere between 20–40 percent overnight"—which comes out to a loss of between $520 billion and $1.04 trillion (based on a value of $2.6 trillion))); *id.* (citing Bill Johnson, *Assessing the Impact of New York's Rent Control Law*, YIELD PRO, Aug. 7, 2019, https://bit.ly/2Z5fn0z). Indeed, one of the plaintiffs in this case—FGP LLC—owned a rent-stabilized building that had an accepted offer to sell for $2.75 million prior to enactment of the 2019 amendments, and the offer promptly dropped to $1.8 million when the amendments were adopted. Compl. ¶ 22. Combining these figures, it follows that some buildings have lost as much as seventy percent of their value thanks to the amended RSL—a reduction in value that qualifies as a regulatory taking.

It is no surprise that the 2019 amendments dramatically reduce the already-depressed value of rent-stabilized buildings: even compared with New York's existing regime, the 2019 amendments are an extreme, unprecedented restriction on landlords, closing off practically every avenue by which rental property owners can increase rental income or recover maintenance and improvement expenditures

*Second*, the amended RSL self-evidently reduces the returns generated by rent-stabilized apartments. The 2019 amendments are particularly egregious, as they ban vacancy and longevity increases; eliminate luxury decontrol and high-income decontrol; and suppress recoupment of costs incurred improving apartments and buildings. Taken together, these features of the 2019

---

their regulated counterparts. And for rental properties built before 1973, the difference is even greater: the values of the regulated properties were half of their unregulated peers. *Id.*

amendments dramatically diminish the overall returns generated by Plaintiffs' rent-stabilized properties. *See* Compl. ¶ 50.

Even before the 2019 amendments, median regulated rents in Manhattan were approximately fifty-three percent below market rents in the Borough. Compl. ¶ 117 (citing Josh Barbanel, *Wealthy, Older Tenants in Manhattan Get Biggest Boost From Rent Regulations*, WALL STREET JOURNAL, June 12, 2019, https://tinyurl.com/yyfr73aa). New York's own Department of Finance estimates that the income from unregulated units built in Manhattan before 1973 can be as much as sixty to ninety percent higher than those similarly situated units subject to rent stabilization. *Id.* (citing NEW YORK CITY DEPARTMENT OF FINANCE, *FY 2020 Guidelines for Properties Valued Based on the Income Approach*, Jan. 15, 2019, https://tinyurl.com/y4ax65cw). And the disparity between stabilized and market rent rates has only grown over time, in large part because the Rent Guidelines Board in recent years has authorized only *de minimis* annual rent increases for stabilized units. For example, between 2014 and 2017, while the median monthly contract rent for market units increased annually 3.22%—a 10% increase over the three-year period—the rent for stabilized units averaged annual increases of only 0.85%—a 2.6% increase over the same period. Compl. ¶ 118 (citing NEW YORK CITY RENT GUIDELINES BOARD, *2018 Income and Affordability Study*, Apr. 5, 2018, https://bit.ly/2GXxv1Y).

Even the Rent Guidelines Board has recognized that its annual rent increases do not keep pace with property owners' operating expenses. For instance, while the Board estimates that owner expenses have increased approximately 5.4% on average over the last 20 years—a cumulative cost increase of 169%—it has approved rent increases at less than half that rate—a cumulative increase of only 66%. Compl. ¶ 119. This chasm between owners' expenses and their rental income directly impacts net operating incomes, which have likewise decreased each year under the RSL.

Especially for units with long-term tenants, property owners subject to the Rent Guidelines Board's low rent-rate increases risk having no net operating income at all, a far cry from the *increasing* net operating income that most investors reasonably expect.

**2. Interference with Investment-Backed Expectations.** All landlords share at least one investment-backed expectation: that their rents collected will exceed their expenditures. The amended RSL interferes substantially with Plaintiffs' investment-backed expectations due to the immediate, dramatic reduction in property values and net operating income along with the threat of net operating income being eliminated entirely over time as allowed rent increases fail to keep up with expenditures.

Furthermore, the 2019 amendments imposed these economic losses on property owners through unprecedented changes to the legal regime that governs rent-stabilized apartments. As previously discussed, after the 2019 amendments, owners are no longer authorized by statute to take vacancy and longevity increases, they cannot avail themselves of condominium or cooperative conversion provisions or luxury and high-income decontrols that previously made it possible for some owners to exit the market for rent-stabilized apartments, they are prohibited from increasing rents to recover the full costs of improvements, and they are faced with a lengthier and more costly process for evicting tenants who fail to pay rent. None of these changes to the law was foreseeable to investors, and when considered in aggregate they fundamentally change the nature of Plaintiffs' investments.

