UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

335-7 LLC, FGP 309 LLC, 226 LLC, 431 HOLDING
LLC, and 699 VENTURE CORP.,

        Plaintiffs,

        *and*

312 WEST 93RD STREET ASSOCIATES,

        Proposed Plaintiff-Intervenor,

        *v.*

CITY OF NEW YORK, NEW YORK CITY RENT
GUIDELINES BOARD, and RUTHANNE
VISNAUSKAS (in her official capacity as commissioner
of the New York State Division of Homes and
Community Renewal),

        Defendants,

        *and*

NEW YORK TENANTS & NEIGHBORS, and
COMMUNITY VOICES HEARD,

        Defendant-Intervenors.

**OPINION AND ORDER**

20 Civ. 1053 (ER)

Ramos, D.J.:

        Landlords 335-7 LLC, FGP 309 LLC, 226 LLC, 431 Holding LLC, and 699 Venture

Corp. bring this action, pursuant to 42 U.S.C. § 1983, against the City of New York, the New

York City Rent Guidelines Board, and Commissioner Ruthanne Visnauskas of the New York

State Division of Homes and Community Renewal, challenging New York's rent stabilization

laws in general, and in particular amendments made in 2019 thereto, under the Fifth and

Fourteenth Amendments to the United States Constitution.  Tenant advocacy groups New York

Tenants & Neighbors and Community Voices Heard subsequently intervened as defendants. Now pending before this Court are Defendants' motions to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Also before this Court is the motion of landlord 312 West 93 Street Associates to intervene as a plaintiff pursuant to Rules 24(a)(2) and 24(b)(1)(B).  For the reasons set forth below, the motions to dismiss are granted, and the motion to intervene is denied as moot.

## I.    Factual Background

### A.    The Rent Regulation Framework

During World War II, as labor was diverted to the war effort and the housing supply decreased, the federal government froze rents.  Doc. 1 at ¶ 29; *Regina Metro. Co., LLC v. New York State Div. of Hous. and Cmty. Renewal*, 35 N.Y.3d 332, 395 (N.Y. 2020) (Wilson, J., dissenting).  In the wake of the war, federal rent regulation was repealed, but New York City (the "City") continued to experience a significant housing shortage.  *Id.*  The State Legislature responded by passing the Emergency Housing Rent Control Law in 1946, which was meant to "to prevent speculative, unwarranted and abnormal increases in rents . . . [and] disruptive practices . . . [that] will produce serious threats to public health, safety and general welfare." *Black v. State of N.Y.*, 13 F. Supp. 2d 538, 539 (S.D.N.Y. 1998); N.Y. Unconsol. Law § 8581 *et seq*.  In 1962, the State Legislature passed the Local Emergency Housing Rent Control Act ("LEHRCA"), which transferred authority over rent regulation from the State to the City.  *Black*, 13 F. Supp. 2d at 540; N.Y. Unconsol. Law § 8601 *et seq.*  LEHRCA mandated that the local legislature conduct a housing and vacancy survey every three years to determine whether a public emergency exists requiring rent and eviction regulation.  § 8603.

In the ensuing years, enabled by LEHRCA, two systems of rent regulation arose in the City:  rent control and rent stabilization.  Rent control limits the rent that landlords can charge to tenants or their successors who (1) have lived in an apartment since 1971 (2) within a building pre-dating February 1, 1947.  Doc. 1 at ¶ 27; N.Y. Unconsol. Law § 8601 *et seq.*; N.Y. Unconsol. Law § 26-401 *et seq.*; N.Y. Rent. & Evict. § 2100.1 *et seq.*

Rent stabilization was then enacted in 1969 when the City's "housing crisis was once again dire" during the Vietnam War.  *Regina Metro.*, 35 N.Y.3d at 395 (Wilson, J., dissenting); N.Y. Unconsol. Law § 26-501 *et seq.*  In passing rent stabilization, the New York City Council found that "unless residential rents and evictions continue to be regulated and controlled, disruptive practices and abnormal conditions will produce serious threats to the public health, safety and general welfare."  § 26-501.

Rent stabilization covers "rental housing accommodations . . . that were not already governed by rent control, including buildings constructed after February 1, 1947 containing six or more dwelling units."  *Black*, 13 F. Supp. 2d at 540; § 26-504; Doc. 1 at ¶ 31.  In addition, some property owners may opt into rent stabilization for tax benefits.  *See, e.g.*, N.Y. Real Prop. Tax Law § 421-a.  Rent stabilization also covers considerably more units.  Today, there are approximately 22,000 rent controlled apartments, as compared to approximately one million rent-stabilized apartments, across the City.  Doc. 1 at ¶¶ 1, 27.  The New York Court of Appeals has repeatedly acknowledged that rent stabilization places "a less onerous burden on the property owner" than rent control.  *Braschi v. Stahl Assocs. Co.*, 74 N.Y.2d 201, 210 (N.Y. 1989)).

### B. Relevant Rent Stabilization Legislative History

The Rent Stabilization Law of 1969 establishing rent stabilization, N.Y. Unconsol. Law § 26-501 *et seq.*, was quickly followed by the Vacancy Decontrol Act of 1971, which allowed for decontrol as rent-stabilized units became vacant. *Roberts v. Tishman Speyer Props., L.P.*, 62 A.D.3d 71, 76 n.4 (1st Dep't 2009). The 1971 law was seen as an "experiment in free-market controls[,]" and was itself short-lived when, in 1974, the State Legislature passed the Emergency Tenant Protection Act (the "ETPA"), N.Y. Unconsol. Law § 8621 *et seq.*

Again recognizing "a serious public emergency" requiring regulation to prevent abusive rent, the ETPA recaptured apartments deregulated by the 1971 decontrol law. § 8622; *KSLM-Columbus Apartments, Inc. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 6 A.D.3d 28, 32 (1st Dep't 2004). Together with LEHRCA, the ETPA empowered the City to extend rent stabilization by declaring an emergency housing shortage every three years when the vacancy rate was not more than 5%. *Roberts*, 62 A.D.3d at 76 n.4; *KSLM*, 6 A.D.3d at 32; § 8623.

The State Legislature again relaxed rent-stabilization through the Rent Reform Acts of 1993 and 1997. The 1993 reforms included luxury decontrol, which exempted apartments that rented for over $2,000 per month that became vacant from rent-stabilization, as well as high-income decontrol, which exempted units that were occupied by people earning more than $250,000. The 1993 reforms also allowed for permanent rent increases for individual apartment improvements, which are renovations to individual apartments. Docs. 1 at ¶ 39, 65 at 5. The 1997 reforms provided vacancy and longevity allowances permitting rent increases when certain apartments were vacated, limited succession rights to family members with a close relationship to the original tenant, and modified the vacancy and high-income decontrol thresholds. Docs. 1 at ¶ 39, 65 at 5.