The 2019 amendments also upset investors' reasonable expectations by making rent stabilization a permanent fixture of New York law. When the State adopted its first rent-stabilization statute in 1974, it justified the measure because of a housing "emergency" caused by World War II and a resulting vacancy rate below five percent. *See* Compl. ¶ 123. No one expected

31

rent stabilization to be given a permanent place in the State's housing law. The state legislature declared as much when passing the statute. *See* N.Y. UNCONSOL. LAW TIT. 23 § 8622 (McKinney) (explaining that "the ultimate objective of state policy" is "the transition from regulation to a normal market of free bargaining between landlord and tenant"). And the legislature furthered this policy by enacting luxury deregulation in 1993, which had the intended effect of returning numerous units to the free market. Any reasonable property owner in the years following would have thought that rent stabilization was only a temporary measure to address a declared emergency, and relying on the State's own word, such a property owner would have invested accordingly. This assessment is buttressed by Justice Scalia's analysis in *Pennell*; the use of property regulations to compel private funding for a permanent welfare program is contrary to the "traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessitates." 485 U.S. at 21 (Scalia, J., concurring in part and dissenting in part). In light of this fact, property owners had a reasonable investment-backed expectation that Defendants' rent control regime would be temporary.

**3. Extraordinary Character of the Regulation.** A number of factors indicate that the amended Rent Stabilization Laws are extraordinary in character—which demonstrates that they commit a regulatory taking.

*First*, whenever a regulation destroys "one of the most essential sticks in the bundle of rights that are commonly characterized as property," such as the right to exclude or the right to control the disposition of property, it is more likely a taking. *Hodel v. Irving*, 481 U.S. 704, 716 (1987) (quotation marks omitted). As described above, the amended RSL effects a per se taking because it prevents owners from holding many of the "essential sticks" of the property-rights bundle. And even if the amended RSL did not go far enough to qualify as a per se physical taking,

it would come so close to that threshold that its character weighs heavily in favor of at least deeming the regulatory regime to effect a regulatory taking.

*Second*, a statute is more likely to be a regulatory taking when it lacks a "reciprocity of advantage to everyone concerned." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1018 (1992) (quotation marks omitted), or when the "whole benefit gained" by the regulation is not greater "than the sum of the burdens imposed," *Hodel*, 481 U.S. at 716. Where these features are present, it is "more likely that the property is being pressed into some form of public service under the guise of mitigating serious public harm." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 350 (2002) (quotation marks omitted). Here, the amended RSL does not yield an "average reciprocity of advantage" to both landlords and tenants. In the aftermath of the 2019 amendments, New York's rent-stabilization scheme is tailored to *only* benefit tenants in every conceivable way, especially those tenants already living in stabilized units. Indeed, that is the explicit purpose of the rent-stabilization regime. *See Santiago-Monteverde*, 22 N.E.3d at 1016 (explaining that rent stabilization in New York is a "benefit . . . aimed at a population that the government deems in need of protection," namely tenants). Property owners receive no reciprocal benefits from the amended RSL. They lose the right to control and dispose of their property; they lose the value of their property; and they lose whatever profit they could otherwise make from their property. But they receive nothing in return. This complete lack of reciprocity demonstrates rent stabilization's true nature: conscripting Plaintiffs' property in the exclusive service of tenants.

*Third*, the balance of benefits and burdens under the RSL evince a regulatory taking. Unlike a traditional "public program adjusting the benefits and burdens of economic life to promote the common good," *Penn Central*, 438 U.S. at 124, pursued through across-the-board taxes, *Pennell*,

485 U.S. at 21 (Scalia, J., concurring in part and dissenting in part), the benefits here are concentrated on an arbitrary subset of New York tenants. So, too, are the burdens concentrated on a portion of New York landlords. Because neither the benefits nor the burdens are diffuse, the amended RSL has effects that are akin to a law taking property from A and giving it to B. That constitutes a taking under the Constitution.