4

The State Legislature further amended rent regulation, in relevant part, three times from 2003 until 2015.  In 2003, the State Legislature allowed landlords to engage in preferential rent, which is leasing at a rental rate below the permitted rate so that they could then raise the rent to the highest possible amount upon renewal of the lease.  Docs. 1 at ¶ 49d, 65 at 5.  In 2011, the State Legislature limited the frequency of rent increases, decreased the amount recoverable for individual apartment improvements, and increased decontrol thresholds.  Doc. 65 at 5.  In 2015, the State Legislature again revised the decontrol thresholds, and changed the amounts recoverable for major capital improvements, which are building-wide renovations.  *Id.*

In 2017, pursuant to LEHRCA and the ETPA, and at the request of the City, the United States Census Bureau conducted the latest housing and vacancy survey.[1]  The survey determined that the vacancy rate in the City was 3.63%, well below the statutory emergency threshold of 5% triggering the extension of rent-stabilization.  2017 Survey.

The latest changes to the rent stabilization scheme came with the State Legislature's passage of the Housing Stability and Tenant Protection Act of 2019 (the "2019 Amendments").  *Kuzmich v. 50 Murray St. Acquisition*, 187 A.D.3d 670, 670 (1st Dep't 2020).  The 2019 Amendments eliminated luxury decontrol, high-income decontrol, preferential rent, and vacancy allowances, capped landlords' recovery of units, reduced recovery for major capital and individual apartment improvements, lengthened the time to evict tenants, and increased the threshold of tenant consent that landlords needed to meet to convert rent-stabilized units to cooperatives or condominiums.  Doc. 1 at ¶¶ 46a-c, 49a-f; *Cmty. Hous. Improvement Prog.*

---

[1]  At the City's request, "[t]he Census Bureau has conducted the housing and vacancy survey for the City since 1965."  About this Survey, United States Census Bureau, https://www.census.gov/programssurveys/nychvs/about.html (last visited Mar. 8, 2021) ("Census Website"); HPD Releases the Initial Findings of the 2017 New York City Housing and Vacancy Survey, N.Y.C. Hous. & Pres. Dev. (March 12, 2018), https://rentguidelinesboard.cityof newyork.us/wpcontent/uploads/2019/08/2017_hvs_initial_findings_news_release.pdf  ("2017 Survey") (noting survey was conducted by the United States Census Bureau at the City's request).  The 2021 survey is currently underway.  Census Website.

("*CHIP*") v. *City of New York,* Nos. 19 Civ. 4087 (EK) (RLM) and 19 Civ. 6447 (EK) (RLM),

2020 WL 5819900, at *2 (E.D.N.Y. Sept. 30, 2020).

      C.      **The Current Statutory Framework**

Today, rent stabilization law is governed by the surviving provisions of the Rent

Stabilization Law of 1969, the ETPA, the 2019 Amendments, and the regulations promulgated

thereunder (together, these laws will be referred to as the "RSL").  The RSL is administered

through the New York State Division of Housing and Community Renewal ("DHCR"), which

promulgates regulations under the RSL and adjudicates complaints.  Doc. 1 at ¶ 16.

The RSL established the Rent Guidelines Board.  § 26-510(a).  Annual guidelines for rent

adjustments are set by the Rent Guidelines Board after consideration of several factors, including

the economic condition of the housing market, the overhead costs of renting, housing supply,

data on the cost of living, and any other available information.  § 26-510(b).  Landlords may seek

rent adjustments by performing individual apartment or major capital improvements.  §§ 26-

511(c)(6)(b), 26-511(c)(13), 2522.4(a).  Landlords can also apply for hardship exemptions if the

fair rent increase does not allow them to maintain the same average annual net income, or the

landlords' annual gross rent income does not exceed their annual operating expenses by 5%

gross rent.  §§ 26-511(c)(6), 26-511(6-a), 2522.4(b)-(c).

 Although the RSL does not allow landlords to screen prospective tenants using record of

prior litigation between the prospective tenant and a prior landlord, it does allow landlords to

perform background checks on prospective tenants.  N.Y. Real Prop. §§ 227-f(1), 238-a(1)(b).

While the RSL requires landlords to renew leases for rent-stabilized tenants and some

successors, landlords may request identification of all persons living in the unit once a year.  §§

26-511(c)(9), 2520.6(o), 2523.5(b), 2523.5(e).  The RSL also allows landlords to evict tenants

for unsatisfactory behavior, including violating a substantial obligation of the tenancy, committing a nuisance, using their apartment for immoral or illegal purposes, illegal occupancy, refusing to renew their lease, and unreasonably refusing the owner access to the apartment. § 2524.3.

Landlords who are natural persons may also recover a single apartment for personal use upon a showing of immediate and compelling necessity. § 26-511(9)(b). Corporate owners can recover the use of residential apartments for the owners' business, as permitted by zoning laws. § 2524.5. In addition, owners are permitted to leave units vacant, or demolish, or sell their buildings. *Id.*

### D.      Plaintiffs' § 1983 Lawsuit

Plaintiffs are current or former landlords of City apartment buildings that contain at least some rent-stabilized units. Three of the Plaintiffs are landlords of buildings with a mix of rent-stabilized and unregulated apartments. Plaintiff 335-7 LLC ("335-7") owns the buildings located at 335 and 337 West 14th Street. *Id.* at ¶ 9. Of the 56 total units across both buildings, 22 are rent-stabilized. *Id.* Plaintiff 226 LLC ("226") is the owner of 226 West 16th Street. *Id.* at ¶ 12. The 226 building contains 16 apartments, 6 of which are rent-stabilized. *Id.* Plaintiff 431 Holding LLC ("431") owns 172 Prince Street. *Id.* at ¶ 11. Seven of 431's 25 units are rent-stabilized. *Id.*

The remaining two Plaintiffs own or previously owned buildings that are composed entirely of rent-stabilized units. Plaintiff 699 Venture Corp. ("699") owns 699 East 137th Street, which contains 23 rent-stabilized units. *Id.* at ¶ 13. Until approximately October 23, 2019, Plaintiff FGP 309 LLC ("FGP") owned a 15-unit, rent-stabilized building located at 309 East 110th Street. *Id.* at ¶ 10. Although FGP was offered $2.7 million to sell its building before the

2019 Amendments, it eventually sold for $1.8 million after the passage of the 2019

Amendments.  *Id.* at ¶ 122.

Plaintiffs bring this § 1983 action against the City, the Rent Guidelines Board (together,

the "City Defendants"), and DHCR Commissioner Ruthanne Visnauskas (the "State Defendant")

challenging the constitutionality of the RSL.  Doc. 1.  Plaintiffs allege that the RSL, and in

particular the 2019 Amendments, effect an unconstitutional physical, regulatory, and

confiscatory taking of private property for non-public use without just compensation under the

Fifth and Fourteenth Amendments.[2]  *Id.*

In particular, Plaintiffs allege that the RSL is a physical taking without just compensation

because it prevents them from making a profit on their units, using their property as they wish,

and exiting the market.  Rent increases are reduced, spread out over a longer period of time, and

landlords can no longer give preferential rental rates.  *Id.* at ¶¶ 49a-49b, 49d.  If owners choose

to renovate an apartment, they may only recover $15,000 for the improvements over 15 years.