### B.     The Amended RSL is Subject to Scrutiny Under *Nollan* and *Dolan*.

Aside from the *Penn Central* test, the Supreme Court has also held that certain land-use exactions are regulatory takings for which just compensation is due under the *Nollan/Dolan* analysis. *See Dolan v. City of Tigard*, 512 U.S. 374 (1994); *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987). According to these cases, "a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013). The Court in *Yee* noted that if a rent-control ordinance in practice transferred wealth only to a small group of beneficiaries, that fact "may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance," 503 U.S. at 530 (citing *Nollan*, 483 U.S. at 834–35), thus making clear that Defendants are wrong when they argue that rent control laws do not implicate the *Nollan*/*Dolan* inquiry. The *Yee* Court further invoked these cases when explaining that any statute "compel[ling] a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy" might be a regulatory taking. *Id.* at 528 (citing *Nollan*, 483 U.S. at 831–32). The Court's statements in *Yee* indicate that a regulatory taking challenge to the amended RSL may proceed under the Court's *Nollan*/*Dolan* line of cases.

Defendants argue that *Nollan* and *Dolan* do not apply because no property has been exacted as a condition of Plaintiffs' property use, State Br. 26; City Br. 24–25, but that is not correct. As

already explained above, the amended RSL strips owners of their reversionary interest by requiring them to rent their apartments to incumbent tenants in perpetuity. *See supra* 13–14. That is a recognized property interest under New York law, and Defendants cannot condition Plaintiffs' property use on forfeiture of this interest in the absence of a nexus and rough proportionality.

The Supreme Court's decision in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005), is not to the contrary. *Lingle* clarified that the Takings Clause does not require that all property regulations "substantially advance legitimate state interests," *id.* at 531, but it also reaffirmed the requirement that exactions of property in the land use context must "substantially advance[ ] the *same* interests that land-use authorities assert[ ] would allow them to deny the permit altogether," *id.* at 547. The amended RSL conditions Plaintiffs' use of their buildings in the residential rental market on Plaintiffs forfeiting their reversionary interest, and nothing in *Lingle* suggests that a nexus and rough proportionality are not required to justify this exaction.

Finally, it bears noting that none of the Defendants argue that the amended RSL satisfies the *Nollan*/*Dolan* standard to the extent that this standard applies. As the Complaint alleges and Defendants do not appear to dispute, Plaintiffs did not cause any of the problems that the amended RSL supposedly alleviates, so there is no nexus. Compl. ¶ 148. Furthermore, even if Defendants could somehow demonstrate a nexus, the enormous costs imposed on property owners by the amended RSL are grossly excessive and disproportionate. *Id.* ¶ 149.

### C.   Defendants' Enforcement of the Amended RSL Constitutes a Confiscatory Taking.

The Supreme Court has long held that the Takings Clause entitles the owners of public utilities that are subject to price ceilings to "just and reasonable" rates. *FPC v. Nat. Gas Pipeline Co. of Am.*, 315 U.S. 575, 585 (1942). A "just and reasonable" rate is contrasted with an unjust and "confiscatory" one. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989); *see also FPC*

*v. Texaco Inc.*, 417 U.S. 380, 391–92 (1974). The caselaw gives regulators flexibility in how they calculate rates, but owners of property that is subject to this doctrine are at a minimum entitled to recover either "the cost of prudently invested capital used to provide the service," *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 485–86 (2002), or a return equal to what prudent investors "expect given the risk of the enterprise," *Duquesne Light Co.*, 488 U.S. at 314.

Defendants argue that this line of cases applies only to public utilities and is irrelevant to price regulation of apartment rental rates. But as Defendants' own cases show, the *reason* price regulation is subjected to heightened judicial scrutiny in the public utility context is that unlike most other forms of private property, public utilities are required by law to "serve the public, and must furnish service on demand to all applicants at government-determined rates." *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993); *see also Yakus v. United States*, 321 U.S. 414, 437 (1944) ("The present [price-control] statute is not open to the objection that petitioners are compelled to serve the public as in the case of a public utility . . ."). When courts have rejected claims under the fair-return standard raised by property owners outside utility industries, they have done so precisely because the property owners *could* leave the relevant market. *See, e.g.*, *Bowles v. Willingham*, 321 U.S. 503, 517 (1944) (rejecting a rent-control challenge because there was "no requirement that the apartments in question be used for purposes which bring them under the [statute]," namely, that they continue to be offered as accommodations for rent); *Garelick*, 987 F.2d at 916 (rejecting a fair-return claim by anesthesiologists because "unlike public utilities, [they] are under no legal duty to provide services to the public and to submit to price regulations"); *Whitney v. Heckler*, 780 F.2d 963, 972–73 (11th Cir. 1986) (no right to fair return "where the regulated group is not required to participate in the regulated industry"); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 445–47 (8th Cir. 1984)