*Id.* at ¶ 49c.  Substantial rehabilitation cannot be done unless the building is significantly

deteriorated, and mostly empty, and any displaced tenants must be given a stipend.  *Id.* at ¶ 46e.

Plaintiffs allege that the RSL also prevents landlords from exiting the market.  *Id.* at ¶ 45.

Landlords are barred from using their rental units for most non-residential uses and cannot tear

down buildings without approval and covering the cost of tenant relocation.  *Id.* at ¶¶ 59b-59c.

Buildings that are landmarks or are fully tenanted, like 699, cannot feasibly be demolished.  *Id.*

at ¶ 46e.  In addition, the 2019 Amendments repealed luxury and high-income decontrol, and

---

[2] Plaintiffs agreed to the dismissal of their due process claim and conceded that their damages claim against the
State Defendant is barred by sovereign immunity.  Doc. 86 at 43 n.11 (citing *Regina Metro.*, 35 N.Y.3d at 349-50),
39-40 n.9.  Accordingly, both claims are dismissed.

made it more difficult to convert rent-stabilized units to condominiums or cooperatives.  *Id.* at ¶¶ 46a-46c.

Landlords also have less control over selecting their tenants and use of their property. Landlords can no longer screen prospective tenants for involvement in litigation against a prior landlord, a screening mechanism upon which 335-7, 431, and 226 relied.  *Id.* at ¶¶ 59f, 77c. Eviction also takes longer and vacancy is prohibitively expensive.  Doc. 1 at ¶¶ 49f, 59e.

Plaintiffs further allege that the RSL is a regulatory taking because it is tailored to benefit tenants and interferes with landlords' investment-backed expectations.  *Id.* at ¶¶ 116, 123, 135. Prior to the 2019 Amendments, owners could expect their income to increase, to recoup expenditures on major capital improvements or individual apartment improvements, to convert property, and to exclude tenants based on prior lawsuits with landlords.  *Id.* at ¶ 129.  In particular, 335-7 alleges that it invested $370,000 on major capital improvements for its rent-stabilized units in reliance on the prior provisions of the RSL, but estimates that it will only recover $291,000 in rent adjustments under the RSL.  *Id.* at ¶ 126.  Plaintiffs 335-7, 226, and 431 also allege that, all together, they have lost $227,000 on their rent-stabilized units in 2019.  *Id.* at ¶ 136.  Plaintiffs 226 and 431 further allege that they could collect rents 2.5% higher than they do now for their rent-stabilized units if they were decontrolled.  *Id.* at ¶ 117.  In addition, FGP sold for $900,000 less than it was offered before the 2019 Amendments passed.  *Id.* at ¶ 122.

Finally, Plaintiffs plead that the RSL is no longer justified by an emergency housing crisis and that the RSL effects a confiscatory taking because landlords do not get a fair return on their investment.  *Id.* at ¶¶ 154-69, 198.  Plaintiffs request that the Court declare the RSL, and in particular the 2019 Amendments, an unlawful taking, enjoin application of the RSL, and award damages.  *Id.* at ¶¶ A-Y.

This action is one of several filed in the Southern and Eastern Districts of New York challenging the RSL under the same theories.  The earliest-filed cases in the Eastern District of New York have been almost entirely dismissed, and the remaining cases filed in the Southern District of New York have motions to dismiss pending.[3]

###    E.    The Proposed Intervenor

Proposed-Intervenor 312 West 93rd Street Associates ("312") is the owner of a single room occupancy property ("SRO"). [4]  Doc. 83-1 at ¶ 9.  SROs are regulated by the RSL.  *Id.* at ¶ 9.  However, rent increases and operation costs are calculated differently and, according to 312, more harshly for SROs than for other properties governed by the RSL.  Doc. 84 at 2.  Proposed Intervenor 312 therefore proposes adding Equal Protection and as-applied physical and regulatory taking challenges specific to SROs to Plaintiffs' complaint.  Doc. 83-1 at ¶¶ 314-44.

###    F.    Procedural History

On February 6, 2020, Plaintiffs filed the complaint.  On March 26, tenant advocacy groups New York Tenants & Neighbors and Community Voices Heard (the "Defendant-Intervenors") were granted leave to intervene.  Doc. 45.  On May 15, the State Defendant, City Defendants, and Defendant-Intervenors filed separate motions to dismiss the complaint.  Docs. 60, 62, 64.  On May 24, nine more tenant advocacy groups[5] were granted leave to file an amicus

---

[3]  *CHIP*, 2020 WL 5819900, at *14 (dismissing the entire *CHIP*, No. 19 Civ. 407, complaint and the *74 Pinehurst LLC v. State of New York,* No. 19 Civ. 6447, complaint, except the as-applied regulatory taking challenge raised by plaintiffs Eight Mulberry Realty Corp. and the Panagouliases); *Building and Realty Inst. of Westchester and Putnam Counties v. State of New York*, No. 19 Civ. 11285 (KMK) (S.D.N.Y. Dec. 10, 2019); *G-Max Mgmt., Inc. v. State of New York,* No. 20 Civ. 634 (KMK) (S.D.N.Y. Jan. 23, 2020).

[4]  Units in an SRO are either rooms containing up to two residents, or two or more rooms located within the same apartment in a multi-unit dwelling whose occupants reside separately and independently of the other occupants of the same apartment.  *Id.* at ¶ 27.

[5] The amici are the Met Council on Housing, Stuyvesant Town/Peter Cooper Village Tenants Association, P.A.L.A.N.T.E. Harlem, Community Free Democrats, Park West Village Tenants Association, Housing Rights Initiative, Stellar Tenants for Affordable Housing, 50 West 93rd Street Tenants Association, and the Central Park

brief.  Doc. 72.  On June 2, Proposed-Intervenor 312 requested leave to intervene.  Doc. 76.  On June 11, the Court granted the Defendant-Intervenors' motion to intervene while noting, however, that because "the parties are well into the process of briefing potentially dispositive motions to dismiss . . . . any additional application to intervene may well be untimely."  Doc. 80 at 8-9.  Proposed-Intervenor 312 moved to intervene, attaching a proposed complaint, on June 26.  Doc. 81.

## II.   Legal Standards

### A.   Motions to Dismiss pursuant to Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in plaintiff's favor.  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).  However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To satisfy the pleading standard under Fed. R. Civ. Pro. 8, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570).  Thus, a plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

---

Gardens Tenants Association (the "Amici").  Doc. 71.  The Amici argue in favor of dismissal based on a survey of Supreme Court jurisprudence.  *Id.*

### B.      Motions to Intervene pursuant to Rule 24

To intervene as of right under Rule 24(a)(2), a proposed intervenor must meet each of the following four conditions:

> (1) the motion is timely;
> (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action;
> (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and
> (4) the applicant's interest is not adequately represented by the other parties.