36

(noting that "nursing homes, unlike public utilities, have freedom to decide whether to remain in business and thus subject themselves voluntarily to the limits imposed by [the State] on the return they obtain from investment of their assets in nursing home operation"); *St. Francis Hosp. Ctr. v. Heckler*, 714 F.2d 872, 883–84 (7th Cir. 1983) (similar with Medicare participants).

The fair-return standard applies here because Defendants have made it impossible for Plaintiffs to exit the market for rent stabilized apartments. As already explained at length above, the amended RSL has both the purpose and effect of cutting off all practical means by which Plaintiffs could leave this market. *See supra* 17–24. Utility regulators plainly could not avoid their duty to promulgate just and reasonable rates under *Duquesne* by enacting a law that would theoretically allow the owner of an electric company to exit the market by tearing down its power plants and making large cash payments to its customers. Likewise here, Defendants cannot avoid heightened judicial scrutiny of the rates they set by holding out the possibility that Plaintiffs could exit the market by pursuing various alternative uses of their buildings that are impossible, economically unrealistic, or both.

Despite Defendants' arguments to the contrary, the factual allegations in the Complaint are more than sufficient to state a plausible claim that Plaintiffs have been denied the just and reasonable rate of return to which they are constitutionally entitled. Both with respect to Plaintiffs' properties in particular and rent stabilized buildings in general, the Complaint alleges that the Rent Guidelines Board's decisions ensure that rent increases on stabilized units will not even keep pace with operating costs—which necessarily means that they do not provide owners with a constitutionally adequate rate of return. *See* Compl. ¶¶ 37, 44, 136. The Rent Guidelines Board's 2019 order authorized increases of 1.5% for one-year leases and 2.5% for two-year leases, despite the fact that its own research indicated increases of 4.75% and 9.25% would have been necessary

for owners to keep pace with real costs. *Id.* ¶ 44. This is not a new phenomenon; in 2006, the Rent Guidelines Board concluded that increases of 8% for a one year lease and 13.5% for a two year lease would maintain levels of inflation-adjusted net operating income, yet it approved increases of only 4.25% for one year leases and 7.25% for two year leases. *Id.* ¶ 37. Similarly, in 2017 the Rent Guidelines Board concluded that increases of 6% and 8.5% would be necessary to maintain net operating income but approved increases of only 1.25% and 2%. *Id.* More generally, the Board estimates that owner expenses have increased approximately 5.4% annually on average over the last twenty years—a cumulative cost increase of 169%—but it has approved rent increases over that period of only 66%. *Id.* ¶ 119. These rate increases are plainly confiscatory, especially when considered in light of the 2019 changes to the law that made it impossible for Plaintiffs to earn a just and reasonable return on their investments through some other means such as a condominium conversion or rent increase linked to a major capital improvement. *See id.* ¶¶ 125–26 (detailing how change to the law guarantees that Plaintiff 335-7 will receive a negative return on recent major capital improvement).

Put simply, the rents dictated by the amended RSL and the Rent Guidelines Board deprive landlords of any opportunity to recover their reasonably incurred costs or to earn a fair return on their prudentially made investments. This is especially evident when comparing the return on Plaintiffs' investments to those made "in other business undertakings which are attended by corresponding risks and uncertainties." *Duquesne Light Co.*, 488 U.S. at 314–15. Apartments equivalent to those owned by Plaintiffs but that are not subject to the RSL generate rents as much as two-and-a-half times greater than the maximum rents that Plaintiffs are permitted to collect. Compl. ¶ 117. Given the risks inherent in investing in residential real estate, no prudent investor

would accept the return that the amended RSL permits Plaintiffs. Defendants are therefore liable for a confiscatory taking.