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006).

Alternatively, a court may permit intervention if the motion is timely and the proposed intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Courts evaluating as-of-right or permissive motions consider the same factors. *BNP Paribas v. Kurt Orban Partners LLC*, No. 19 Civ. 4616 (ALC) (SLC), 2021 WL 355136, at *2 (S.D.N.Y. Feb. 2, 2021). However, the principle consideration for permissive intervention is whether intervention will cause undue delay or prejudice to the original parties. *Id.*

Assessing timeliness under either provision of Rule 24 is within the broad discretion of the district court and "defies precise definition." *Griffin v. Sheeran*, 767 F. App'x 129, 133 (2d Cir. 2019) (citing *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198 (2d Cir. 2000)). Courts evaluate timeliness using factors such as the length of time the movant knew or should have known of his interest in the case, the prejudice to the existing parties from his delay, the prejudice to the movant if denied intervention, and the presence of any unusual circumstance weighing in favor of or against timeliness. *Griffin*, 767 F. App'x at 133 (*Holocaust*, 225 F.3d at 198); *MasterCard*, 471 F.3d at 390.

### C.        Leave to Amend pursuant to Rule 15

Rule 15 of the Federal Rules of Civil Procedure allows a party to amend its complaint

pursuant to the other party's written consent or the court's leave.  Fed. R. Civ. P. 15(a)(2).

Under Section 15(a)(2), a "court should freely give leave [to amend] when justice so

requires."  Fed. R. Civ. P. 15(a)(2).  Motions to amend are ultimately within the discretion of the

district court judge, *Foman v. Davis*, 371 U.S. 178, 182 (1962), who may deny leave to amend

for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing

party."  *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (citation omitted).

An amendment to a pleading is futile if the proposed claim would not withstand a motion

to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Dougherty v. North Hempstead Bd. of Zoning*

*Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citation omitted).  Amendment is futile when it is

"beyond doubt that the plaintiff can prove no set of facts in support of his amended

claims."  *Pangburn v. Culbertson*, 200 F.3d 65, 70-71 (2d Cir. 1999) (citation omitted).

Following this standard, courts accept the plaintiff's factual allegations as true and draw

reasonable inferences in favor of the plaintiff.  *Dougherty*, 282 F3d at 87.

## III.    Discussion

### A.        Dismissal Motions

Pursuant to § 1983, Plaintiffs allege that the RSL effects an unconstitutional taking in

violation of the Fifth and Fourteenth Amendments.  The Takings Clause of the Fifth

Amendment, made applicable to the states by the Fourteenth Amendment, prohibits the taking of

private property for public use without just compensation.  U.S. Const. amend. V; *Dolan v. City*

*of Tigard*, 512 U.S. 374, 383-84 (1994).

Section 1983 permits citizens to recover damages for violation of their constitutional rights by officials acting under the color of state law.  *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020).  Although § 1983 claims are typically governed by a three-year statute of limitations, the Second Circuit has found that as long as one of the acts comprising a taking occurs within the limitations period, the claim is not time-barred.  *Sherman v. Town of Chester*, 752 F.3d 554, 566-67 (2d Cir. 2014).  Because Plaintiffs allege that the passage of the 2019 Amendments renders the RSL unconstitutional, an act that is well within the limitations period, their claims are not time-barred.  Doc. 1 at ¶ 4.

In addition, Plaintiffs' taking claims are raised as both facial and as-applied constitutional challenges.  "A facial challenge is an attack on a statute itself as opposed to a particular application."  *City of Los Angeles, Cal. v. Patel*, 576 U.S. 409, 415 (2015); *see also Bucklew v. Precythe,* 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.").  Such an attack requires Plaintiffs to establish that "no set of circumstances exists under which [the RSL] would be valid[,]"  *U.S. v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *U.S. v. Salerno*, 481 U.S. 739, 745 (1987)), and is considered "the most difficult challenge to mount successfully,"  *Salerno*, 481 U.S. at 745.[6]

By contrast, an as-applied challenge "requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right."  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006).

---

[6]  Although Plaintiffs advocate for a less stringent facial challenge standard proposed by a three-Justice plurality of the Supreme Court in *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999), the Second Circuit has repeatedly declined to apply a lesser standard for facial challenges outside of the First Amendment context.  *Copeland v.* Vance, 893 F.3d 101, 110-11 (2d Cir. 2018); *see also* New *York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) ("This Court, however, has determined that, because the test set forth by the *Morales* plurality has not been adopted by the Supreme Court as a whole, we are not required to apply it.").

In accordance with these standards, the Court addresses Plaintiffs' facial and as-applied challenges in turn.

### i.       Physical Taking (Count I)

Plaintiffs allege that the RSL enacts a physical taking.  A physical taking is "paradigmatic" –  "a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Indeed, "[t]he clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use."  *Palazzolo v. R.I.*, 533 U.S. 606, 617 (2001).  A physical taking is thus considered "relatively rare, easily identified, and usually represent[s] a greater affront to individual property rights [than other kinds of taking.]"  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002).  Such a taking destroys the entire "bundle" of property rights:  possession, use, and disposal.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).  Accordingly, when the government effects a physical taking of private property for a public purpose, "it has a categorical duty to compensate the former owner[.]"  *Tahoe-Sierra*, 535 U.S. at 322.

### a.       Facial Challenge

Plaintiffs allege that the RSL effects a physical taking because it compels owners to rent their property indefinitely and limits their ability to reclaim their property or exit the market. Doc. 1 at ¶¶ 55-96, 105-06.  However, similar allegations have been repeatedly rejected by the Supreme Court and other courts in this Circuit.

In *Yee v. City of Escondido, Cal.*, mobile park owners challenged legislation limiting their right to evict tenants or convert their property for other uses as a *per se* taking.  503 U.S. 519, 524-27 (1992).  The Supreme Court rejected the mobile park owners' argument, reasoning

that "[p]ut bluntly, no government has required any physical invasion of petitioners' property." *Id.* at 528.  The mobile park owners had voluntarily made their property available to tenants and nothing in the law's terms required them to continue to do so.  *Id.* at 527-28.  The Supreme Court concluded that the law "merely regulate[d] petitioners' *use* of their land by regulating the relationship between landlord and tenant" which aligned with longstanding precedent "that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."  *Id.* at 528-29 (collecting cases).