### D.    Plaintiffs' Regulatory Takings Claims Are Ripe.

The Supreme Court's decision in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), was overruled in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). The City Defendants ask this Court to revive *Williamson County* and hold that Plaintiffs' regulatory takings claims are not ripe because Plaintiffs have not undertaken the arduous and pointless task of applying for a hardship exemption from the rental rates that otherwise apply to rent-stabilized apartments. As the Complaint alleges and the City Defendants cannot dispute, virtually no one applies for these exemptions because the Division takes years to process them and there is no meaningful chance that any such application that is submitted will actually be granted. Compl. ¶¶ 150–53. The Supreme Court held in *Knick* that a claim under the Takings Clause becomes ripe as soon as the property in question is taken and that property owners are not required to first pursue remedies through state administrative or judicial proceedings before suing in federal court. Under this recent and binding Supreme Court precedent, Plaintiffs' claims are ripe.

### III.   To the Extent that the Amended RSL Takes Property, It Violates the Public Use Clause.

Defendants are correct that Plaintiffs' claim that the amended RSL violates the Fifth Amendment's Public Use Clause depends on a threshold showing that this statutory regime effects a taking under the Fifth Amendment. But to the extent that the Court declines to dismiss any of the takings theories already discussed above, it should also permit Plaintiffs to move forward with their claim under the Public Use Clause.[9]

---

[9] The significance of Plaintiffs' claim under the Public Use Clause is that it provides a basis for enjoining enforcement of the amended RSL rather than merely ordering Defendants to pay Plaintiffs just compensation. Now that the State has invoked sovereign immunity as a defense to

The Supreme Court has repeatedly indicated that if a law is enacted "to benefit a particular class of identifiable individuals," the taking is for a non-public use. *See Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984); *Kelo v. City of New London, Conn.*, 545 U.S. 469, 478 (2005). "A purely private taking"—that is, a transfer of property from one private party to another private party to benefit the second private party—"could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void." *Midkiff*, 467 U.S. at 245.

S.B. 6458 was clearly enacted to benefit a particular class of identifiable individuals: tenants who live in rent-stabilized apartments. This reality is apparent from the text of the law; at every turn, S.B. 6458 prefers rent-stabilized tenants over owners, ensuring that benefits accrue to all such tenants regardless of need—at the expense of takings from the owners. And the statements of the legislators who ushered in S.B. 6458 confirm that the amended RSL exists solely to protect tenants: "[t]hese reforms give New Yorkers the strongest tenant protections in history" (Senator Stewart-Cousins); "[t]he Housing Stability and Tenant Protection Act of 2019 will shift the balance toward helping renters throughout New York State to stay in their homes" **(**Senator May); and "[t]he legislation that we have adopted today protects rent stabilized tenants" (Senator Mayer). Compl. ¶ 174.

Despite Defendants' arguments to the contrary, the fact that the amended RSL benefits a particular class of individuals differentiates this case from cases in which the Supreme Court has

---

any award of damages, it is clear that the Court should enjoin enforcement of the amended RSL by state officials even if it rejects Plaintiffs' Public Use Clause claim. *See Ex parte Young*, 209 U.S. 123, 163 (1908) (state officer enjoined because plaintiff lacked "a plain and adequate remedy at law"). Plaintiffs do not contest that the State can avoid paying damages in this case by invoking sovereign immunity. The City Defendants, however, do not have sovereign immunity and have not suggested otherwise.

found that a taking was for a public use. For example, in *Kelo* the city of New London, Connecticut, justified its challenged redevelopment plan largely because it was projected "to increase tax and other revenues, and to revitalize an economically distressed city." 545 U.S. at 472 (quoting 843 A.2d 500, 507 (Conn. 2004)). In contrast, the RSL *decreases* the city's property tax revenue each year. Compl. ¶ 177. Because the amended RSL transfers property from one private party to another solely to further the interests of the receiving private party—rent-stabilized tenants—and does not further general public interests like increased tax revenue, is "serve[s] no legitimate purpose of government." *See Midkiff*, 467 U.S. at 245. It follows that the RSL does not merely effect a taking but a taking that violates the Public Use Clause.