In accordance with *Yee*, courts in this Circuit have long upheld the RSL against facial physical taking challenges because landlords have voluntarily offered their property for rent and, by the express terms of the RSL, landlords can evict unsatisfactory tenants, reclaim or convert units, or exit the market.  In *Harmon v. Markus*, the Second Circuit affirmed dismissal of a physical taking claim challenging the RSL precisely because landlords retain the rights to recover possession of a unit for immediate and compelling necessity, to demolish the building, or to evict an unsatisfactory tenant—rights that remain under the RSL even after the 2019 Amendments.  412 F. App'x 420, 422 (2d Cir. 2011) (summary order).[7]  *See also Fed. Home Loan Mortg. v. New York State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47-48 (2d Cir. 1996) ("where a property owner offers property for rental housing, the Supreme Court has held that government regulation of the rental relationship does not constitute a physical taking"); *Greystone Hotel Co. v. City of New York*, 13 F. Supp. 2d 524, 526-27 (S.D.N.Y. 1998) (holding that the RSL mandate that a hotel rent to tenants rather than serve transients paying a nightly rate

---

[7] Plaintiffs reason that, as an unpublished decision, *Harmon* has no precedential effect.  However, summary orders offer "valuable appellate guidance" and courts are not "free to rule differently in similar cases."  *U.S. v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010); *U.S. v. Tejeda*, 824 F. Supp. 2d 473, 475 (S.D.N.Y. 2010).

was not a physical taking because the rooms were voluntarily offered for tenancy); *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 87 N.Y.2d 325, 335 (N.Y. 1995) (upholding the RSL because "no new use of the property has been forced upon plaintiff, and no unconstitutional physical taking has been effectuated").

The New York Court of Appeals decision in *Rent Stabilization Ass'n of New York City, Inc. v. Higgins*, 83 N.Y.2d 156 (N.Y. 1993), is particularly instructive.  In *Higgins*, the Court of Appeals rejected a physical taking challenge to the RSL because it does not force landlords into a "new use" of their property.  *Id.* at 173.  At the time that *Higgins* was decided, like today, the RSL did not include luxury or high-income decontrol.

Most recently, the Eastern District of New York rejected a physical taking challenge to the RSL, following the 2019 Amendments, in *CHIP*, 2020 WL 5819900, at *6.  The *CHIP* Court observed that the effect of the 2019 Amendments "while significant to investment value, personal use, unit deregulation, and eviction rights, is not so qualitatively different from what came before as to permit a different outcome."  *Id.*

In opposition, Plaintiffs argue that this case is akin to the physical taking found in *Horne v. Dep't of Agriculture*, 576 U.S. 350 (2015).  In *Horne*, the Supreme Court found a law that mandated that raisin growers set aside part of their crop for the government *gratis* was a physical taking.  *Id.* at 354-55, 362.  The *Horne* Court reasoned that the law was a "clear physical taking" because it gave the government the full "bundle" of property rights "to possess, use, and dispose of" their subset of raisins.  *Id.* at 361-62 (citation omitted).  However, unlike the law in *Horne*, the RSL does not transfer possession or disposal rights from landlords.  *CHIP,* 2020 WL 5819900, at *6 (citation omitted).

17

Plaintiffs further contend that the RSL is a physical taking because it forces them to rent to successors who are relative strangers.  This argument fails for two reasons.  *First*, as defined, successors are not strangers; they must have lived with the original tenant for one to two years and must be identified upon the landlords' request.  §§ 2523.5(b), 2523.5(e).  *Second*, even if successors were strangers, the RSL is not a physical taking as long as it only forces new tenants, not a new use.  *Higgins*, 83 N.Y.2d at 173 (finding no physical taking where "the challenged regulations may require the owner-lessor to accept a new occupant but not a new use of its rent-regulated property").

Although Plaintiffs complain that the RSL constitutes a physical taking by restricting their reversionary interests because conversion, eviction and vacancy are up to the tenant, not the owner, the same was true in all of the cases where the RSL has been upheld.  *See, e.g., Higgins*, 83 N.Y.2d at 171-73 (finding that, given the right to evict under the RSL, "the tenancies are not perpetual" and "the owners are not deprived of their reversionary interest").  More recently, in *Elmsford Apartment Assocs., LLC v. Cuomo*, Chief Judge Colleen McMahon rejected the physical taking challenge to an executive order temporarily halting eviction proceedings for nonpayment of rent during the COVID-19 pandemic.  469 F. Supp.3d 148, 163 (S.D.N.Y. 2020).  Relying on *Yee*, the *Elmsford* Court reasoned that even a restriction that goes as far as a temporary moratorium on evictions for nonpayment of rent is not a physical taking.  *Id.*

Plaintiffs' further argue that *Yee* does not grapple with how restrictive the RSL can be on exiting the market before the law becomes a physical taking.  However, whether exit options provided by the law are impossible to pursue is not the proper subject of a facial challenge.  And, although Plaintiffs suggest that the RSL makes it practically impossible to change the use of their rent-stabilized units or otherwise exit the market, Plaintiffs do not allege that any of them have

actually "run th[e] gauntlet" required to pursue either path.  *Yee*, 503 U.S. at 528; *see infra* Part III.A.i.b.

To the extent Plaintiffs argue that landlords cannot exit the market because it is prohibitively expensive, the Second Circuit has held that "economic hardship is not equivalent to legal compulsion for purposes of takings analysis."  *Garelick v. Sullivan,* 987 F.2d 913, 917 (2d Cir. 1993).

Finally, despite Plaintiffs' argument to the contrary, the RSL is not permanent.  Under the LEHRCA and ETPA, the City reevaluates the housing supply and vacancies every three years to determine if the vacancy rate is below the statutory threshold for a housing emergency triggering continued regulation.  In 2017, the City extended the RSL because the vacancy rate was 3.63%, below the 5% threshold set forth in § 8623.  *See supra* n.1.

Accordingly, Plaintiffs' facial physical taking claim is dismissed.

### b.      As-Applied Challenge

Plaintiffs' allegations supporting their as-applied physical taking challenges are sparse. Plaintiffs 335-7, 431, and 226 allege that they can no longer screen tenants using landlord-tenant litigation history.  Doc. 1 at ¶ 77c.  Plaintiff 699 alleges that demolition is not feasible because its building is fully tenanted.  Doc. 1 at ¶ 46e.  However, neither of these limitations locks Plaintiffs out of screening their tenants or leaving the rental market.  Plaintiffs can still screen potential tenants by credit report, § 238-a(1)(b), and can evict tenants for several types of unsatisfactory behavior, § 2524.3.  Plaintiffs also always have the option to sell their buildings as FGP did. *Yee*, 503 U.S. at 529 ("When a landlord decides to rent his land to tenants, the government may . . . require the landowner to accept tenants he does not like") (citation omitted); *Harmon*, 412 F. App'x at 422 (upholding RSL against a taking challenge in part because the law did not prevent

exiting the market); *Higgins*, 83 N.Y.2d at 172 ("Indeed, once a property owner decides to rent

to tenants, the antidiscrimination laws eliminate an owner's unfettered discretion in rejecting

tenants").  Plaintiffs' as-applied physical taking claims are therefore dismissed.