Furthermore, even assuming that taking Plaintiffs' property and giving it to their tenants is not "[a] purely private taking," *Midkiff*, 467 U.S. at 245, the amended RSL still goes beyond the bounds of the Fifth Amendment's "public use" limitation. The Supreme Court's "cases have repeatedly stated that one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid" and found that when the government takes property its taking must be "rationally related to a conceivable public purpose." *See id.* at 241. Courts have found that, in some cases, rent regulation may be so irrational as to violate the public use requirement. *See Hall v. City of Santa Barbara*, 833 F.2d 1270, 1280–81 (9th Cir. 1986), *abrogated in part not relevant by Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992) (recognizing that rent regulation, on some facts, might run afoul of *Midkiff*'s rational relationship standard); *Richardson v. City & Cty. of Honolulu*, 759 F. Supp. 1477, 1492–96 (D. Haw. 1991) (holding that a rent regulation was not rationally related to a conceivable public purpose and thus was invalid).

This is just such a case: as the Complaint details, there is no rational basis for the recent amendments to the RSL—and thus the law effects a taking for an impermissible non-public use. Contrary to their asserted justifications, the amended RSL will fail to improve any purported "emergency"; reduce rather than increase the vacancy rate; negatively impact the quality of existing rental units; and fail to provide affordable housing to low-income individuals. *See* Compl. ¶¶ 185–223. The fact that Defendants have renewed and expanded the RSL time and time again despite the fact that they have done nothing to further their purported ends indicates that the laws have no rational relationship to any conceivable public purpose—particularly when it comes to the 2019 amendments. Plaintiffs are thus likely to succeed in proving that the amended RSL commits takings for non-public use.[10]

## IV.   Plaintiffs' Claims Are Not Barred by the Statute of Limitations.

In a single paragraph at the end of its brief, the State argues that Plaintiffs' claims are time-barred to the extent that they concern provisions of the RSL that existed prior to February 6, 2017. This argument is meritless. Under Second Circuit precedent, the three-year statute of limitations does not apply to takings challenges, and, even if it did, the 2019 amendments reset the statute of limitations for challenging the RSL in its entirety. The Second Circuit has viewed takings as "continuing violation[s]." *Sherman v. Town of Chester*, 752 F.3d 554, 566 (2d Cir. 2014). Regulation that results in a taking can constitute "a continuing invasion of plaintiffs' property rights akin to a continuing trespass." *South Lyme Property Owners Ass'n v. Town of Old Lyme*, 539 F. Supp.2d 547, 557 (D. Conn. 2008); *see also Kuhnle Bros., Inc. v. City of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997). This is true of the RSL, which encroaches on Plaintiffs' property interest

---

[10] Plaintiffs preserve the argument that the Supreme Court should revisit its precedents on the meaning of the Public Use Clause, including *Kelo* and *Midkiff*. Contrary to the City's assertion, preserving this additional argument for a higher court is not a concession that Plaintiffs' argument is foreclosed by existing precedent. *See* City Br. 27.

every time Plaintiffs are required to renew a lease or otherwise stopped from exiting the market for rent-stabilized apartments. Moreover, the 2019 amendments exacerbate the detrimental effects of the prior provisions of the RSL that remain in place. As a result, the 2019 amendments to the RSL started a new limitations period for challenging the entire regulatory regime. *See Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 957 (9th Cir. 2011) (explaining that "substantive amendments to a takings statute will give rise to a new cause of action . . . if those amendments alter the effect of the ordinance upon the plaintiffs" (internal quotation marks omitted)).[11]

## **CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss should be denied.

Dated: June 29, 2020                                                  Respectfully submitted,

Todd A. Rose[†]                                          s/Charles J. Cooper
Paul Coppe (PC9245)                              Charles J. Cooper*
David P. Haberman (DPH6629)            David H. Thompson*
ROSE & ROSE                                              Peter A. Patterson*
291 Broadway, 13th Floor                       Brian W. Barnes*
New York, NY 10007                               COOPER & KIRK, PLLC
(212) 349-3366                                          1523 New Hampshire Avenue, NW
trose@roseandroselaw.com                  Washington, DC 20036
                                                                      (202) 220-9600
                                                                      ccooper@cooperkirk.com

* Admitted *pro hac vice*.
[†] Motion to proceed *pro hac vice* pending.

*Attorneys for Plaintiffs*

---

[11] In view of the New York Court of Appeals' decision in *Regina Metro. Co., LLC v. N.Y.S. Div. of Hous. & Cmty. Renewal*, No. 1, 2020 WL 1557900, at *9 (Apr. 2, 2020), Plaintiffs agree that their procedural due process claim is moot and should therefore be dismissed for want of jurisdiction and without prejudice under Rule 12(b)(1).