### ii.    Regulatory Taking (Count II)

Plaintiffs allege that the RSL effects a regulatory taking.  Doc. 1 at ¶¶ 107-53.  A

regulatory taking arises from "some public program adjusting the benefits and burdens of

economic life to promote the common good."  *Tahoe*, 535 U.S. at 324-25 (*Penn Central Transp.*

*Co. v. City of New York*, 438 U.S. 104, 124 (1978)).  The Supreme Court has warned that a

regulatory taking must not be treated as a categorical physical taking because it "would

transform government regulation into a luxury few governments could afford."  *Tahoe*, 535 U.S.

at 324.  Indeed, "[g]overnment hardly could go on if to some extent values incident

to property could not be diminished without paying for every such change in the general law."

*Dolan*, 512 U.S. at 384-85 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413

(1922)).

As Justice Holmes explained, however, "while property may be regulated to a certain

extent, if a regulation goes *too far* it will be recognized as a taking."  *Palazzolo*, 533 U.S. at 617

(quoting *Pennsylvania Coal*, 260 U.S. at 415) (emphasis added).  In defining "too far," the

Supreme Court has said that a regulatory scheme governing private property "may, in some

instances, be so onerous that its effect is tantamount to a direct appropriation or ouster."  *Lingle*,

544 U.S. at 537.  The "doctrine of regulatory takings [thus] 'aims to identify regulatory actions

that are functionally equivalent to the classic taking.'"  *Stop the Beach Renourishment, Inc. v.*

*Florida Dep't of Env't Prot.*, 560 U.S. 702, 713 (2010)  (citing *Lingle*, 544 U.S. at 539).

The Supreme Court has identified three species of regulatory taking. *Lingle*, 544 U.S. at 538-39. *First,* a "total regulatory taking[]" occurs when "regulations . . . completely deprive an owner of *all* economically beneficial us[e] of her property." *Id.* at 538 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). Such a categorical regulatory taking occurs under "narrow" circumstances. *Lingle*, 544 U.S. at 538. *Second*, a "special" category of regulatory taking, a land-use exaction, arises when the "government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." *Id.* at 546 (citing *Dolan*, 512 U.S. at 379-80 and *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 828 (1987)). The test governing land-use exactions asks whether "the exaction would substantially advance the same government interest that would furnish a valid ground for denial of the permit" and demands the easement be "rough[ly] proportiona[l] . . . both in nature and extent to the impact of the proposed development." *Lingle*, 544 U.S. at 547 (citing *Nollan*, 483 U.S. at 834 and *Dolan*, 512 U.S. at 391).

*Finally*, all other regulatory taking claims are governed by the considerations described in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978). *Lingle*, 544 U.S. at 538. The *Penn Central* factors include "[t]he economic impact of the regulation**"** on the plaintiff, "the extent to which the regulation has interfered with [plaintiff's] distinct investment-backed expectations[,]" and "the "character of the governmental action." *Id.* at 538 (quoting *Penn Central*, 438 U.S. at 124). The *Penn Central* test requires "examination of the justice and fairness of the governmental action[,]" "does not lend itself to any set formula," and is largely "ad hoc and fact intensive." *Eastern Enters. v. Apfel*, 524 U.S. 498, 523 (1998) (plurality opinion) (citations omitted). The Court will address each test in turn.

###### a.      Facial Challenge

This case does not fit the "narrow" category of *per se* regulatory taking.  The Second Circuit has long held that the RSL does not "deprive [landlords] of economically viable use of the property."  *Fed. Home Loan Mortg*, 83 F.3d at 48; *see also Greystone*, 13 F. Supp. 2d at 528 (same).  Most recently, the *Elmsford* Court found that even a moratorium on evictions does not qualify as a categorical regulatory taking because "landlords can continue to accept rental payments from tenants not facing financial hardship, while also covering the cost of ownership by collecting security deposit funds from consenting tenants who have been affected by the pandemic."  469 F. Supp.3d at 164.  Even following the 2019 Amendments, the RSL does not strip landlords of all economic enjoyment of their rent-stabilized properties because they still collect rent from their tenants and, to the extent their rental income does not exceed their operating costs, they may seek hardship exemptions.  They may also convert or sell their buildings.

The land-use exaction standard is also inapplicable to this case.  Plaintiffs' claims do not arise from the "special context" of government easements in exchange for permits and the Supreme Court has declined to extend land-use exaction cases to any other context.  *Lingle*, 544 U.S. at 547 (citation omitted); *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999) ("we have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use").

The Court must therefore apply the *Penn Central* analysis to Plaintiffs' claims.  Although facial challenges brought under the Takings Clause "face an uphill battle,"[8] and courts have

---

[8]  *Elmsford*, 469 F. Supp.3d at 165 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedectis*, 480 U.S. 470, 495-96 (1987)).

suggested that the *Penn Central* test is ill-suited to a facial constitutional challenge because of its "ad-hoc" nature,[9] courts in this Circuit have applied the *Penn Central* factors in rejecting facial challenges to the RSL.  *CHIP*, 2020 WL 5819900, at *7-8 (dismissing facial regulatory challenge to the RSL under *Penn Central* analysis); *Higgins*, 83 N.Y.2d at 173-74 & n.4.

Plaintiffs' allegations fail to satisfy any of the *Penn Central* factors.  With respect to the first factor, Plaintiffs argue that rent increases authorized by the Rent Guidelines Board are not commensurate with operating costs, which reduces the value of buildings with rent-stabilized units.  However, the Second Circuit has "rejected the notion that loss of profit—much less loss of a reasonable return—alone could constitute a taking."  *Park Ave. Tower Assocs. v. City of New York*, 746 F.2d 135, 139-40 (2d Cir. 1984) (collecting cases rejecting taking claims where property value diminished from 75 to 90%); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) ("mere diminution in the value of property, however serious, is insufficient to demonstrate a taking"); *Fed. Home Loan Mortg.*, 83 F.3d at (denying regulatory taking claim because "[a]lthough [plaintiff] will not profit as much as it would under a market-based system, it may still rent apartments and collect the regulated rents. "); *Rent Stabilization Ass'n of New York City, Inc. v. Dinkins*, 805 F. Supp. 159, 163 (S.D.N.Y. 1992).  A landlord is "not guaranteed a reasonable return on its investment" and "lack of profit does not establish a regulatory taking if the property use allowed by the regulation is sufficiently desirable to permit property owners to sell the property to someone for that use."

---

[9]  In *W.95 Hous. Corp. v. New York City Dep't of Hous. Pres. and Dev.*, the Second Circuit noted "the difficulty of such an assessment suggests that a widely applicable rent control regulation such as the RSL is not susceptible to facial constitutional analysis under the Takings Clause."  31 F. App'x 19, 21 (2d Cir. 2002); *see also Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*, 452 U.S. 264, 294-95 (1981) ("the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary").

*Greystone*, 13 F. Supp. 2d at 528 (citation omitted).  Indeed, Plaintiffs have "no constitutional right to what [they] could have received in an unregulated market."  *Id.*

Plaintiffs also cannot argue that the 2019 Amendments interfered with their reasonable investment-backed expectations.  Rent regulation has existed in some form in the City for over seventy years, and rent stabilization in particular has existed for over fifty years.  Plaintiffs knowingly entered a highly regulated industry.  "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."  *Concrete Pipe*, 508 U.S. at 645 (citation omitted); *see also Regina Metro.*, 35 N.Y.3d at 369 ("no party doing business in a regulated environment like the New York City rental market can expect the RSL to remain static").

The third *Penn Central* factor, the character of the regulation, also weighs in favor of dismissal.  In *Penn Central*, the Supreme Court upheld a New York law that restricted renovations to landmark properties in part because the law was a "comprehensive plan" that applied to over 400 sites.  *Penn Central*, 438 U.S. at 132.  The Supreme Court relied on the legislature's conclusion that the law benefitted all New Yorkers economically and improved their quality of life.  *Id*. at 134-35.  Like the statute at issue in *Penn Central*, the RSL is a longstanding and far reaching regulatory scheme that benefits all New Yorkers.  The RSL applies to over 1 million rent-stabilized apartments.  Based on triennial housing and vacancy surveys, the City Council has repeatedly declared a housing emergency justifying extension of the RSL finding that "unless residential rents and evictions continue to be regulated and controlled, disruptive practices and abnormal conditions will produce serious threats to the public health, safety and general welfare[.]"  § 26-501.  The RSL thereby aids community stability and diversity to the benefit all New Yorkers, including Plaintiffs. *Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992) ("[T]he

State has a legitimate interest in local neighborhood preservation, continuity, and stability."). And, as the Supreme Court recognized in *Pennell v. City of San Jose*, "we have long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare."  485 U.S. 1, 13 (1988).

In opposition, Plaintiffs argue that this Court should instead ask whether the RSL "substantially advance[s] legitimate state interests[,]" a regulatory taking test Justice Scalia relied on in his *Pennell* dissent.  *Pennell*, 485 U.S. at 18 (Scalia, J., concurring in part and dissenting in part) (citing *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)).  The *Pennell* majority declined to evaluate the rent control ordinance at issue because the taking claim was premature.  485 U.S. at 9-10.  In dissent, Justice Scalia explained that he would have found the rent control ordinance invalid under *Agins* because it allowed an additional rent decrease for hardship, which would "establish a welfare program privately funded by those landlords who happen to have 'hardship' tenants."  485 U.S. at 18 (Scalia, J., concurring in part and dissenting in part).  However, the *Agins* "substantially advances" test was affirmatively rejected in *Lingle*, 544 U.S. at 545 ("we conclude that the 'substantially advances' formula announced in *Agins* is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation").  In any event, even if the test did apply, it would not invalidate the RSL.  As even Justice Scalia's dissent noted, rent regulation is generally constitutional "[s]ince the owner's use of the property is (or, but for the regulation, would be) the source of the social problem, it cannot be said that he has been singled out unfairly."  *Pennell*, 485 U.S. at 20 (Scalia, J., concurring in part and dissenting in part).

Plaintiffs further argue, based on *In re Santiago-Monteverde*, that the RSL benefits only an arbitrary subset of tenants to the detriment of landlords.  24 N.Y.3d 283, 290 (N.Y. 2014).

But in *Santiago-Monteverde*, the New York Court of Appeals determined that rent-stabilization was a public assistance benefit that would be exempted from bankruptcy proceedings, not whether the RSL was improperly shifting wealth from landlords to tenants. *Id.* at 287. That the RSL may benefit some tenants and burden some landlords does not make it a taking given that "[l]egislation designed to promote the general welfare commonly burdens some more than others." *Penn Central*, 438 U.S. at 133.

In addition, the New York Court of Appeals, applying the "substantially advances" test, held in *Higgins* that the RSL is not a regulatory taking because it does not lead to perpetual tenancy, owners maintain reversionary interests, and there is a close causal nexus between the law and its aim to prevent eviction and homelessness. 83 N.Y.2d at 173-74. Just like the version of the RSL at issue in *Higgins*, the RSL after the 2019 Amendments lacks high-income and luxury decontrol provisions, but continues to permit landlords to collect rent, seek hardship exemptions based on need, recapture an apartment for personal or business use, convert units, evict their tenants, and sell their buildings, while also protecting tenants against eviction and homelessness.

Accordingly, Plaintiffs' facial regulatory challenge to the RSL is dismissed.

### b.    As-Applied Challenge

Plaintiffs also make four as-applied regulatory challenges. Plaintiffs 335-7, 431, and 226 allege that they lost a total of $227,000 on their rent-stabilized units in 2019. Doc. 1 at ¶ 136. In particular, 335-7 estimates that it will recoup only $291,000 of the $370,000 it spent on major capital improvements for its rent-stabilized units, and 226 and 431 allege that they could collect rents 2.5% higher for their units if they were unregulated. *Id.* at ¶¶ 117, 126. FGP alleges that it made $900,000 less in profit from selling its building after passage of the 2019 Amendments. *Id.*

at ¶ 122.  Because Plaintiffs do not allege that they have sought financial hardships, however, their claims are not ripe and cannot be considered by this Court.

"Ripeness is a constitutional prerequisite to exercise of jurisdiction by the federal courts." *Nat'l Org. for Marriage, Inc. v. Walsh,*, 714 F.3d 682, 687 (2d Cir. 2013) (citing *Nutritional Health All. v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998)).  "A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)).  A regulatory taking claim alleging that the law "go[es] too far in burdening the property" requires "follow[ing] reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law."  *Palazzolo*, 533 U.S. at 620-21.  Otherwise, the claim is not ripe.  *Id.  See also Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985) ("a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."), *rev'd on other grounds*, *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162, 2169 (2019).

Plaintiffs argue that the Supreme Court in *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162 (2019), invalidated the finality requirement set forth in *Williamson*.  In *Williamson*, the Supreme Court declined to consider whether application of a zoning law to a landowner's tract constituted a taking because the claim was premature.  *Williamson*, 473 U.S. at 193-94.  The Supreme Court explained that, because the landowner could still seek a variance from the governing commission but had not yet done so, the claim was not yet final.  *Id.*  The Supreme

Court further found that the taking claim was not yet ripe because the property owner had failed

to seek compensation from the State.  *Id.* at 194.  Contrary to Plaintiffs' argument, however, in

*Knick*, the Supreme Court reversed *Williamson* only to the extent of finding that the property

owner need not seek compensation from the State before raising a taking claim in federal court

and expressly "d[id] not question the validity of th[e] finality requirement."  *Knick*, 139 S. Ct. at

2169.  *See also Sagaponack Realty, LLC v. Vill. of Sagaponack*, 778 F. App'x 63, 64 (2d Cir.

2019) (citing *Knick*, 139 S. Ct. at 2169) (summary order) ("*Knick* leaves undisturbed the first

prong [of *Williamson*], that a state regulatory agency must render a final decision on a matter

before a taking claim can proceed.").

The RSL provides for hardship exemptions if the fair rent increase does not allow

landlords to maintain the same average annual net income, or the landlords' annual gross rent

income does not exceed the annual operating expenses by 5% gross rent.  §§ 26-511(c)(6), 26-

511(6-a).  Because none of the Plaintiffs allege seeking hardship exemptions despite

complaining of loss of profit, their as-applied challenges are unripe.  *Harmon v. Markus,* No. 08

Civ. 5511 (BSJ), 2010 WL 11530596, at *3 (S.D.N.Y.  Mar. 1, 2010), *aff'd,* 412 F. App'x 420

(2d Cir. 2011) (summary order) (finding landlords' Fifth Amendment challenge to the RSL

unripe because they had not filed for hardship exemptions); *see also Hodel*, 452 U.S. at 297

(finding taking claim unripe because owners had not sought a variance or waiver).

Even if Plaintiffs' as-applied challenges were ripe, they would not succeed.

To the extent FGP sold its building for $900,000 less than it was offered before the 2019

Amendments were enacted, a 33% decrease in the sale price is not a taking as a matter of law.

*Park Ave.*, 746 F.2d at 139-40 (citing cases rejecting taking claims where property value

diminished from 75 to 90%).  FGP's claim would also fail because the property was sold and

therefore "sufficiently desirable" to buyers who want to continue in the rent regulated market. *Greystone*, 13 F. Supp. 2d at 528 (citation omitted).

Plaintiffs 335-7, 431, and 226 own buildings where a majority of the units are unregulated.  That they claim to have lost $227,000 across their 35 rent-stabilized units, amounting to less than $7,000 lost per apartment, or that 226 and 431 could obtain higher rent if their rent-stabilized apartments were decontrolled, is insufficient to support a regulatory taking claim.  Loss of profit alone does not constitute a taking.  *Park Ave.*, 746 F.2d at 139.  Plaintiffs also have no constitutional right to an unregulated market.  *Greystone*, 13 F. Supp. 2d at 528 (citation omitted).  This reasoning is especially persuasive when each of these Plaintiffs can collect unregulated rent from the majority of the units in their buildings.

Finally, 335-7 estimates that it lost $79,000 in major capital improvements to its rent-stabilized units made in reliance on prior RSL provisions.  Aside from the speculative nature of the claim, 335-7's allegation also fails because "no party doing business in a regulated environment like the New York City rental market can expect the RSL to remain static[.]" *Regina Metro.*, 35 N.Y.3d at 369.  Moreover, because it is a mixed building, 335-7 can raise rents in the majority of its units to cover its overhead costs.

Accordingly, Plaintiffs' as-applied regulatory taking challenges are dismissed.

### iii.      Confiscatory Taking (Count III)

Plaintiffs allege that the RSL is a confiscatory taking under the Fifth and Fourteenth Amendments.  Doc. 1 at ¶¶ 154-67.  The confiscatory taking analysis arises in the context of private companies statutorily required to provide public utilities, which "creates its own set of questions under the Takings Clause of the Fifth Amendment." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989).  In such public utilities cases "[t]he guiding principle has been that the

Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory." *Id.* (citation omitted). "If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an end." *Id.* at 310 (citation omitted). Determining whether a rate is unjust or unreasonable "will depend to some extent on what is a fair rate of return given the risks under a particular rate-setting system, and on the amount of capital upon which the investors are entitled to earn that return." *Id.*

The confiscatory taking analysis is inapplicable to the RSL. Landlords of rent-stabilized apartments are not public utility companies. Nor are they compelled to enter, or remain, in the rent-stabilization market. "[W]here a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking." *Garelick*, 987 F.2d at 916.

Plaintiffs argue that they are compelled to remain in the rent-stabilization market because the RSL prevents fair return on their investment. However, on the face of the RSL, there are several ways for landlords to exit the market even if rent-stabilization reduces the value of their investment. In *Bowles v. Willingham*, the Supreme Court upheld a rent control statute precisely because the statute did not require that they partake in or stay in the rent control market, even though the statute "may reduce the value of the property regulated." 321 U.S. 503, 517 (1944).

Accordingly, Plaintiffs' confiscatory taking claim is dismissed.

### iv.   Taking for Non-Public Use (Count IV)

Plaintiffs allege that the RSL enforces a taking for non-public use because it has not improved the housing emergency it is meant to alleviate, and reduces tax revenue. Doc. 1 at ¶¶ 168-226. Because Plaintiffs have insufficiently alleged a taking, this claim must fail. *See supra*

Parts III.A.i-iii.  Even if there had been a taking, however, this claim would still fail as Plaintiffs'

argument runs contrary to longstanding Supreme Court precedent.

In *Kelo v. City of New London, Conn.*, the Supreme Court upheld a city's revitalization

plan, rejecting the argument that economic development does not satisfy the Fifth Amendment's

public use requirement. 545 U.S. 469, 484-85 (2005).  The *Kelo* Court explained that, "[f]or

more than a century, our public use jurisprudence has wisely eschewed rigid formulas and

intrusive scrutiny in favor of affording legislatures broad latitude in determining what public

needs justify the use of the takings power."  *Id.* at 483.  The *Kelo* Court further explained that the

city's "determination that the area" sought to be condemned "was sufficiently distressed to

justify a program of economic rejuvenation is entitled to our deference" and that "[p]romoting

economic development is a traditional and long-accepted function of government."  *Id.* at 483-

84.  *See also Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 241-42 (1984) (finding elimination of

a land oligopoly is a public use).  The establishment of affordable public housing, which applies

to approximately 1 million apartments across the City, is a "well-established" public use.

*Goldstein v. Pataki*, 516 F.3d 50, 58-59 (2008).

Plaintiffs' public use claim is thus dismissed.

### B.      Intervention Motion

Because Plaintiffs' complaint has been dismissed in its entirety, 312's motion to

intervene is denied as moot.  *Marshal v. Original Drifters, Inc.*, No. 19 Civ. 7035 (PGG), 2020

WL 1151564, at *6 n.8 (S.D.N.Y. Mar. 10, 2020) (collecting cases).  In any event, 312's motion

was also untimely.  *Nat'l Ass'n for the Advancement of Colored People v. New York*, 413 U.S.

345, 367-69 (1973) (finding untimely intervention motion filed "over three months" after

complaint).

**C.      Leave to Amend**

For the reasons set fort above, Plaintiffs are denied leave to amend their claims because amendment would be futile.  *See supra* Parts III.A.i-iv.

**IV.      Conclusion**

For all of these reasons, Defendants' motions to dismiss are granted.  Proposed-Intervenor 312's motion to intervene is denied as moot.  The Clerk is directed to terminate the motions, Docs. 60, 62, 64, and 81, and close the case.

SO ORDERED.

Dated:     March 8, 2021
               New York, New York

                                                                 _____
                                                                 Edgardo Ramos, U.S.D.J.